No. __25A01059_____

**STATE COURT OF DEKALB COUNTY**
**GEORGIA, DEKALB COUNTY**

**Date Summons Issued and E-Filed**

2/18/2025

**SUMMONS**

_____
/s/ Mundy Jackson
_____

Deputy Clerk

Deposit Paid $ _____

MALACHI CARTER
_____

Plaintiff's name and address
_____

**[ ] JURY**

**vs.**

PHANTOM FIREWORKS EASTERN REGIONS, LLC
_____
PHANTOM FIREWORKS SHOWROOMS, LLC and PHANTOM
IMPORTIN AND DISTRIBUTING, LLC
_____
Defendant's name and address

**TO THE ABOVE-NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of State Court, Suite 230, 2nd Floor, Administrative Tower, DeKalb County Courthouse, 556 N. McDonough Street, Decatur, Georgia 30030 and serve upon the plaintiff's attorney, to wit:
____MAX COMPTON, ESQ._____
Name
____501 RIVERSIDE DR., SUITE 1200, JACKSONVILLE, FL 32202_____
Address
____912-443-1017_____380092_____
Phone Number                              Georgia Bar No.

an **ANSWER** to the complaint which is herewith served upon you, within thirty (30) days after service upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. The answer or other responsive pleading can be filed via electronic filing through eFileGA via www.eFileGA.com or, if desired, at the e-filing public access terminal in the Clerk's Office at 556 N. McDonough Street, Decatur, Georgia 30030

_____     _____
Defendant's Attorney                         Third Party Attorney
_____     _____
Address                                      Address
_____     _____
Phone No.              Georgia Bar No.        Phone No.          Georgia Bar No.

**TYPE OF SUIT**

☐ Personal Injury ☒ Products Liability
☐ Contract ☐ Medical Malpractice
☐ Legal Malpractice ☐ Product Liability
☐ Other

Principal $ _____

Interest $ _____

Atty Fees $ _____

**Access to the e-filing site and the rules is available at www.dekalbstatecourt.net**
**To indicate consent to e-service check the box below.**
☒(Plaintiff consents to e-service pursuant to OCGA 9-11-5 (f). The email address for service appears in the complaint.**

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**MALACHI CARTER**

        **Plaintiff,**

**v.**

**PHANTOM FIREWORKS EASTERN
REGIONS, LLC; PHANTOM
FIREWORKS SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,**

        **Defendants.**

**CIVIL ACTION FILE NO.**
25A01039
_____

**JURY TRIAL DEMANDED**

---

## COMPLAINT

COMES NOW the Plaintiff, Malachi Carter, by and through his undersigned counsel, hereby file this Complaint against Defendants PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC for the claims stated herein. In support thereof, the Plaintiff states as follows.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this civil action to recover for the damages and injuries he sustained from an unreasonably dangerous and defective firework ("Subject Firework") designed, manufactured, imported, tested, distributed, inspected, and sold by Defendants according to their manufacturing plan and under their control. Specifically, the Subject Firework suddenly malfunctioned exploding upon being ignited in accordance with its federally mandated instructions for use. This "blowout" and/or "burnout" event itself establishes the product was sold in violation

STATE COURT OF
DEKALB COUNTY, GA.
2/17/2025 4:07 PM
E-FILED
BY: Mundy B Jackson

of federal law.

2.      The malfunctioning Subject Firework caused a devastating injury to Plaintiff, the end user of the product. A photo of Plaintiff's sever injuries is provided below:



3.      The Plaintiff sues Defendants for their role in negligently designing, manufacturing, testing, importing, distributing, supplying, inspecting, and handing of the Subject Firework and their respective rolls in the introduction of the defective Subject Firework into commerce causing the incident and Plaintiff's injuries. Plaintiff further sues Defendants for negligence *per se* because the sale of a firework that explodes upon ignition is due to either a blowout or burnout failure which itself establishes a violation of federal and state law meant to protect end users from non-compliant fireworks. These statutes and regulations provide a series of mandatory duties that Defendants agreed and were required to comply with. Thus, the very event at issue establishes a breach of these duties a matter of law as because the sudden explosion itself violates the criminal statutes and regulations that are designed to protect consumers from dangerous fireworks like the Subject Firework.

**THE PARTIES JURISDICTION & VENUE**

4.      The State Court of DeKalb County, Georgia has subject-matter jurisdiction over the matters complained of and the causes of action alleged herein because DeKalb County is the place where the injury occurred.

5.      At the time of the incident giving rise to this Complaint, Plaintiff, Malachi Carter ("Malachi"), was a Georgia resident and citizen who lived in Dekalb County, Georgia.

6.      Defendant Phantom Fireworks Eastern Regions LLC is a foreign limited liability company registered in Delaware that is registered to do business in Georgia. Defendant Fireworks Eastern Region LLC may be served with process through its registered agent Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corner, GA, 30092.

7.      Defendant Phantom Fireworks Showrooms LLC is a foreign limited liability company registered in Delaware that is registered to do business in Georgia. Defendant Fireworks Showrooms LLC may be served with process through its registered agent Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corner, GA, 30092.

8.      Defendant Phantom Importing and Distributing LLC is a foreign limited liability company registered in Delaware. Defendant Fireworks Showrooms LLC may be served with process through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808.

9.      This Court has general jurisdiction over Defendants Phantom Fireworks Eastern Regions LLC and Phantom Fireworks Showrooms LLC as they are registered to do business in Georgia and their registered agent is located within Gwinnett County, Georgia. *Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 431, 863 S.E.2d 81, 88 (2021) ("we held that any corporation that is authorized to do business in Georgia is subject to the general jurisdiction of Georgia's

courts") (*citing Allstate Ins. Co. v. Klein*, 262 Ga. 599, 599, 422 S.E.2d 863, 864 (1992), *approved of in Mallory v. Norfolk S. Ry. Co.,* 600 U.S. 122, 127 (2023) (citing the Pennsylvania Supreme Court and Georgia Supreme Court's conflicting rulings on general jurisdiction by registration and affirming the reasoning in *Klein*). State law requires that all sellers of fireworks comply with Georgia's firework standards and federal law.

10.     This Court has personal jurisdiction over Phantom Importing and Distributing LLC as this Defendant designs, imports, tests, and distributes every consumer product sold at Phantom Firework stores in Georgia. Phantom Importing and Distributing LLC controls the testing, manufacture, distribution and sale of all Phantom fireworks in the State of Georgia. The complete control of the manufacturing process makes Phantom Importing and Distributing LLC the de facto manufacturer of Phantom fireworks products distributed to its Phantom storefronts in Georgia. As such Defendants actions outlined in greater detail below constitute both transacting business within this state and committing tortious injuries in this state under the Georgia Long Arm Statute.

11.     Further, the exercise of jurisdiction over Phantom Importing and Distributing LLC is proper under both the Georgia Long Arm Statute and the U.S. Constitution because Phantom Importing and Distributing LLC intended that the products they oversee will be ultimately purchased from the Phantom stores they have established in Georgia and used by Georgia consumers like the Plaintiff. *LG Chem, Ltd. v. Lemmerman*, 863 S.E.2d 514, 521 (Ga. Ct. App. 2021). Thus, Phantom Importing and Distributing LLC purposefully availed themselves of Florida law and jurisdiction is proper.

12.     The torts, wrongs, and injuries complained of herein occurred in Gwinnett County, Georgia.  Venue is thus proper in Gwinnett County, Georgia pursuant to O.C.G.A. § 14-2-510(3) and (4).

Exhibit A

## FACTUAL ALLEGATIONS

13.     Plaintiff Malachi Carter is a Georgia resident who used the Subject Firework, a Phantom brand multishot firework called the "Bombilation," to celebrate the Fourth of July holiday.

14.     The Subject Firework is a multishot firework sometimes referred to as a cake.

15.     The Subject Firework was designed, manufactured, marketed, distributed and sold by the Defendants who control the sourcing of the firework from Chinese suppliers and controls the designing, manufacturing, packaging, testing, labeling, certification, and sale of the Subject Firework. Thus, Defendants are in fact the legal manufacturers of the Subject Firework.

16.     Defendants certified that the Subject Firework would comply with federal and state law and agreed to be accountable for the Subject Firework's compliance with federal and state law.

17.     Per federal law the Subject Firework's instructions state to place the firework on a flat, hard surface, light the firework and get away. *See* 16 C.F.R. 1500.14(b)(7). Under federal law, upon ignition the Subject Firework is supposed to then shoot nine flaming balls into the sky.

18.     Also according to federal law a multishot firework that suddenly explodes upon ignition when used following the required federal instructions violates federal law. A firework that suddenly explodes when ignited also violates parallel Georgia state law which incorporates these federal standards. In turn, the Subject Firework's was at all times required to not suddenly explode and all of its discharges of pyrotechnic material were required to be shot only from the intended orifices at the end of the 9 tubes.

19.     On July 4, 2024, after placing the Subject Firework on flat ground and following the federally required instructions, the Subject Firework suddenly malfunctioned. Specifically,

Exhibit A

the Subject Firework immediately exploded before Plaintiff had any change to get away. The

result of the explosion caused serious and permanent injury to the Plaintiff.

20.    This event is known as a blowout and/or burn out event, which by definition

shows that the Subject Firework failed to comply with federal law and Georgia law which

incorporates federal law.

21.    "Any burning through the bottom or sides or any unintended rupture of the casing

through the bottom or side of an item constitutes a burnout or blowout." Consumer Fireworks

Testing Manual, 2006 WL 4888941, at *9-*10. A "[b]lowout" occurs "when the walls of the

device rupture or the nozzles and/or end plugs in the tubes are ejected while the device is

functioning." *See id.* A "burnout" occurs "[w]hen burning pyrotechnic material burns a hole

through the sidewall…" *See id*. A blowout or burnout is "determined by either observing the

device as it functions, or by examining the spent device." *See id*. These events are classified as

"malfunctions" by the CPSC.

22.    From the carcass of the Subject Firework, it is clear that a blowout and/or burnout

event occurred:

Exhibit A



23.    Just from the photo above, even though the pyrotechnic material was only

supposed to escape from the end of the tube, the explosion was so great that the tubes themselves

no longer exist. Thus, the Subject Firework failed to properly operate was illegally under both

federal and state law. In turn, the photo above shows that the Defendants to manufactured,

imported, distributed and sold the Subject Firework in a defective condition.

24.    Thus, because the Subject Firework malfunctioned during ordinary use, there is

an inference under Georgia law that the Subject Firework was defective.

25.    As a result of the violative and defective Subject Firework's malfunction, Malachi

sustained permanent and life altering injuries including facial injuries, burn injuries, dental

injuries, hearing loss and/or a traumatic brain injury.

26.    Other feasible designs existed that would have prevented this type of malfunction

and prevented this incident. Defendant ignore other feasible designs that would substantially

reduce the likelihood of explosion.

27.    Further Defendants had a duty to adequately test their fireworks to ensure the

<span style="color:red">Exhibit A</span>

Subject Firework would be safe for use.

28.    Through adequate testing protocols, Defendants knew or should have known that the Subject Firework was defectively designed and/or defectively manufactured making it susceptible to this exact type of malfunction when used for its intended purpose.

29.    Defendants recklessly and maliciously disregarded proper testing standards. Defendants have repeatedly become aware that non-compliant fireworks were being placed on the market leading to blowout and burnout events as well as tipovers due to their improper manufacturing. Defendants were aware that the industry testing implemented was insufficient to protect the public from defective fireworks.

30.    Because Defendant failed to take any adequate steps to alter their testing regime after being made aware of these prior events, it was likely to continuously sell fireworks in a defective condition posing a threat to end users. This event was simply the culmination of the Defendants' careless and reckless disregard for the safety of end users.

31.    The Subject Firework's defective design, and/or defective manufacture was a proximate cause of Plaintiff's injuries.

32.    Defendants are strictly liable for the defective nature of the Subject Firework and are liable for their negligent acts and omissions that allowed the defective Subject Firework to be introduced into the stream of commerce.

33.    Defendants were negligent as a matter of law due to the violative nature of the Subject Firework and are liable for negligence per se.

## COUNT I—STRICT LIABILITY
### (Malachi Against all Defendants)

34.    Malachi re-alleges and incorporates paragraphs 1 through 33 of this Complaint as if fully stated herein.

<span style="color:red">Exhibit A</span>

35.    Defendants are responsible for manufacturing, designing, distributing, and selling the Subject Firework and for otherwise placing the Subject Firework into the stream of commerce.

36.    The Subject Firework, the Subject Firework was defective in its design and/or manufacture.

37.    The Subject Firework was susceptible to malfunctions during use that would cause a blowout or burnout upon ignition endangering any user or bystander near the product..

38.    The propensity to malfunction was the result of the defective design and/or manufacture of the Subject Firework that failed to ensure that the components of the Subject Firework were safe for use.

39.    Ordinary consumers would not expect the internal components of the Subject Firework to suddenly explode upon ignition during ordinary use.

40.    The sudden explosion of the Subject Firework frustrates the expectations of the ordinary consumer.

41.    Alternative designs existed that would prevent this type of malfunction and/or mitigate this type of malfunction without substantially altering its utility.

42.    Because the Subject Firework malfunctioned during ordinary use, there is an inference under Georgia law that the Subject Firework was defective.

43.    The Subject Firework's defective conditions rendered it unreasonably dangerous for its intended and foreseeable uses.

44.    The Subject Firework's defective conditions were each a proximate cause of Malachi's injuries and damages.

**WHEREFORE**, Plaintiff, MALACHI CARTER, demands judgment against Defendants for all injuries and damages sustained as a result of the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, loss of consortium, mental anguish, emotional distress, pain and suffering, costs, and interest, and for any such further relief as the Court deems appropriate.

### COUNT II—NEGLIGENCE
### (Malachi Against all Defendants)

45.     Malachi re-alleges and incorporates paragraphs 1 through 33 of this Complaint as if fully stated herein.

46.     Defendants are responsible for designing, manufacturing, testing, distributing and selling the Subject Firework, and for otherwise placing the Subject Firework into the stream of commerce.

47.     Defendants had a duty to design, manufacture and test the Subject Firework in a manner that left it free from any design or manufacturing defects that would cause the product to be unreasonably dangerous to users and bystanders.

48.     Defendant controlled the design, manufacture, packaging, labeling and testing of the Subject Firework through their control of Chinese suppliers who manufactured, packaged, labeled and tested the Subject Firework according to Defendants' plan.

49.     Defendants knew or should have known that due to its defective design and/or manufacture of the Subject Firework, that the Subject Firework was prone to malfunctions that would cause it to suffer a dangerous blowout and/or burnout event.

50.     Defendants knew or should have known that the propensity of the Subject Firework to malfunction placed users and bystanders at an unreasonable risk of harm and

rendered the Subject Firework unreasonably dangerous and thereby, defective under Georgia law.

51.     Ordinary consumers would not expect the internal components of the Subject Firework to suddenly explode during ordinary use.

52.     The blowout and burnout of the Subject Firework frustrates the expectations of the ordinary consumer.

53.     Alternative designs existed that would prevent this type of malfunction and/or mitigate this type of malfunction without substantially altering its utility.

54.     Alternative testing regimes existed to ensure that the Subject Firework would be free from defect.

55.     Defendants breached their duty of care under Georgia law when it placed into the stream of commerce the unreasonably dangerous Subject Firework that was defective in design and/or manufacture.

56.     Defendants' breach of the above duties were each a proximate cause of Malachi's injuries and damages.

**WHEREFORE**, Plaintiff, MALACHI CARTER, demands judgment against Defendants for all injuries and damages sustained as a result of the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, loss of consortium, mental anguish, emotional distress, pain and suffering, costs, and interest, and for any such further relief as the Court deems appropriate.

### COUNT III—NEGLIGENCE PER SE
**(Malachi Against all Defendants)**

57.     Malachi re-alleges and incorporates paragraphs 1 through 33 of this Complaint as

Exhibit A

if fully stated herein.

58.     For context, in this count, Plaintiff does not seek a private right to enforce the

following statutory and regulatory provisions, but rather to set out a negligence claim alleging

that the violation constituted negligence per se. *McLain v. Mariner Health Care, Inc*., 279 Ga.

App. 410, 411, 631 S.E.2d 435, 436–37 (2006) ("complaint alleges violations of regulations

promulgated under the Medicaid and Medicare statutes, the complaint makes no attempt to set

forth a private cause of action under them").

59.     Under Georgia law "negligence per se arises when a statute or ordinance is

violated." *Mercy Hous. Georgia III, L.P. v. Kaapa*, 368 Ga. App. 270, 274, 888 S.E.2d 346, 350

(2023), cert. denied (Dec. 19, 2023) (internal citations & quotations omitted). Further, "[t]he

violation of certain mandatory regulations may also amount to negligence per se if the

regulations impose a legal duty." *See id*. To determine if a statute and/or regulatory violation is

proper for negligence per se, "a trial court must consider (1) whether the injured person falls

within the class of persons it was intended to protect and (2) whether the harm complained of

was the harm the statute was intended to guard against." *See id*. Finally, the claimant must show

that the violative act was a proximate cause of Plaintiff's injuries. *See id*.

60.     Turning to the instant cause of action, Defendants are responsible for designing,

manufacturing, testing, distributing and selling the Subject Firework, and for otherwise placing

the Subject Firework into the stream of commerce in compliance with federal and state law.

61.     Defendants had a duty to design, manufacture and test the Subject Firework to

ensure that it complied with federal and state law.

62.     Defendants design, manufacture, importation, delivery, sale and otherwise

introduction of the Subject Firework in violation of federal and state law establishes a claim for

negligence per se, because the purpose of these statute is to protect consumer firework

purchasers, including the Plaintiff, from fireworks, like the Subject Firework, that suddenly

explode upon ignition due to a blowout or burnout event.

63.    Specifically, the Federal Hazardous Substances Act sets out requirements for the

labeling of hazardous household products and prohibits the sale of products that are so dangerous

that proper labeling is insufficient to protect consumers. Thus, the purpose of the Federal

Hazardous Substance Act, and specifically banning certain hazardous substances, is to protect

consumers. 15 U.S.C.A. § 1261. Specifically, a banned hazardous substance is one that "the

degree or nature of the hazard involved in the presence or use of such substance in households is

such that the objective of the protection of the public health and safety can be adequately served

only by keeping such substance, when so intended or packaged, out of the channels of interstate

commerce." *See id*.

64.    A multishot firework that suddenly explodes upon ignition is classified as a

blowout or a burn out and when this occurs following the required federal instructions violates

federal law. *See* 15 U.S.C.A. § 1262 (allowing the Commission by regulation to designate a

substance which it finds meets the requirements of section 1261(f)(1)(A) as a "hazardous

substance" and "banned hazardous substance"); 15 U.S.C.A. § 1261 (defining the requirements

of "hazardous substance" and "banned hazardous substance"); 16 C.F.R. § 1507.1 (designating

"Any fireworks device (other than firecrackers) which fails to conform to applicable

requirements is a banned hazardous substance"); and 16 C.F.R. § 1507.6 (requiring "[t]he

pyrotechnic chamber in fireworks devices shall be constructed in a manner to allow functioning

in a normal manner without burnout or blowout"). Thus, any firework not constructed in a

manner to allow functioning in a normal manner without burnout or blowout is a "banned

Exhibit A

hazardous substance."

65.    In fact, Defendants' corporate representative for Phantom Importing and

Distribution LLC and Phantom Firework Showrooms LLC admitted as much in prior litigation:

```
 4          Q.   Do you agree that every firework Phantom
 5   sells should operate in a manner -- or should be
 6   constructed in a manner to allow functioning in a normal
 7   manner without burnout or blowout?
 8          A.   Yes.
 9          Q.   Do you agree that any firework that
10   suffers burnout or blowout does not meet this standard?
11          A.   If it was used as intended, yes.
```

*See* Exhibit A (Excerpt of Prior Testimony) at page 86.

66.    A violative firework like the Subject Firework is considered a banned hazardous

substance and the introduction or delivery of a banned hazardous substance carries criminal

penalties.

67.    For example, the Federal Hazardous Substances Act prohibits "the delivery for

introduction into interstate commerce of any… banned hazardous substance" 15 U.S.C.A. §

1263. A product that fails to conform to 16 C.F.R. § 1507.6—such as the Subject Firework—

constitutes the "banned hazardous substance" under 16 C.F.R. § 1507.1. Further, the introduction

and delivery of such a product—including specifically the Subject Firework delivered and

introduced into the State of Georgia from Ohio (where the Defendants receive the products)—

constitutes the delivery and introduction of a banned hazardous substance.

68.    Notably, the sale of banned hazardous substances and/or consumer fireworks that

violate the federal regulations for consumer fireworks—including for those like the Defendants

who have repeatedly sold fireworks in violation of the act—carries criminal penalties

Exhibit A

(constituting a felony and/or misdemeanor) and is punishable by imprisonment. 15 U.S.C.A. §

1264.

69.    Thus, the performance of the Subject Firework itself establishes that it was a

banned hazardous substance under the Federal Hazardous Substance Act due to its blowout and

burnout malfunction and the sale violated the federal hazardous substance act and constituted a

criminal violation of the act.

70.    Likewise, the sale of a banned hazardous substance constitutes a violation of

Georgia law and carries criminal penalties. *See* O.C.G.A. § 25-10-8.

71.    Under Georgia law a consumer firework is defined as one that complies with 16

C.F.R. Part 1507 and American Pyrotechnics Association Standard 87-1. O.C.G.A. § 25-10-

1(a)(1). Similar to 16 C.F.R. 1507.6, the American Pyrotechnics Association Standard 87-1

prohibits blowouts and/or burnouts in consumer fireworks.[1] This is because the purpose of this

statutory scheme was to allow the sale of fireworks in Georgia to the extent that they comply

with federal law. *See* Georgia House Daily Report, 2015 Reg. Sess. No. 27 ("HB 110

decriminalizes and regulates the sale and licensing of consumer fireworks, which must also

comply with the United States Consumer Product Safety Commission and other regulated

industries").

72.    Plaintiff is a member of the class of persons that is meant to be protected by the

firework laws and regulations implementing these standards. Specifically, the regulations

explain: "[t]he purpose of these rules and regulations is to provide precautionary and protective

techniques that are reasonable and practical measures for the prevention of injury to persons and

property from the retail sales, distribution, manufacturing, storage, transportation, and use of

---

[1] APA 87-1A Final Consumer Fireworks Std. .pdf at pages 81-82.

Consumer Fireworks, Display Fireworks, and Pyrotechnic Articles as authorized pursuant to Chapter 10 of Title 25 of the Official Code of Georgia Annotated." Ga. Comp. R. & Regs. 120-3-22-.01.

73.    Thus, manufacturing, transporting or selling fireworks in violation of the federal standards incorporated into Georgia law constitutes a violation of Georgia law. O.C.G.A. § 25-10-2; O.C.G.A. § 25-2-17; Ga. Comp. R. & Regs. 120-3-22-.11(5) and Ga. Comp. R. & Regs. 120-3-22-.15.

74.    These violations constitute a felony or misdemeanor under Georgia law. O.C.G.A. § 25-10-8; and O.C.G.A. § 25-2-38.

75.    In sum, both the federal and state statutes and regulations create a duty of care that applies to the Defendants manufacture, distribution and sale of the Subject Firework. The relevant provisions here that prohibit consumer fireworks that suddenly explode constituting either a blowout or a burnout were directly meant to protect consumers like Plaintiff from injuries caused by a dangerous blowout or burnout event. Thus, not only due these statutory and regulatory schemes create a duty of care, the purpose of the statute is to protect consumers like Plaintiff from the exact type of harm that Plaintiff alleges occurred.

76.    In turn, the manufacture, distribution and sale of the Subject Firework violated federal and state law because the explosive event that occurred during ordinary use is itself direct evidence that the Subject Firework failed to conform with federal and state law.

77.    Defendants violations of these statutes and regulations was effectively a breach of their duty of care under Georgia tort law.

78.    Defendants breach of the aforementioned statutes and regulations were a proximate cause of Plaintiff's injuries.

<span style="color:red">Exhibit A</span>

**WHEREFORE**, Plaintiff, MALACHI CARTER, demands judgment against all Defendants for all injuries and damages sustained as a result of the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, loss of consortium, mental anguish, emotional distress, pain and suffering, costs, and interest, and for any such further relief as the Court deems appropriate

### COUNT IV – PUNITIVE DAMAGES

1.      Plaintiff adopts and re-alleges paragraphs 1-71 above and incorporates them as if stated verbatim herein.

2.      Defendants knew or should have known that it has been regularly selling non-compliant fireworks in violation of federal and state law. Defendants' testing regime has proven to be insufficient to ascertain that Phantom Fireworks sold in the United States will be safe and comply with federal and state law. Defendants failure to change their practices to ensure that the fireworks they sell will be safe for use and comply with mandatory safety standards amounts to reckless indifference over the safety of their consumers who depend on Defendants to protect them from danger. The continuous failures of Phantom products and the lack of action to rectify or take additional measures to prevent such incidents amounts to deplorable conduct.

3.      As set forth herein, Defendants' failure to properly and safely design and sell the Subject Firework shows willful and intentional misconduct, gross negligence, reckless indifference, and that entire want of care which raises the presumption of conscious indifference to the consequences of its actions, entitling Plaintiff to punitive damages pursuant to O.C.G.A. § 15-12-5.1.

Exhibit A

## **DAMAGES**

4.      Plaintiff adopts and re-alleges paragraphs 1-74 above and incorporates them as if stated verbatim herein.

5.      As a result of Defendants' negligent and reckless conduct alleged herein, Plaintiff suffered the following damages:

        a.  Physical injuries;

        b.  Emotional and mental anguish and suffering;

        c.  Loss of enjoyment of life;

        d.  Economic losses, wages, and benefits;

        e.  Past, present and future medical and related expenses;

        f.  Past, present and future pain and suffering;

        g.  Permanent scarring and disfigurement; and

        i.  Lost wages and loss of wage earning capacity.

6.      The negligence and other alleged acts and/or omissions of Defendants were the proximate and/or contributing cause of the injuries to Plaintiff described herein.

7.      As a result of Defendants' negligence, recklessness, willfulness, and wanton conduct, Plaintiff is entitled to an award of actual, consequential, and punitive damages in an amount to be determined by the trier of fact.

**WHEREFORE,** Plaintiff respectfully prays for:

        a.  Judgment against Defendants for all actual, consequential, and punitive damages, together with interest as allowed by law;

        b.  All costs and disbursements of this action to be taxed against Defendants;

        c.  An award of attorney's fees;

        d.  **Trial by jury**; and

Exhibit A

e. That Plaintiff have other such relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED, this the 17th day of February, 2025.

**MORGAN & MORGAN**

*/s/ Max Compton*

_____
William Maxwell Compton
Georgia Bar No. 380092
Counsel for Plaintiff

501 Riverside Dr., Suite 1200
Jacksonville, FL 32202
(912) 443-1017 - Direct
(912) 443-1184 – Facsimile
MCompton@forthepeople.com

STATE COURT OF
DEKALB COUNTY, GA.
2/17/2025 4:07 PM
E-FILED
BY: Mundy Jackson

Exhibit A

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of ___DeKalb___ County

| For Clerk Use Only | | | |
|---|---|---|---|
| Date Filed | 2/18/2025 | Case Number | 25A01059 |
| | MM-DD-YYYY | | |

**Plaintiff(s)**

Carter, Malachi

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

Phantom Fireworks Eastern Regions, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

Phantom Fireworks Showrooms, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

Phantom Importing and Distributing, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** ___William M. Compton___   **Bar Number** ___380092___   **Self-Represented** ☐

### Check One Case Type in One Box

**General Civil Cases**

☐ Automobile Tort
☐ Civil Appeal
☐ Contract
☐ Garnishment
☐ General Tort
☐ Habeas Corpus
☐ Injunction/Mandamus/Other Writ
☐ Landlord/Tenant
☐ Medical Malpractice Tort
☒ Product Liability Tort
☐ Real Property
☐ Restraining Petition
☐ Other General Civil

**Domestic Relations Cases**

☐ Adoption
☐ Dissolution/Divorce/Separate Maintenance
☐ Family Violence Petition
☐ Paternity/Legitimation
☐ Support – IV-D
☐ Support – Private (non-IV-D)
☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**

☐ Contempt
  ☐ Non-payment of child support, medical support, or alimony
☐ Modification
☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
Case Number                   Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____

Exhibit A

## AFFIDAVIT OF SERVICE

State of Georgia                    County of DeKalb                    State Court

Case Number: 25A01059

Plaintiff:
**MALACHI CARTER**

vs.

Defendant:
PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS
SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,

Received by Veritext Legal Solutions on the 20th day of February, 2025 at 11:12 am to be served on **Phantom Fireworks Eastern Regions LLC c/o Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092**.

I, Kimberly Greenway, being duly sworn, depose and say that on the **21st day of February, 2025** at **12:38 pm, I**:

served **Phantom Fireworks Eastern Regions LLC c/o Corporation Service Company** by personally serving **Alisha Smith, Intake specialist** located at **2 Sun Court, Suite 400, Peachtree Corners, GA 30092 with: SUMMONS; COMPLAINT;**.

**Description** of Person Served: Age: 46, Sex: F, Race/Skin Color: Black, Height: 5'9", Weight: 130, Hair: Black, Glasses: N

I certify that I am over the age of 18, have no interest in the above action.

Subscribed and Sworn to before me on the 22nd
day of February, 2025 by the affiant who is
personally known to me.

NOTARY PUBLIC

**Kimberly Greenway**
GCPS #206

**Veritext Legal Solutions**
633 E. Colonial Drive
Orlando, FL 32803
**(800) 275-7991**

Our Job Serial Number: KGS-2025011653
Ref: 7186934

RICHARD BENITO
NOTARY
EXPIRES
GEORGIA
09-14-2025
PUBLIC
DAWSON COUNTY

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

Exhibit A

## AFFIDAVIT OF SERVICE

State of Georgia                     County of DeKalb                     State Court

Case Number: 25A01059

Plaintiff:
**MALACHI CARTER**

vs.

Defendant:
**PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS
SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,**

Received by Veritext Legal Solutions on the 20th day of February, 2025 at 11:12 am to be served on **Phantom
Fireworks Showrooms LLC c/o Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners,
GA 30092.**

I, Kimberly Greenway, being duly sworn, depose and say that on the **21st day of February, 2025** at **12:38 pm, I:**

served **Phantom Fireworks Showrooms LLC c/o Corporation Service Company** by personally serving **Alisha
Smith, Intake specialist** located at **2 Sun Court, Suite 400, Peachtree Corners, GA 30092 with: SUMMONS;
COMPLAINT;.**

**Description** of Person Served: Age: 46, Sex: F, Race/Skin Color: Black, Height: 5'9", Weight: 130, Hair: Black,
Glasses: N

I certify that I am over the age of 18, have no interest in the above action.

Subscribed and Sworn to before me on the 22nd
day of February, 2025 by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

_____
**Kimberly Greenway**
GCPS #206

**Veritext Legal Solutions**
633 E. Colonial Drive
Orlando, FL 32803
**(800) 275-7991**

Our Job Serial Number: KGS-2025011652
Ref: 7186934

RICHARD BENITO
NOTARY
EXPIRES
GEORGIA
09-14-2025
PUBLIC
DAWSON COUNTY

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

**STATE COURT OF
DEKALB COUNTY, GA.
2/24/2025 10:55 AM
E-FILED
BY: Kelly M Johnson**

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

              Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

              Defendants.

Civil Action File No.:  25A01059

### NOTICE OF TAKING DEPOSITION OF MALACHI CARTER

TO:    Mr. Malachi Carter
        c/o William Maxwell Compton, Esq.
        MORGAN & MORGAN
        501 Riverside Drive, Suite 102
        Jacksonville, FL 32202

YOU ARE HEREBY NOTIFIED, pursuant to O.C.G.A. § 9-11-26, et seq., that on

**Thursday, May 29, 2025**, commencing at **10:00 a.m.** at MORGAN & MORGAN, 501

Riverside Drive, Suite 102, Jacksonville, Florida, before an officer duly authorized by law to

administer oaths, the undersigned will proceed to take the deposition of **Malachi Carter** for

discovery and all other purposes allowed by law. The deposition will continue from day-to-day

until examination is complete.

This 19th day of March, 2025.

              Respectfully submitted,

              SWIFT, CURRIE, MCGHEE & HIERS, LLP

              */s/ Kevan G. Dorsey*

              _____

              Kevan G. Dorsey
              Georgia Bar No.: 271402

Exhibit A

R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER,<br><br>                    Plaintiff,<br><br>v.<br><br>PHANTOM FIREWORKS EASTERN<br>REGIONS, LLC, PHANTOM FIREWORKS<br>SHOWROOMS, LLC, and PHANTOM<br>IMPORTING AND DISTRIBUTING, LLC,<br><br>                    Defendants. | Civil Action File No.:  25A01059 |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Notice of Taking Deposition of Malachi Carter*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

***/s/ Kevan G. Dorsey***
_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

3

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

AFFIDAVIT OF SERVICE

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

MALACHI CARTER,

                                                    NO. 25A01059

          Plaintiff,

     v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, et al,

          Defendants.

STATE OF DELAWARE          }
                           }ss.
COUNTY OF NEW CASTLE       }

I, Lisa Joyner, of Parcels Inc., the State of Delaware, County of New Castle, being duly sworn, say that on the 20th day of February 2025 at 12:05 p.m., I personally served a copy of a Summons and Complaint with supporting documents on **Phantom Importing and Distributing LLC,** by serving the registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19801.

Name of individual accepting service: Lynanne Gares – Authorized to accept
Description of individual: Caucasian female, age 40-45, 150 lbs., 5'5" with brown hair.

_____
                    Lisa Joyner

Subscribed and sworn before me
This 20th day of February 2025

_____
Notary Public
My commission expires

ZAHID HOSSAIN NAWAZ
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires August 25, 2026

Exhibit A

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

<u>**ANSWER AND DEFENSES OF PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, AND PHANTOM IMPORTING AND DISTRIBUTING, LLC TO PLAINTIFF'S COMPLAINT**</u>

COME NOW Defendants, Phantom Fireworks Eastern Regions, LLC, Phantom Fireworks Showrooms, LLC, and Phantom Importing and Distributing, LLC, and file this, their Answer and Defenses to Plaintiff's Complaint as follows:

<u>**FIRST DEFENSE**</u>

Discovery has just commenced, written discovery has not been exchanged, Defendants have not yet collected Plaintiff's medical records from his healthcare providers or employment records from his employers, and no depositions have been taken.  Therefore, Defendants answer Plaintiff's Complaint based on information currently available regarding Plaintiff's negligence allegations and the injuries and damages claimed by Plaintiff.

<u>**SECOND DEFENSE**</u>

Plaintiff fails to state a claim.

## THIRD DEFENSE

Plaintiff's claims should be barred, or fail as a matter of law, as they lack the requisite evidentiary support including but not limited to, pertinent expert opinions.

## FOURTH DEFENSE

Defendant Phantom Fireworks Eastern Regions, LLC is not a proper party.

## FIFTH DEFENSE

Plaintiff failed to include an indispensable party.

## SIXTH DEFENSE

Plaintiff's recovery is barred by, or should be reduced by, his own negligence.

## NOTICE TO PLAINTIFF

Defendants request Plaintiff preserve all components of the firework at issue and any other pertinent evidence related to the alleged events.

Defendants respond to the numbered paragraphs of Plaintiff's Complaint as follows:

## RESPONSE TO THE ALLEGED SUMMARY OF THE ACTION

1.

Defendants acknowledge the basis of Plaintiff's Complaint but deny the allegations of wrongdoing contained therein.

2.

Defendants are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, cannot admit or deny same.

3.

Defendants acknowledge the basis of Plaintiff's Complaint but deny the remaining allegations.

## RESPONSE TO THE PARTIES JURISDICTION & VENUE

4.

Defendants deny the allegations.

5.

Defendants are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, cannot admit or deny same.

6.

Defendants admit the allegations.

7.

Defendants admit the allegations.

8.

Defendants admit the allegations.

9.

Defendants admit the allegations upon sufficient process and service of process. Defendants deny the statement that State law governs or controls firework standards.

10.

Defendants admit the allegations upon sufficient process and service of process.

11.

Defendants admit the allegations upon sufficient process and service of process.

12.

Defendants deny the allegations.

## RESPONSE TO THE FACTUAL ALLEGATIONS

13.

Defendants are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, cannot admit or deny same.

14.

Defendants admit the Bombilation is a multi-shot firework.

15.

Defendants deny the allegations as pled.

16.

Defendants deny the allegations as they misstate and over simplify the regulatory process.

17.

The allegations refer to Federal Regulations which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned Regulations. Responding further, Defendants deny the characterization of the firework mechanisms as stated.

18.

Defendants deny the allegations.

19.

Defendants are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, cannot admit or deny same.

20.

Defendants deny the allegations.

21.

The allegations refer to various documents which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned documents.

22.

Defendants deny the allegations.

23.

Defendants deny the allegations.

24.

Defendants deny the allegations.

25.

Defendants are currently without knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, cannot admit or deny same. Responding further, Defendants have not had the opportunity to inspect the firework. Defendants deny allegations of wrongdoing.

26.

Defendants deny the allegations.

27.

Defendants deny the allegations as it misstates and over simplifies the governing laws and regulations.

28.

Defendants deny the allegations.

Exhibit A

29.

Defendants deny the allegations.

30.

Defendants deny the allegations.

31.

Defendants deny the allegations.

32.

Defendants deny the allegations.

33.

Defendants deny the allegations.

## RESPONSE TO COUNT I –
## ALLEGATIONS REGARDING STRICT LIABILITY
### (Malachi Against all Defendants)

34.

Defendants incorporate by reference their responses to Paragraphs 1 through 33 of the Complaint as if fully set forth herein.

35.

Defendants deny the allegations.

36.

Defendants deny the allegations.

37.

Defendants deny the allegations.

38.

Defendants deny the allegations.

39.

Defendants deny the allegations as they are not clearly stated to provide sufficient understanding of "ordinary use" and "ignition."

40.

Defendants deny the allegations as it implies the firework suddenly exploded.

41.

Defendants deny the allegations.

42.

Defendants deny the allegations.

43.

Defendants deny the allegations.

44.

Defendants deny the allegations.

## RESPONSE TO COUNT II –
## ALLEGED NEGLIGENCE
### (Malachi Against all Defendants)

45.

Defendants incorporate by reference their responses to Paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46.

Defendants deny the allegations.

47.

Defendants deny the allegations.

48.

Defendants deny the allegations.

49.

Defendants deny the allegations.

50.

Defendants deny the allegations.

51.

Defendants deny the allegations as they are not clearly stated to provide sufficient understanding of "ordinary use" and "ignition."

52.

Defendants deny the allegations as they imply the firework suddenly exploded.

53.

Defendants deny the allegations.

54.

Defendants deny the allegations.

55.

Defendants deny the allegations.

56.

Defendants deny the allegations.

Exhibit A

## RESPONSE TO COUNT III –
## ALLEGATIONS REGARDING NEGLIGENCE PER SE
### (Malachi Against all Defendants)

57.

Defendants incorporate by reference their responses to Paragraphs 1 through 56 of the Complaint as if fully set forth herein.

58.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

59.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

60.

Defendants deny the allegations.

61.

Defendants deny the allegations.

62.

Defendants deny the allegations.

63.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

64.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

65.

The testimony cited speaks for itself and did not pertain to the particular event in this case.

66.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

67.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

68.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information. Defendant further denies the allegation of repeated selling of hazardous fireworks.

69.

Defendants deny the allegations.

70.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

71.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

72.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

73.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

74.

The allegations refer to documents, definitions and various laws which speak for themselves. Defendants deny the allegations to the extent inconsistent with the clear language of the aforementioned information.

75.

Defendants deny the allegations.

76.

Defendants deny the allegations.

77.

Defendants deny the allegations.

78.

Defendants deny the allegations.

### RESPONSE TO COUNT IV –
### ALLEGED PUNITIVE DAMAGES

1.  [sic.]

Defendants incorporate by reference their responses to Paragraphs 1 through 71 of the Complaint as if fully set forth herein.

2.

Defendants deny the allegations.

3.

Defendants deny the allegations.

### RESPONSE TO THE ALLEGED DAMAGES

4.

Defendants incorporate by reference their responses to Paragraphs 1 through 74 of the Complaint as if fully set forth herein.

5.

Defendants deny the allegations.

6.

Defendants deny the allegations.

7.

Exhibit A

Defendants deny the allegations.

Any allegations contained in Plaintiff's Complaint not herein responded to by number, including Plaintiff's *ad damnum* and all subparts, are hereby denied.

**DEFENDANTS DEMAND A TRIAL BY A JURY OF TWELVE.**

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*
_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

STATE COURT OF
DEKALB COUNTY, GA.
3/19/2025 6:22 PM
E-FILED
BY: Kelly Johnson

-13-

<span style="color:red">Exhibit A</span>

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| MALACHI CARTER,<br><br>                  Plaintiff,<br><br>v.<br><br>PHANTOM FIREWORKS EASTERN<br>REGIONS, LLC, PHANTOM FIREWORKS<br>SHOWROOMS, LLC, and PHANTOM<br>IMPORTING AND DISTRIBUTING, LLC,<br><br>               Defendants. | Civil Action File No.: 25A01059 |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of *Answer and Defenses of Phantom Fireworks Eastern Regions, LLC, Phantom Fireworks Showrooms, LLC, and Phantom Importing and Distributing, LLC to Plaintiff's Complaint* via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 19th day of March, 2025.

                           Respectfully submitted,

                           SWIFT, CURRIE, MCGHEE & HIERS, LLP

                           */s/ Kevan G. Dorsey*

                           _____
                           Kevan G. Dorsey
                           Georgia Bar No.: 271402
                           R. Scott Connally
                           Georgia Bar No.: 171421
                           *Attorneys for Defendants*

-14-

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER,<br><br>               Plaintiff,<br><br>v.<br><br>PHANTOM FIREWORKS EASTERN<br>REGIONS, LLC, PHANTOM FIREWORKS<br>SHOWROOMS, LLC, and PHANTOM<br>IMPORTING AND DISTRIBUTING, LLC,<br><br>               Defendants. | Civil Action File No.:  25A01059 |

### RULE 5.2 CERTIFICATE

COMES NOW, Defendant Phantom Fireworks Eastern Regions, LLC, and pursuant to Superior/State Court Uniform Rule 5.2, hereby notifies the Court that on the 19th day of March, 2025, Defendant served upon opposing counsel a copy of the following:

1. Defendant Phantom Fireworks Eastern Regions, LLC's First Request for Admissions of Fact to Plaintiff;

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER,<br><br>     Plaintiff,<br><br>v.<br><br>PHANTOM FIREWORKS EASTERN<br>REGIONS, LLC, PHANTOM FIREWORKS<br>SHOWROOMS, LLC, and PHANTOM<br>IMPORTING AND DISTRIBUTING, LLC,<br><br>     Defendants. | Civil Action File No.: 25A01059 |

### CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of **Rule 5.2 Certificate** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 19th day of March, 2025.

        Respectfully submitted,

        SWIFT, CURRIE, MCGHEE & HIERS, LLP

        */s/ Kevan G. Dorsey*

        _____
        Kevan G. Dorsey
        Georgia Bar No.: 271402
        R. Scott Connally
        Georgia Bar No.: 171421
        *Attorneys for Defendants*

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

Exhibit A

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

MALACHI CARTER,

                Plaintiff,

v.                                                              Civil Action File No.:  25A01059

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                Defendants.

## DEMAND FOR JURY OF TWELVE

COME NOW Defendants, Phantom Fireworks Eastern Regions, LLC, Phantom Fireworks Showrooms, LLC, and Phantom Importing and Distributing, LLC, by and through their attorneys, and demand in writing prior to the commencement of the trial term that the above styled case be tried by a jury of twelve, pursuant to O.C.G.A. § 15-12-122.

This 19th day of March, 2025.

                Respectfully submitted,

                SWIFT, CURRIE, MCGHEE & HIERS, LLP

                */s/ Kevan G. Dorsey*

                _____
                Kevan G. Dorsey
                Georgia Bar No.: 271402
                R. Scott Connally
                Georgia Bar No.: 171421
                *Attorneys for Defendants*

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

<span style="color:red">Exhibit A</span>

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

MALACHI CARTER,

                   Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                   Defendants.

Civil Action File No.:  25A01059

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Demand for Jury of Twelve*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

3

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

                 Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                 Defendants.

Civil Action File No.:  25A01059

## NOTICE OF LEAVE OF ABSENCE

COMES NOW, Kevan G. Dorsey, and respectfully notifies all Judges before whom he has cases pending, all affected Clerks of Court, and all opposing counsel, that he will be on leave pursuant to Georgia Uniform Court Rule 16.

1.

The time Applicant will be away from the practice of law is:

- Thursday, May 1, 2025 through and including Friday, May 2, 2025.

- Monday, May 5, 2025 through and including Friday, May 9, 2025.

- Friday, May 16, 2025.

- Wednesday, June 25, 2025 through and including Friday, June 27, 2025.

- Tuesday, July 1, 2025 through and including Thursday, July 3, 2025.

2.

The purpose of the leave is family leave and vacation.

All affected Judges and opposing counsel shall have ten (10) days from the date of this Notice to object.  If no objections are filed, the Leave of Absence shall be granted.

<span style="color:red">Exhibit A</span>

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

STATE COURT OF
DEKALB COUNTY, GA.
3/19/2025 6:22 PM
E-FILED
BY: Kelly Johnson

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of *Notice of Leave of Absence* via e-file, e-mail and/or by mailing to the following addresses with sufficient postage affixed thereto:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 19th day of March, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

3

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
penny.wofford@swiftcurrie.com

<span style="color:red">Exhibit A</span>

# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA
### DIVISION 6

## SECOND AMENDED STANDING ORDER IN ALL CIVIL CASES
## INSTRUCTIONS TO PARTIES AND COUNSEL

This case has been assigned to Judge Ana Maria Martinez. The purpose of this Order is to inform the parties and their counsel of the Court's policies, practice, and procedure. It is issued to promote the just and efficient determination of the case. This Order, in combination with this Court's Local Rules and the Georgia Civil Practice Act, shall govern this case.

## CASE ADMINISTRATION

1.      **Contacting Chambers**

Nakeya Burton, our Civil Case Manager, is your principal point of contact on matters relating to this case. Where possible, communication with Ms. Burton should be by telephone (404-687-7135) or by e-mail (nlburton1@dekalbcountyga.gov). Mailed, couriered, and hand delivered communications should be addressed as follows:

> Ms. Nakeya Burton
> Civil Case Manager
> 556 N. McDonough St.
> DeKalb County Courthouse
> Decatur, GA 30030

Any documents required to be filed in this case should be addresses and delivered to the Clerk of State Court rather than Ms. Burton.

The Court's staff attorney is Colt Burnett. He can be reached by telephone (404-687-7134) or e-mail (ccburnett@dekalbcountyga.gov). Neither the parties nor their counsel should discuss the merits of the case with Ms. Burton or Mr. Burnett.

Email is preferred when contacting the Court. Please ensure all parties are copied on your correspondence to the Court. Neither the parties nor their counsel should discuss the merits of the

case with the Court through these communications.

**2.      Courtesy Copies**

Parties are not required to forward courtesy copies of motions and other filings directly to chambers. However, in large cases, courtesy copies of substantive motions are appreciated via email to Ms. Burton.

## CASE MANAGEMENT

**1.      Extension of Time**

The Court, along with counsel for the parties, is responsible for processing cases toward prompt and just resolutions. To that end, the Court seeks to set reasonable but firm deadlines. Motions for extensions, whether opposed, unopposed or by consent, will be granted only upon a showing of good cause. Motions requesting an extension of the discovery period must be made prior to the expiration of the existing discovery period, and such motions ordinarily will be granted only in cases where good cause is shown.

In the event the parties need an extension of the discovery period and the case has already been extended three times, or is older than two years, the Court requires that a proposed Consent Scheduling Order be filed alongside the motion addressing all significant remaining deadlines. Proposed Orders should be emailed to Ms. Burton in Word format.

**2.      Conferences**

Scheduling, discovery, pre-trial and settlement conferences promote the speedy, just, and efficient resolution of cases.   Therefore, the Court encourages the parties to request a conference when counsel believes one will be helpful and counsel has specific goals and an agenda for the conference.

### 3.    Candor in Responsive Pleadings

In accordance with O.C.G.A. § 9-11-8 (b), a party's responsive pleading must admit or deny the averments of the adverse party's pleading. A party may not deny, in his responsive pleading, an averment in his opponent's pleading on the grounds that the averment raises a matter of law rather than fact.

### 4.    Discovery Responses - Boilerplate and General Objections

Boilerplate objections in response to discovery requests are strongly discouraged. Parties should not carelessly invoke the usual litany of rote objections, i.e., attorney-client privilege, work-product immunity from discovery, overly broad/unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, unless the responding party has a valid basis for these objections.

Moreover, general objections are disfavored, i.e., a party should avoid including in his response to a discovery request a "Preamble" or a "General Objections" section stating that the party objects to the discovery request "to the extent that" it violates some rule pertaining to discovery, e.g., the attorney-client privilege, the work product immunity from discovery, the requirement that discovery requests be reasonably calculated to lead to the discovery of admissible evidence, and the prohibition against discovery requests that are vague, ambiguous, overly broad, or unduly burdensome. Instead, each individual discovery request should be met with every specific objection that actually applies to that particular request. Otherwise, it is impossible for the Court or the party upon whom the discovery response is served to know exactly what objections have been asserted to each individual request. All such general objections may be disregarded by the Court.

Finally, a party who objects to a discovery request but then responds to the request must

indicate whether the response is complete. For example, in response to an interrogatory, a party is not permitted to raise objections and then state, "Subject to these objections and without waiving them, the response is as follows" unless the party expressly indicates whether additional information would have been included in the response but for the objection(s).

Evidence introduced at trial which was requested but not disclosed during the discovery period will not be admitted.

**5.     Conduct During Depositions**

(a)   At the beginning of the deposition, deposing counsel shall instruct the witness to ask deposing counsel, rather than the witness's own counsel, for clarifications, definitions or explanations of any words, questions or documents presented during the course of the deposition. The witness shall abide by these instructions.

(b) All objections except those that would be waived if not made at the deposition under O.C.G.A. § 9-11-32 (d) (3) (B) and those necessary to assert a privilege or to present a motion pursuant to O.C.G.A. § 9-11-30 (d), shall be preserved. Therefore, those objections need not be made during the course of depositions. If counsel defending a deposition feels compelled to make objections during depositions, he or she should limit the objections to only "objection to form." Defending counsel should only elaborate on his/her objection upon the request of deposing counsel. Defending counsel should avoid speaking objections except in extraordinary circumstances.

(c) Counsel SHALL NOT instruct a witness not to answer a question unless that counsel has objected to the question on the ground that the answer is protected by a privilege or a limitation on evidence directed by the Court. And the objection had better be good.

(d) Counsel shall not make objections or statements that might suggest an answer to a

witness. Counsel's statements when making objections should be succinct and verbally economical, stating the basis of the objection and nothing more.

(e)  Counsel and their witness-clients SHALL NOT engage in private off-the-record conferences during depositions or during breaks regarding any of counsel's questions or the witness's answers, except for the purpose of deciding whether to assert a privilege. Any conferences that occur pursuant to, or in violation of, this rule are a proper subject for inquiry by deposing counsel to ascertain whether there has been any witness-coaching and, if so, what. Any conferences that occur pursuant to, or in violation of, this rule shall be noted on the record by the counsel who participated in the conference. The purpose and outcome of the conference shall also be noted on the record.

(f)  Deposing counsel shall provide to the witness's counsel a copy of all documents shown to the witness during the deposition. The copies shall be provided either before the deposition begins or contemporaneously with the showing of each document to the witness. The witness and the witness's counsel do not have the right to discuss documents privately before the witness answers questions about them. In virtual depositions, all documents being presented to a witness must be sent to opposing counsel prior to the deposition.

(g)  Depositions are limited to no more than seven hours of time on the record. Breaks do not count when calculating the duration of the deposition.

6.    **Serving Discovery Prior to Expiration of the Discovery Period**

All discovery requests must be served early enough so that the responses thereto are due on or before the last day of the discovery period.

7.    **Discovery Motions and Objections to Discovery**

Prior to filing a motion to compel discovery, the movant - after conferring with the

respondent in a good faith effort to resolve the dispute by agreement - should contact Mr. Burnett via email and with copies to all parties and notify him that the movant seeks relief with respect to a discovery matter. <u>Parties are directed to meaningfully confer in good faith in person or on the phone prior to contacting the Court to request assistance with discovery disputes</u>. Ordinarily, Mr. Burnett will then schedule a conference call or meeting to attempt to resolve the matter without the necessity of a formal motion. This process shall not apply to post-judgment discovery. There should be no discussion of the merits of the case when contacting Ms. Burton or Mr. Burnett.

**8.    Motions for Summary Judgment and Daubert Motions**

All Motions for Summary Judgment and Daubert Motions shall be filed within 30 days of the close of discovery.

**9.    Pretrial Orders**

The statement of contentions in the Pretrial Order governs the issues to be tried. The plaintiff should make certain that all theories of liability are explicitly stated, together with the type and amount of each type of damage sought. The specific actionable conduct should be set out, and, in a multi-defendant case, the actionable conduct of each defendant should be identified. The defendant shall explicitly set out any affirmative defenses upon which it intends to rely at trial, as well as satisfy the above requirements with respect to any counterclaims.

The exhibits and witnesses intended to be introduced at trial shall be specifically identified. It is not sufficient to include boiler plate language covering groups of potential witnesses, such as "all individuals identified during discovery." Instead, witnesses to be called at trial must be identified **by name**. Failure to identify a witness, including expert witnesses, by name in the consolidated pretrial order may result in the exclusion of the undisclosed witness' testimony from trial. **In listing witnesses or exhibits, a party shall not reserve the right to supplement his list,**

**nor should a party adopt another party's list by reference.**

Witnesses and exhibits not identified in the Pretrial Order may be excluded, unless it is necessary to allow them to be introduced to prevent a manifest injustice.

In preparing the Pretrial Order, each party shall identify to opposing counsel each deposition, interrogatory or request to admit response, or portion thereof, which the party expects to or may introduce at trial, except for impeachment. All exhibits, depositions, and interrogatory and request to admit responses shall be admitted at trial when offered unless the opposing party indicates an objection to it in the Pretrial Order. The Pretrial Order will be strictly adhered to during the trial. Any witness, evidence, or claim not contained therein shall be excluded.

**10.    Pretrial Conference, Motions *in Limine*, and Pretrial Matters**

Generally, the Court will conduct a pretrial conference. The purpose of the conference is to simplify the issues to be tried, to assist in settlement negotiations where appropriate, and to give the parties a specially set date for trial. The parties will be required at the pretrial conference to identify the specific witnesses they will call in their case in chief at trial.

Lead counsel is required to appear at the pretrial conference, unless leave of the court has been obtained.

Motions *in Limine* and responses thereto shall be filed before the pretrial conference. The parties are directed to discuss any filed Motions *in Limine* before the pretrial conference, so that they may inform the Court at the conference which, if any, will need to be addressed by the Court. General Motions *in Limine* will be argued and ruled upon the first day of trial. Motions *in Limine* regarding case specific evidentiary issues should be brought to the attention of the Court at the pretrial hearing as a special hearing may need to be scheduled prior to trial. Motions *in Limine* filed the day of trial may be reserved.

Prior to trial, counsel shall make a good faith effort to resolve any objections in depositions to be presented at trial. All unresolved objections, together with the transcript, argument, and citations, shall be filed, with an electronic copy to the Court, no later than ten (10) business days prior to trial.

**11.    Trial**

Requests to charge and proposed verdict forms are required to be submitted to the Court, via email to Mr. Burnett, in Word format, five (5) business days before the first day of trial. The original request to charge shall be e-filed with the Clerk of Court. The Court has a standard charge in civil cases covering subjects such as the standard of proof, experts, and witness credibility. The Court encourages the parties to refer to the Suggested Pattern Jury Instructions by the Council of Superior Court Judges of Georgia. Charges for which there is not a pattern charge must contain citations to the legal authorities supporting the charge requested.

**12.    Technology**

Our courtroom has various electronic equipment for use by counsel at trial. For more information about the equipment, please contact Ms. Burton. It is the parties' responsibility to make sure they know how to use the equipment available, to have the cords necessary to hook up to the equipment, and for ensuring that the parties' equipment interfaces with the Court's technology.

SO ORDERED, this 10th day of November, 2022.

Honorable Ana Maria Martinez
Judge, State Court of DeKalb County

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

                Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                Defendants.

Civil Action File No.:  25A01059

## PLAINTIFF'S RESPONSES TO DEFENDANT PHANTOM FIREWORKS EASTERN REGIONS, LLC'S FIRST REQUEST FOR ADMISSIONS OF FACT

COMES NOW, Plaintiff Malachi Carter, in the above-styled action, and hereby responds to Defendant Phantom Fireworks Eastern Regions, LLC's First Request for Admissions of Fact. Plaintiff's responses are provided pursuant to and in accordance with the Georgia Civil Practice Act. Plaintiff objects to any duties or obligations placed upon him by Defendant's requests which exceed those placed on him by the Georgia Civil Practice Act.

Plaintiff's responses are based on the information presently available to Plaintiff that he believes to be correct. Plaintiff's responses are being made with the assistance of counsel, and the exact language used to answer an interrogatory may be that of his attorney. Plaintiff specifically reserves the right to supplement these responses in accordance with the Georgia Civil Practice Act, if necessary.

STATE COURT OF
DEKALB COUNTY, GA.
4/3/2025 10:13 AM
E-FILED
BY: Kelly M Johnson

### STATEMENTS OF FACT

1.

As of February 17, 2025, Plaintiff incurred at least $75,000.00 in medical expenses that he claims were caused by the alleged firework incident.

**RESPONSE: Admit.**

2.

Plaintiff continues to receive medical treatment he contends is necessitated by the July 4, 2024, incident.

**RESPONSE: Admit.**

3.

Plaintiff continues to incur expenses for medical treatment he contends is necessitated by the July 4, 2024, incident.

**RESPONSE: Admit.**

4.

Plaintiff seeks the recovery of lost wages in connection with the July 4, 2024 incident.

**RESPONSE: Admit.  Please see Plaintiff's Complaint at p. 18.**

5.

Plaintiff seeks a recovery for diminished capacity to labor in connection with the July 4, 2024 incident.

**RESPONSE: Admit.  Please see Plaintiff's Complaint at p. 18.**

6.

Plaintiff seeks to recover for past, current and future pain and suffering incurred as a result of the alleged July 4, 2024 incident.

**RESPONSE: Admit.   Please see Plaintiff's Complaint at p. 18.**

7.

Plaintiff seeks to recover for past, current and future emotional distress incurred as a result of the alleged July 4, 2024 incident.

**RESPONSE: Admit.  Please see Plaintiff's Complaint at p. 18.**

8.

Plaintiff seeks to recover a total damages award that is greater than $75,000.00.

**RESPONSE: Admit.**

9.

Plaintiff seeks to recover a total damages award that is less than $75,000.00.

**RESPONSE: Denied.**

10.

Plaintiff will ask the fact-finder for an award of money damages in excess of $75,000.00.

**RESPONSE: Admit.**

11.

Plaintiff will ask the fact-finder for an award of money damages less than $75,000.00.

**RESPONSE:  Denied.**

<span style="color:red">Exhibit A</span>

12.

Plaintiff will ask the fact-finder for an award of money damages not to exceed $75,000.00.

**RESPONSE: Denied.**

13.

Admit Defendants did not cause any injuries to Plaintiff.

**RESPONSE: Denied.**

Respectfully submitted this 3rd day of April, 2025.

**MORGAN & MORGAN**

*/s/ Max Compton*

_____
William Maxwell Compton
Georgia Bar No.: 380092
Attorney for Plaintiff

501 Riverside Dr.
Suite 1200
Jacksonville, FL 32202
Direct: 912-443-1017
Fax: 912-443-1184
MCompton@forthepeople.com

STATE COURT OF
DEKALB COUNTY, GA.
4/3/2025 10:13 AM
E-FILED
BY: Kelly Johnson

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

               Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

               Defendants.

Civil Action File No.:  25A01059

### AMENDED NOTICE OF TAKING DEPOSITION OF MALACHI CARTER

TO:    Mr. Malachi Carter
        c/o William Maxwell Compton, Esq.
        MORGAN & MORGAN
        191 Peachtree St Suite 4200,
        Atlanta, GA 30303

      YOU ARE HEREBY NOTIFIED, pursuant to O.C.G.A. § 9-11-26, et seq., that on

**Monday, July 14, 2025**, commencing at **10:00 a.m.** at MORGAN & MORGAN, 191 Peachtree

St Suite 4200, Atlanta, GA 30303, before an officer duly authorized by law to administer oaths,

the undersigned will proceed to take the deposition of **Malachi Carter** for discovery and all

other purposes allowed by law. The deposition will continue from day-to-day until examination

is complete.

      This 13th day of May, 2025.

                    Respectfully submitted,

                    SWIFT, CURRIE, MCGHEE & HIERS, LLP

                    */s/ Kevan G. Dorsey*

                    _____
                    Kevan G. Dorsey
                    Georgia Bar No.: 271402

Exhibit A

R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

2

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER,<br><br>                    Plaintiff,<br><br>v.<br><br>PHANTOM FIREWORKS EASTERN<br>REGIONS, LLC, PHANTOM FIREWORKS<br>SHOWROOMS, LLC, and PHANTOM<br>IMPORTING AND DISTRIBUTING, LLC,<br><br>                    Defendants. | Civil Action File No.:  25A01059 |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Amended Notice of Taking Deposition of Malachi Carter*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
191 Peachtree St Suite 4200,
Atlanta, GA 30303
mcompton@forthepeople.com

This 13th day of May, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

***/s/ Kevan G. Dorsey***

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**MALACHI CARTER,**

      **Plaintiff,**

**v.**

**PHANTOM FIREWORKS
EASTERN REGIONS, LLC;
PHANTOM FIREWORKS
SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,,**

      **Defendants.**

**CIVIL ACTION FILE NO.
25A01059**

**JURY TRIAL DEMAND**

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.2, I hereby certify that on May 15, 2025, I served a true and correct copy of the following on all counsel of record via statutory electronic service:

1. Plaintiff's First Set of Combined Requests for Admissions, Interrogatories, and Requests for Production to Defendant Phantom Fireworks Eastern Regions, LLC.

2. Plaintiff's First Set of Combined Requests for Admissions, Interrogatories, and Requests for Production to Defendant Phantom Fireworks Showrooms, LLC.

3. Plaintiff's First Set of Combined Requests for Admissions, Interrogatories, and Requests for Production to Defendant Phantom Fireworks Importing and Distributing, LLC.

Exhibit A

**MORGAN & MORGAN**

*/s/ Max Compton*

_____

William Maxwell Compton
Georgia Bar No. 380092
Attorney for *Plaintiff*

STATE COURT OF
DEKALB COUNTY, GA.
5/15/2025 12:58 PM
E-FILED
BY: Kelly Johnson

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **MALACHI CARTER** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION FILE NO.: 25A01059** |
| **PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

---

### NOTICE OF DEPOSITION TO PHANTOM IMPORTING AND DISTRIBUTING LLC FOR A CORPORATE REPRESENTATIVE DEPOSITION ON CERTAIN TOPICS

**PLEASE TAKE NOTICE** that at the time, date and place listed below the Plaintiff

shall, pursuant to O.G.G.A. § 9-11-30(b)(6), take the videotaped deposition(s) of the Corporate

Representative(s) of Phantom Importing and Distributing LLC regarding the topics identified in

Exhibit A hereto.  Said deposition(s) shall be taken by remote means. The deposition(s) will be

taken before an officer authorized by law to administer oaths and shall be videotaped by a

certified videographer. It is necessary and desirable to videotape the deposition in order to

preserve the testimony for use at trial.  The oral examination will continue day to day until

completed.  Said deposition(s) may and will be used at the trial of the instant case.

| DEPONENT: | LOCATION OF DEPOSITION: | DATE & TIME: |
|---|---|---|
| **Corporate Representative for Phantom Importing & Distributing LLC** | **Veritext – Link will be provided 5 days prior to date.** | **Thursday, July 17, 2025**<br><br>**10:00 AM** |

STATE COURT OF
DEKALB COUNTY, GA.
5/15/2025 1:57 PM
E-FILED
BY: Kelly M Johnson

Exhibit A

## **DEFINITIONS**

*In responding to the enclosed requests, the following definitions apply:*

1.      "Defendant," "Phantom Importing," "YOU," and "YOURS" mean Defendant Phantom Importing and Distributing LLC including its predecessors-in-interest, successors-in interest, agents, servants, employees, associates, subsidiaries, affiliated companies, shareholders, directors, officers, or other authorized representatives.

2.      "Phantom Eastern" shall refer to Co-Defendant Phantom Fireworks Eastern Regions, LLC including its predecessors-in-interest, successors-in interest, agents, servants, employees, associates, subsidiaries, affiliated companies, shareholders, directors, officers, or other authorized representatives.

3.      "Phantom Showrooms" shall refer to Co-Defendant Phantom Fireworks Showrooms, LLC including its predecessors-in-interest, successors-in interest, agents, servants, employees, associates, subsidiaries, affiliated companies, shareholders, directors, officers, or other authorized representatives.

4.      "Testing" shall have the same meaning here as when used by YOUR corporate representative in the January 8, 2023, Deposition taken in *Paige Torres v. Phantom Fireworks Showrooms LLC* et al. formerly pending the Fifteenth Judicial Circuit Court in and for Palm Beach County, Florida (hereinafter referred to as the "Jan. 8, 2024, Drgagoui Dep."). *See* Jan. 8, 2024, Drgagoui Dep. at page 25.

5.      "Malfunction" and "Malfunctioning" shall have the same meaning here as it does in in the CPSC regulations that YOU adhere to when importing and selling fireworks in the United States. *See e.g* Jan. 8, 2024, Drgagoui Dep. at pages 65-66 ("Okay. Yeah, that's how CPSC defines a malfunctioning device... We don't have a definition spelled out like this for

malfunctioning… I can say that Phantom agrees that a fireworks device that tips over while functioning that was lit on a flat level, hard surface would be a malfunction…"). *See also* Exhibit 8 to Jan. 8, 2024, Drgagoui Dep. at pages 12-13 (listing "Aerial reports discharging on the ground," "Blowouts" and "Burnouts" in the CPSC list of "most common malfunctions…").

6.      "Blowout" and "Burnout" shall have the same meaning here as these terms have in 16 C.F.R. 1507.6. *See* Jan. 8, 2024, Drgagoui Dep. at pages 85-86 ("Q. Do you agree that every firework Phantom sells should operate in a manner -- or should be constructed in a manner to allow functioning in a normal manner without burnout or blowout? A. Yes. Q. Do you agree that any firework that suffers burnout or blowout does not meet this standard? A. If it was used as intended, yes.").

7.      "Associated with," "related to," "relating to," and "concerning" mean to pertain to, refer to, contain, describe, embody, mention, constitute, support, corroborate, demonstrate, prove, evidence, show, refute, dispute, rebut, controvert, or contradict (whether legally, factually, or otherwise), in whole or in part.

8.      "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise) and includes, without limitation, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, faxes, mail, email, and postings of any type.

9.      "Document" shall mean any writing, recording, Electronically-Stored Information, or photograph in Your actual or constructive possession, custody, care, or control, which pertains directly or indirectly, in whole or in part, either to any of the subjects listed below or to any other matter relevant to the issues in this Action, or which are themselves listed below

as specific documents, including, but not limited to correspondence, memoranda, notes, messages, diaries, minutes, books, reports, charts, ledgers, invoices, computer printouts, microfilms, video tapes, or tape recordings.

10.    "Subject Firework" has the same meaning as it does in Plaintiffs' operative complaint, a Phantom "Bombilation" firework.

11.    "Subject Firework Model" refers to the model of the Subject Firework, the "Bombilation,"  which includes the Subject Firework but is not limited to the specific Subject Firework.

12.    "Electronically-Stored Information" and "ESI" includes, but is not limited to, the following:

 a.  all items covered by Fed. R. Civ. P. 34(a)(1)(A);

 b.  information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (e.g., author, recipient, file creation date, file modification date, etc.);

 c.  internal or external websites;

 d.  output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messenger programs, bulletin board programs, operating systems, source codes, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or a file fragment; activity listing of electronic mail receipts and/or transmittals; and

 e.  any and all items stored on computer memories, hard disks, floppy disks,

CDROM, USBs, hard drives, portable hard drives, magnetic tape, microfiche, or

any other media for digital data storage, or transmittal, such as, but not limited to,

personal digital assistants (e.g., Palm Pilots), hand-held wireless devices (e.g.,

BlackBerrys, iPhones), or similar devices, and file folder tabs, or containers and

labels appended to, or relating to, any physical storage device associated with

each original or copy of all documents requested herein.

**MORGAN & MORGAN**

*/s/ Max Compton*

_____
William Maxwell Compton
Georgia Bar No. 380092
Counsel for Plaintiff

501 Riverside Ave., Suite 1200
Jacksonville, FL 32202
(912) 443-1017 - Direct
(912) 443-1184 – Facsimile
MCompton@forthepeople.com

STATE COURT OF
DEKALB COUNTY, GA.
5/15/2025 1:57 PM
E-FILED
BY: Kelly Johnson

Exhibit A

## EXHIBIT A

1.      Whether Phantom Importing agrees that "[t]he pyrotechnic chambers of fireworks devices must be constructed in such a manner that functioning of the device occurs in a normal manner." *See* Exhibit 8 to Jan. 8, 2024, Dragoui Dep. at page 13.

2.      Whether Phantom Importing agrees that for a firework to function in a "normal manner" "[t]he entire pyrotechnic effect must occur from the intended orifice(s)." *See id*.

3.      Whether Phantom Importing agrees that "[a]ny burning through the bottom or sides or any unintended rupture of the casing through the bottom or side of an item constitutes a burnout or blowout." *See id*.

4.      Whether Phantom Importing agrees that a firework that suffers burnout or blowout when used in accordance to the instructions on the firework does not operate in a normal manner. *See id*.

5.      Whether Phantom Importing agrees that a firework that suffers burnout or blowout when used in accordance to the instructions on the firework has suffered a malfunction.

6.      Whether Phantom Importing agrees that Subject Firework below suffered a blowout:



7.      Whether Phantom Importing agrees that if the Subject Firework was used in accordance with the instructions, then the Subject Firework malfunctioned.

8.      Whether Phantom Importing agrees that if the Subject Firework was used in accordance with the instructions including on the packaging of the Subject Firework, then the Subject Firework does not comply with the CPSC standards for fireworks.

9.      Whether Phantom Importing has any evidence that the Subject Firework was used or ignited in violation of the Subject Firework's instructions for use.

10.     Whether Phantom Importing agrees that "[a]ny fireworks device (other than firecrackers) which fails to conform to applicable requirements is a banned hazardous substance and is prohibited from the channels of interstate commerce." *See* 16 C.F.R. 1507.1.

11.     Whether Phantom Importing agrees that the applicable requirements for the Subject Firework require "[t]he pyrotechnic chamber in fireworks devices shall be constructed in a manner to allow functioning in a normal manner without burnout or blowout." *See* 16 C.F.R. 1507.6.

12.     Whether Phantom Importing agrees that the Subject Firework did not meet the applicable requirements because it suffered a Blowout or Burnout.

13.     Whether Phantom Importing agrees that because the Subject Firework did not meet the applicable requirements because it suffered a Blowout or Burnout that YOU the Subject Firework was a banned hazardous substance that was prohibited from the channels of interstate commerce.

14.     Whether Phantom Importing agrees that Phantom Importing was the entity who placed the Subject Firework into the channels of interstate commerce.

15.     Whether Phantom Importing agrees that Phantom Importing was responsible for testing the Subject Firework Model before importing the Subject Firework Model into the United

States. *See* Jan. 8, 2024, Drgagoui Dep. at pages 48.

16.    Whether Phantom Importing paid the AFSL to conduct testing on the "case" of fireworks that included the Subject Firework before it was imported into the Untied States. *See id*.

17.    Whether Phantom Importing employees and agents led the effort to establish the AFSL and otherwise participated in forming the AFSL. *See id*. at 26.

18.    Whether Phantom Importing paid for AFSL testing to ensure the Subject Firework Model would comply with federal law.

19.    Whether Phantom Importing employees and agents travel to China to "develop" "new items" and "[YOUR] new product line[s] in China…" *See* March 2, 2023, Dragiou Dep. at page 13 (also taken in the matter of Torres v. Phantom Firework Showrooms LLC formerly pending in Palm Beach County, Florida).

20.    Whether Phantom Importing agrees that the Chinese companies who produce the fireworks are YOUR "suppliers." *See id*.

21.    Whether Phantom Importing agrees reviews items that Phantom Importing suppliers send to Phantom Importing and select which items Phantom Importing will import. *See id*. at 14.

22.    Whether You agree that after importing fireworks from YOUR Chinese suppliers, YOU conduct YOUR own testing in Warren, Ohio of the products that YOU import. *See id*. at 20.

23.    Whether You agree that YOU are ultimately responsible for testing fireworks to ensure that the fireworks YOU import are safe for use.

24.    Whether You agree that YOU are ultimately responsible to ensure that fireworks YOU import meet any applicable government standards.

25.    Whether You agree that the State of Georgia requires YOU to obtain insurance

covering injuries associated with fireworks that YOU import that result from a defective condition of a firework that YOU imported.

26.     Whether You agree that the instructions for the Subject Firework instruct the user to "USE ONLY UNDER ADULT SUPERVISION. FOR OUTDOOR USE ONLY. DO NOT HOLD IN HAND. PLACE UPRIGHT AND USE ONLY ON CONCRETE, ASPHALT, OR OTHER HARD LEVEL SURFACE. THIS ITEM MAY TIP OVER IF USED ON GRASS OR OTHER UNEVEN SURFACES AND SERIOUS INJURY COULD RESULT. NEVER HAVE ANY PART OF YOUR BODY OVER THE DEVICE WHEN LIGHTING THE FUSE. LIGHT FUSE AND GET AWAY. NEVER LIGHT A FUSE THAT FAILS TO IGNITE THE DEVICE."

27.     ADMIT that if the firework complies with federal requirements and the user follows the aforementioned instructions, a Burnout or Blowout or other malfunction shall not occur.

28.     Whether You agree that if the firework suddenly explodes after being placed on a level hard surface and ignited, the firework does not comply with applicable federal requirements.

29.     Whether You agree that if the firework suddenly explodes after being placed on a level hard surface and ignited, the firework does not comply with YOUR own safety standards.

30.     Whether You agree that if the firework suddenly explodes after being placed on a level hard surface and ignited, the firework is not safe for consumer use.

31.     Whether You agree that if the firework suddenly explodes after being placed on a level hard surface and ignited, the firework is a banned hazardous substance.

32.     Whether You agree that YOU do not provide any warnings to end users that fireworks will suddenly explode when used in compliance with YOUR instructions for use.

33.     Whether or not YOU agree that a firework that suffers Burnout or Blowout when

used in accordance with the instructions is defective.

34.     Whether or not YOU agree that a firework that suffers Burnout or Blowout when used in accordance with the instructions has suffered a malfunction.

35.     Whether the testing process for the Subject Firework including whether YOU paid for the testing of the Subject Firework.

36.     Whether YOU would sell a firework if you knew that it was manufactured in a way that would cause it to suffer Burnout or Blowout.

37.     Whether YOU contend that a firework that suffers Burnout or Blowout is safe for consumer use.

38.     Whether based on the photo above, if the Subject Firework was used in accordance with its instructions, YOU contend it met YOUR safety standards.

39.     Whether, based on the photo above, if the Subject Firework was used in accordance with its instructions, YOU contend it met applicable federal law.

40.     Whether, based on the photo above, if the Subject Firework was used in accordance with its instructions, YOU contend it was not a banned hazardous substance.

41.     The testing of the Subject Firework or the Subject Fireworks batch or case.

42.     The substance and existence of any and all policies, agreements or arrangements between YOU and a Co-Defendant that govern the relationship for the sourcing, acquisition, review, credentialing, approval, accreditation, or procurement of products for sale at the YOUR showrooms in Georgia.

43.     The substance and existence of any policies, contractual agreements and/or charters between YOU and a Co-Defendant that govern the importation, sourcing, acquisition, review, credentialing, approval, accreditation, or procurement of products at YOUR showrooms in

Exhibit A

Georgia.

44.    The substance and existence of any  and all policies concerning the labeling of products for sale at the YOUR stores in Georgia..

45.    YOUR factual knowledge pertaining to or concerning the subject incident.

46.    The substance and existence of any and all insurance policies or agreements of any kind or nature under which any person or company carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse any payments made to satisfy any such judgment or settlement, including a certified copy of the declarations sheet as to each such policy. This specifically includes any excess policies that Phantom has shown they have purchased in other litigation.

47.    The marketing or advertisement of the Subject Firework Model that YOU used to sell the Subject Firework Model to Georgia consumers.

48.    The warnings that accompanied the Subject Firework.

49.    Whether YOU received complaints from consumers reporting "blowout" or "burnout" events of fireworks YOU imported from 2014 to 2024.

50.    Whether YOU took any action after receiving complaints about multishot firework YOU imported had suffered Blowout or Burnouts from 2014 to 2024 to increase or strengthen YOUR testing protocols

51.    Whether YOU received complaints from consumers reporting a multishot firework YOU imported had suddenly exploded near the ground after being ignited from 2014 to 2024.

52.    Whether YOU took any action after receiving complaints about multishot firework YOU imported had suddenly exploded near the ground after being ignited from 2014 to 2024 to increase or strengthen YOUR testing protocols.

53.    YOUR factual knowledge of the design of the Subject Firework.

54.    The substance of any communications or business dealing that YOU have with the supplier of the Subject Firework Model.

55.    The factual basis for YOUR affirmative defenses.

56.    The process that YOU utilized to gather responsive documents, excluding privileged attorney client communications or work product, including what emails and databases were searched and how YOU selected which emails and/or databases to search. *See Seven Seas Cruises S. De R.L. v. V. Ships Leisure Sam*, No. 09-23411-CIV, 2011 WL 181439, at *5 (S.D. Fla. Jan. 19, 2011); and *In re Grand Jury Proceedings*, 473 F. Supp. 2d 201, 211 (D. Mass. 2007).

**THIS DEPOSITION SHALL ALSO COVER THE CORPORATE REPRESENTATIVE(S)' FACTUAL KNOWLEDGE RELEVANT OF ANY MATTERS RELEVANT TO THE ISSUES IN THIS CASE OR OTHERWISE OUTSIDE THE TOPICS IN THIS NOTICE**

Exhibit A

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

MALACHI CARTER,

               Plaintiff,

           v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

            Defendants.

Civil Action File No.:  25A01059

---

## RULE 5.2 CERTIFICATE

COMES NOW, Defendant Phantom Fireworks Eastern Regions, LLC, and pursuant to Superior/State Court Uniform Rule 5.2, hereby notifies the Court that on the 4th day of June, 2025, Defendant served upon opposing counsel a copy of the following:

1. Defendant Phantom Fireworks Eastern Regions, LLC's First Set of Interrogatories to Plaintiff; and

2. Defendant Phantom Fireworks Eastern Regions, LLC's First Request for Production of Documents to Plaintiff.

This 4th day of June, 2025.

           Respectfully submitted,

           SWIFT, CURRIE, MCGHEE & HIERS, LLP

           */s/ R. Scott Connally*
           _____
           Kevan G. Dorsey
           Georgia Bar No.: 271402
           R. Scott Connally
           Georgia Bar No.: 171421
           *Attorneys for Defendants*

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

<span style="color:red">Exhibit A</span>

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

MALACHI CARTER,

                Plaintiff,

v.                                                         Civil Action File No.:  25A01059

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                Defendants.

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Rule 5.2 Certificate*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
191 Peachtree St Suite 4200,
Atlanta, GA 30303
mcompton@forthepeople.com

This 4th day of June, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ R. Scott Connally*

Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

3

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

<span style="color:red">Exhibit A</span>

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **MALACHI CARTER** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION FILE NO.: 25A01059** |
| **PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

---

**PLAINTIFFS' FIRST MOTION FOR JUDICIAL NOTICE**

---

COMES NOW, Plaintiff, Malachi Carter, through his undersigned counsel and files this First Motion for Judicial Notice. In support thereof Plaintiff states:

**<u>SUMMARY OF THE ARGUMENT</u>**

This product liability case involves a defective firework tested, imported, and sold by the Defendants. The firework suffered what is known in the "blowout" or "burnout" event. Federal law requires that firework compounds are only ejected from the orifices of the firework. A firework that is properly constructed will not self-destruct, and its ejection tubes will remain intact after the firework has deployed its shells. Thus, where a firework malfunctions and spontaneously combusts upon being ignited before the user can move away from the device, the firework violates applicable federal standards. Plaintiff moves for the Court to take judicial notice of these federal requirements and related CPSC manual governing firework testing.

- 1 -

For context, a picture of the Subject Firework is provided below. Plaintiff will introduce expert testimony to establish that only way for the Subject Firework to end up in that state is for it to suffer a "Blowout" or "Burnout" event. Plaintiff will also introduce expert testimony to establish that the only way for this event to occur is if the Subject Firework was sold in violation of applicable regulations. However, pursuant to O.C.G.A. § 24-2-220, at this time it is proper for the Court to take judicial notice of the relevant federal law.



## ARGUMENT AND CITATION TO AUTHORITY

### I)     LEGAL STANDARD FOR JUDICIAL NOTICE OF FEDERAL LAWS

Judicial notice of federal laws and regulations is covered by O.C.G.A. § 24-2-220 which provides:

> The existence and territorial extent of states and their forms of government; all symbols of nationality; the laws of nations; all laws and resolutions of the General Assembly and the journals of each branch thereof as published by authority; the laws of the United States and of the several states thereof as published by authority; the uniform rules of the courts; the administrative rules and regulations filed with the Secretary of State pursuant to Code Section 50-13-6; the general customs of merchants; the admiralty and maritime courts of the world and their seals; the political makeup and history of this state and the federal government as well as the local divisions of this state; the seals of the several departments of the government of the United States and of the several states of the union; and all

similar matters of legislative fact shall be judicially recognized without the introduction of proof. Judicial notice of adjudicative facts shall be governed by Code Section 24-2-201.

O.C.G.A. § 24-2-220.  Judicial notice may be taken at any time during the proceedings.

Najarian Capital, LLC v. Clark, 357 Ga.App. 685, 691 849 S.E.2d 262 (2020).  The state courts of the State of Georgia are "bound to take judicial cognizance of the laws of the United States."  City of Carrollton v. Walker, 215 Ga. 505, 511, 111 S.E.2d 79, 83 (1959); O.C.G.A. § 24-2-220; see also, Parker v. Parker, 207 Ga. 588, 589, 63 S.E.2d 366, 367 (1951); State Highway Dep't v. Parker, 114 Ga. App. 270, 275, 150 S.E.2d 875, 880 (1966); Crowley v. Hughes, 74 Ga. App. 531, 533, 40 S.E.2d 570, 572 (1946).

**II)**    **JUDICIAL NOTICE OF FEDERAL LAWS APPLICABLE TO THE INSTANT CASE**

   *a.  Federal Hazardous Substances Act (15 U.S.C 1261-1278a)*

Plaintiff first seeks judicial notice of 15 U.S.C § 1261-1278a which is a federal act prohibiting and regulating the importation of hazardous substances. Pursuant to 15 U.S.C. § 1262, the Consumer Products Safety Commission ("CPSC") is empowered with establishing regulations to enforce the Federal Hazardous Substances Act.  **Exhibit A** (15 U.S.C. § 1262) ("[w]henever in the judgment of the Commission such action will promote the objectives of this chapter by avoiding or resolving uncertainty as to its application, the Commission may by regulation declare to be a hazardous substance"). See also **Exhibit B** (15 U.S.C. § 1261) (defining Commission as the "CPSC"). This is a federal statute that empowers the CPSC to regulate the sale of fireworks in the United States and this Court must take judicial notice of this act under O.C.G.A. § 24-2-220.

   *b.  Federal Hazardous Substances Act Regulations—Part 1507 Firework Devices.*

Plaintiff's second request is for this Court to take judicial notice of the CPSC regulations set forth in Part 1507 that specifically apply to Firework Devices. *See* 16 C.F.R. § 1507, *et. seq.* Specifically, Plaintiff seeks that this Court take judicial notice of 16 C.F.R. § 1507.1 that states

- 3 -

in relevant part "[a]ny fireworks device (other than firecrackers) which fails to conform to

applicable requirements is a banned hazardous substance and is prohibited from the channels of

interstate commerce." **Exhibit C** (16 C.F.R. § 1507.1).

Further, Plaintiff request that the Court take judicial notice of 16 C.F.R. § 1507.6 that

states "[t]he pyrotechnic chamber in fireworks devices shall be constructed in a manner to allow

functioning in a normal manner without burnout or blowout." **Exhibit D** (16 C.F.R. § 1507.6).

This Court must take judicial notice of these federal regulations pursuant to O.C.G.A. § 24-

2-220.

    c. _Federal Hazardous Substances Act Regulations—Banned Hazardous Substances (16_
       _C.F.R § 1500.17)_

Plaintiff's third request seeks judicial notice of 16 C.F.R. § 1500.17 which prohibits the sale of

"[a]ll fireworks devices, other than firecrackers, including kits and components intended to produce such

fireworks, not otherwise banned under the act, that do not comply with the applicable requirements of part

1507 of this chapter…" **Exhibit E** (16 C.F.R. § 1500.17(9)).  Notably, none of the exceptions to this rule

apply as Plaintiff was not a farmer or rancher, was not conducting wildlife management, the product was

not self-pressurized for household use of vinyl chloride, and was not a "reloadable tube aerial shell

firework." _See_ Id.  This Court must take judicial notice of this federal regulation pursuant to O.C.G.A.

§ 24-2-220.

    d. _Federal Hazardous Substances Act Regulations—Product Requiring Speicial_
       _Labeling Under Section 3(b) of the Act (16 C.F.R § 1500.14)_

Plaintiff's fourth request seeks judicial notice of 16 C.F.R. § 1500.14 which requires

firework labeling and instructions to be provided with content that is directly provided by federal

law:

    (ix) Mines and shells.
    WARNING (OR CAUTION) EMITS SHOWERS OF SPARKS (OR SHOOTS
    FLAMING BALLS, IF MORE DESCRIPTIVE)
    Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.
Place on hard smooth surface (or place upright on level ground, if more descriptive).
Do not hold in hand.
Light fuse and get away.

**Exhibit F** (16 C.F.R. § 1500.14(b)(7)(ix)).  These federally mandated warnings presuppose that the user of a firework will be able to light the fuse and "get away."  However, where a violative firework suffers blowout, the ability to get away can be compromised if the firework blowout or burnout occurs before the user has a chance to get away. This Court must take judicial notice of these federal regulations pursuant to O.C.G.A. § 24-2-220.

> e.   *Firework Testing Order Issued and Other Data Supplied by the CPSC*

Finally, Plaintiff also seeks judicial notice of orders issued by the CPSC. Specifically, Plaintiff seeks to have this Court take judicial notice of the Consumer Fireworks Testing Manual. **Exhibit G** (Consumer Products Testing Manual).  This manual defines the terms "blowout" and "burnout" as "[a]ny burning through the bottom or sides or any unintended rupture of the casing through the bottom or side of an item constitutes a burnout or blowout." *See* Id. at page 13.  A blowout or burnout is considered a malfunction. *See* Id. at pages 12-13.  Additionally, an event where "[a]erial reports discharge[] on the ground" is considered a malfunction.  Id.  Thus, when a consumer follows the instructions and a multishot shell firework, like the Subject Firework, explodes on the ground, a malfunction occurs.

It is proper for this Court to take judicial notice of this manual under Ga. Code Ann., § 24-2-220 because this documents is an official product of the United States government and a matter of public record.  This manual is tantamount to a resolution from a federal agency issued pursuant to its official duties.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff moves this Court to take Judicial Notice, pursuant to

O.C.G.A. § 24-2-220, of: (1) 15 U.S.C §§ 1261, 1262; (2) 16 C.F.R. §§ 1507.1, 1507.6; (3) 16

C.F.R. § 1500.17; (4) 16 C.F.R. § 1500.14; and (5) the U.S. Consumer Product Safety

Commission Fireworks Testing Manual.  A proposed order has been filed simultaneously

herewith.

Respectfully submitted, this 13th day of June, 2025.

**MORGAN & MORGAN**

*/s/ Max Compton*

_____

William Maxwell Compton
Georgia Bar No. 380092
*Attorney for Plaintiff*

501 Riverside Ave., Suite 1200
Jacksonville, FL 32202
(912) 443-1017 - Direct
(912) 443-1184 – Facsimile
MCompton@forthepeople.com

STATE COURT OF
DEKALB COUNTY, GA.
6/13/2025 2:28 PM
E-FILED
BY: Kelly Johnson

<span style="color:red">Exhibit A</span>

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of June, 2025, I served the foregoing Motion for

Judicial Notice on all parties of record using the Court's Odyssey e-file and serve service which

provides statutory electronic service to all counsel of record.

**MORGAN & MORGAN**

*/s/ Max Compton*
_____
William Maxwell Compton
Georgia Bar No. 380092
Attorney for *Plaintiff*

<span style="color:red">Exhibit A</span>

## <u>INDEX OF EXHIBITS</u>

| | |
|---|---|
| **EXHIBIT A** | 15 U.S.C. § 1261 |
| **EXHIBIT B** | 15 U.S.C. § 1262 |
| **EXHIBIT C** | 16 C.F.R. § 1507.1 |
| **EXHIBIT D** | 16 C.F.R. § 1507.6 |
| **EXHIBIT E** | 16 C.F.R. 1500.17 |
| **EXHIBIT F** | 16 C.F.R. § 1507.14 |
| **EXHIBIT G** | U.S. Consumer Product Safety Commission Fireworks Testing Manual |

Exhibit A

# EXHIBIT A

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 30. Hazardous Substances (Refs & Annos)

15 U.S.C.A. § 1261

§ 1261. Definitions

Currentness

For the purposes of this chapter--

**(a)** The term "territory" means any territory or possession of the United States, including the District of Columbia and the Commonwealth of Puerto Rico but excluding the Canal Zone.

**(b)** The term "interstate commerce" means (1) commerce between any State or territory and any place outside thereof, and (2) commerce within the District of Columbia or within any territory not organized with a legislative body.

**(c)** The term "Commission" means the Consumer Product Safety Commission.

**(d)** Repealed. Pub.L. 110-314, Title II, § 204(b)(4)(A), Aug. 14, 2008, 122 Stat. 3041

**(e)** The term "person" includes an individual, partnership, corporation, and association.

**(f)** The term "hazardous substance" means:

**(1)(A)** Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children.

**(B)** Any substances which the Commission by regulation finds, pursuant to the provisions of section 1262(a) of this title, meet the requirements of subparagraph (1)(A) of this paragraph.

**(C)** Any radioactive substance, if, with respect to such substance as used in a particular class of article or as packaged, the Commission determines by regulation that the substance is sufficiently hazardous to require labeling in accordance with this chapter in order to protect the public health.

**(D)** Any toy or other article intended for use by children which the Commission by regulation determines, in accordance with section 1262(e) of this title, presents an electrical, mechanical, or thermal hazard.

**(E)** Any solder which has a lead content in excess of 0.2 percent.

**(2)** The term "hazardous substance" shall not apply to pesticides subject to the Federal Insecticide, Fungicide, and Rodenticide Act, nor to foods, drugs and cosmetics subject to the Federal Food, Drug, and Cosmetic Act, nor to substances intended for use as fuels when stored in containers and used in the heating, cooking, or refrigeration system of a house, nor to tobacco and tobacco products, but such term shall apply to any article which is not itself a pesticide within the meaning of the Federal Insecticide, Fungicide, and Rodenticide Act but which is a hazardous substance within the meaning of subparagraph (1) of this paragraph [1] by reason of bearing or containing such a pesticide.

**(3)** The term "hazardous substance" shall not include any source material, special nuclear material, or byproduct material as defined in the Atomic Energy Act of 1954, as amended, and regulations issued pursuant thereto by the Atomic Energy Commission.

**(g)** The term "toxic" shall apply to any substance (other than a radioactive substance) which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface.

**(h)(1)** The term "highly toxic" means any substance which falls within any of the following categories: (a) Produces death within fourteen days in half or more than half of a group of ten or more laboratory white rats each weighing between two hundred and three hundred grams, at a single dose of fifty milligrams or less per kilogram of body weight, when orally administered; or (b) produces death within fourteen days in half or more than half of a group of ten or more laboratory white rats each weighing between two hundred and three hundred grams, when inhaled continuously for a period of one hour or less at an atmospheric concentration of two hundred parts per million by volume or less of gas or vapor or two milligrams per liter by volume or less of mist or dust, provided such concentration is likely to be encountered by man when the substance is used in any reasonably foreseeable manner; or (c) produces death within fourteen days in half or more than half of a group of ten or more rabbits tested in a dosage of two hundred milligrams or less per kilogram of body weight, when administered by continuous contact with the bare skin for twenty-four hours or less.

**(2)** If the Commission finds that available data on human experience with any substance indicate results different from those obtained on animals in the above-named dosages or concentrations, the human data shall take precedence.

**(i)** The term "corrosive" means any substance which in contact with living tissue will cause destruction of tissue by chemical action; but shall not refer to action on inanimate surfaces.

**(j)** The term "irritant" means any substance not corrosive within the meaning of subparagraph (i) which on immediate, prolonged, or repeated contact with normal living tissue will induce a local inflammatory reaction.

**(k)** The term "strong sensitizer" means a substance which will cause on normal living tissue through an allergic or photodynamic process a hypersensitivity which becomes evident on reapplication of the same substance and which is designated as such by the Commission. Before designating any substance as a strong sensitizer, the Commission, upon consideration of the frequency of occurrence and severity of the reaction, shall find that the substance has a significant potential for causing hypersensitivity.

**(l)(1)** The terms "extremely flammable", "flammable", and "combustible" as applied to any substance, liquid, solid, or the content of a self-pressurized container shall be defined by regulations issued by the Commission.

**(2)** The test methods found by the Commission to be generally applicable for defining the flammability or combustibility characteristics of any such substance shall also be specified in such regulations.

**(3)** In establishing definitions and test methods related to flammability and combustibility, the Commission shall consider the existing definitions and test methods of other Federal agencies involved in the regulation of flammable and combustible substances in storage, transportation and use; and to the extent possible, shall establish compatible definitions and test methods.

**(4)** Until such time as the Commission issues a regulation under paragraph (1) defining the term "combustible" as applied to liquids, such term shall apply to any liquid which has a flash point above eighty degrees Fahrenheit to and including one hundred and fifty degrees, as determined by the Tagliabue Open Cup Tester.

**(m)** The term "radioactive substance" means a substance which emits ionizing radiation.

**(n)** The term "label" means a display of written, printed, or graphic matter upon the immediate container of any substance or, in the case of an article which is unpackaged or is not packaged in an immediate container intended or suitable for delivery to the ultimate consumer, a display of such matter directly upon the article involved or upon a tag or other suitable material affixed thereto; and a requirement made by or under authority of this chapter that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears (1) on the outside container or wrapper, if any there be, unless it is easily legible through the outside container or wrapper and (2) on all accompanying literature where there are directions for use, written or otherwise.

**(o)** The term "immediate container" does not include package liners.

**(p)** The term "misbranded hazardous substance" means a hazardous substance (including a toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted) intended, or packaged in a form suitable, for use in the household or by children, if the packaging or labeling of such substance is in violation of an applicable regulation issued pursuant to section 1472 or 1473 of this title or if such substance, except as otherwise provided by or pursuant to section 1262 of this title, fails to bear a label--

**(1)** which states conspicuously (A) the name and place of business of the manufacturer, packer, distributor or seller; (B) the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the Commission by regulation permits or requires the use of a recognized generic name; (C) the signal word "DANGER" on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word "WARNING" or "CAUTION" on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as "Flammable", "Combustible", "Vapor Harmful", "Causes Burns", "Absorbed Through Skin", or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Commission pursuant to section 1262 of this title; (G) instruction, when necessary or appropriate, for first-aid treatment; (H) the word "poison" for any hazardous substance which is defined as "highly toxic" by subsection (h); (I) instructions for handling and storage of packages which require special care in handling

or storage; and (J) the statement (i) "Keep out of the reach of children" or its practical equivalent, or, (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard, and

**(2)** on which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label.

The term "misbranded hazardous substance" also includes a household substance as defined in section 1471(2)(D) of this title if it is a substance described in paragraph (1) of subsection (f) of this section and its packaging or labeling is in violation of an applicable regulation issued pursuant to section 1472 or 1473 of this title.

**(q)(1)** The term "banned hazardous substance" means (A) any toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted; or (B) any hazardous substance intended, or packaged in a form suitable, for use in the household, which the Commission by regulation classifies as a "banned hazardous substance" on the basis of a finding that, notwithstanding such cautionary labeling as is or may be required under this chapter for that substance, the degree or nature of the hazard involved in the presence or use of such substance in households is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance, when so intended or packaged, out of the channels of interstate commerce: *Provided*, That the Commission, by regulation, (i) shall exempt from clause (A) of this paragraph articles, such as chemical sets, which by reason of their functional purpose require the inclusion of the hazardous substance involved or necessarily present an electrical, mechanical, or thermal hazard, and which bear labeling giving adequate directions and warnings for safe use and are intended for use by children who have attained sufficient maturity, and may reasonably be expected, to read and heed such directions and warnings, and (ii) shall exempt from clause (A), and provide for the labeling of, common fireworks (including toy paper caps, cone fountains, cylinder fountains, whistles without report, and sparklers) to the extent that it determines that such articles can be adequately labeled to protect the purchasers and users thereof.

**(2)** Proceedings for the issuance, amendment, or repeal of regulations pursuant to clause (B) of subparagraph (1) of this paragraph shall be governed by the provisions of subsections (f) through (i) of section 1262 of this title, except that if the Commission finds that the distribution for household use of the hazardous substance involved presents an imminent hazard to the public health, it may by order published in the Federal Register give notice of such finding, and thereupon such substance when intended or offered for household use, or when so packaged as to be suitable for such use, shall be deemed to be a "banned hazardous substance" pending the completion of proceedings relating to the issuance of such regulations.

**(r)** An article may be determined to present an electrical hazard if, in normal use or when subjected to reasonably foreseeable damage or abuse, its design or manufacture may cause personal injury or illness by electric shock.

**(s)** An article may be determined to present a mechanical hazard if, in normal use or when subjected to reasonably foreseeable damage or abuse, its design or manufacture presents an unreasonable risk of personal injury or illness (1) from fracture, fragmentation, or disassembly of the article, (2) from propulsion of the article (or any part or accessory thereof), (3) from points or other protrusions, surfaces, edges, openings, or closures, (4) from moving parts, (5) from lack or insufficiency of controls to reduce or stop motion, (6) as a result of self-adhering characteristics of the article, (7) because the article (or any part or accessory thereof) may be aspirated or ingested, (8) because of instability, or (9) because of any other aspect of the article's design or manufacture.

**(t)** An article may be determined to present a thermal hazard if, in normal use or when subjected to reasonably foreseeable damage or abuse, its design or manufacture presents an unreasonable risk of personal injury or illness because of heat as from heated parts, substances, or surfaces.

### CREDIT(S)

(Pub.L. 86-613, § 2, July 12, 1960, 74 Stat. 372; Pub.L. 89-756, §§ 2(a) to (c), 3(a), Nov. 3, 1966, 80 Stat. 1303, 1304; Pub.L. 91-113, §§ 2(a), (c), (d), 3, Nov. 6, 1969, 83 Stat. 187 to 189; Pub.L. 91-601, § 6(a), formerly § 7(a), Dec. 30, 1970, 84 Stat. 1673, renumbered Pub.L. 97-35, Title XII, § 1205(c), Aug. 13, 1981, 95 Stat. 716; Pub.L. 92-516, § 3(1), Oct. 21, 1972, 86 Stat. 998; Pub.L. 94-284, § 3(c), May 11, 1976, 90 Stat. 503; Pub.L. 95-631, § 9, Nov. 10, 1978, 92 Stat. 3747; Pub.L. 99-339, Title I, § 109(d)(1), June 19, 1986, 100 Stat. 653; Pub.L. 110-314, Title II, § 204(b)(2), (4)(A), (B), (D), Aug. 14, 2008, 122 Stat. 3041, 3042.)

Notes of Decisions (89)

---

### Footnotes

1        So in original. Probably should be "paragraph (1) of this subsection".

15 U.S.C.A. § 1261, 15 USCA § 1261
Current through P.L. 119-5. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   5

# EXHIBIT B



KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 30. Hazardous Substances (Refs & Annos)

15 U.S.C.A. § 1262

§ 1262. Declaration of hazardous substances

Currentness

**(a) Rulemaking**

**(1) In general**

Whenever in the judgment of the Commission such action will promote the objectives of this chapter by avoiding or resolving uncertainty as to its application, the Commission may by regulation declare to be a hazardous substance, for the purposes of this chapter, any substance or mixture of substances, which it finds meets the requirements of section 1261(f)(1)(A) of this title.

**(2) Procedure**

Proceedings for the issuance, amendment, or repeal of regulations under this subsection and the admissibility of the record of such proceedings in other proceedings, shall be governed by the provisions of subsections (f) through (i) of this section.

**(b) Reasonable variations or additional label requirements**

If the Commission finds that the requirements of section 1261(p)(1) of this title are not adequate for the protection of the public health and safety in view of the special hazard presented by any particular hazardous substance, it may by regulation establish such reasonable variations or additional label requirements as it finds necessary for the protection of the public health and safety; and any such hazardous substance intended, or packaged in a form suitable, for use in the household or by children, which fails to bear a label in accordance with such regulations shall be deemed to be a misbranded hazardous substance.

**(c) Exemption from requirements by regulation**

If the Commission finds that, because of the size of the package involved or because of the minor hazard presented by the substance contained therein, or for other good and sufficient reasons, full compliance with the labeling requirements otherwise applicable under this chapter is impracticable or is not necessary for the adequate protection of the public health and safety, the Commission shall promulgate regulations exempting such substance from these requirements to the extent it determines to be consistent with adequate protection of the public health and safety.

**(d) Exemption from requirements of this chapter of substances or containers adequately regulated by other provisions of law**

The Commission may exempt from the requirements established by or pursuant to this chapter any hazardous substance or container of a hazardous substance with respect to which it finds that adequate requirements satisfying the purposes of this chapter have been established by or pursuant to any other Act of Congress.

**(e) Regulation of toys or articles intended for use by children**

**(1)** A determination by the Commission that a toy or other article intended for use by children presents an electrical, mechanical, or thermal hazard shall be made by regulation in accordance with the procedures prescribed by section 553 (other than clause (B) of the last sentence of subsection (b) of such section) of Title 5 unless the Commission elects the procedures prescribed by subsection (e) of section 371 of Title 21, in which event such subsection and subsections (f) and (g) of such section 371 of Title 21 shall apply to the making of such determination. If the Commission makes such election, it shall publish that fact with the proposal required to be published under paragraph (1) of such subsection (e).

**(2)** If, before or during a proceeding pursuant to paragraph (1) of this subsection, the Commission finds that, because of an electrical, mechanical, or thermal hazard, distribution of the toy or other article involved presents an imminent hazard to the public health and it, by order published in the Federal Register, gives notice of such finding, such toy or other article shall be deemed to be a banned hazardous substance for purposes of this chapter until the proceeding has been completed. If not yet initiated when such order is published, such a proceeding shall be initiated as promptly as possible.

**(3)(A)** In the case of any toy or other article intended for use by children which is determined by the Commission, in accordance with section 553 of Title 5, to present an electrical, mechanical, or thermal hazard, any person who will be adversely affected by such a determination may, at any time prior to the 60th day after the regulation making such determination is issued by the Commission, file a petition with the United States Court of Appeals for the circuit in which such person resides or has his principal place of business for a judicial review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Commission or other officer designated by him [1] for that purpose. The Commission shall file in the court the record of the proceedings on which the Commission based its determination, as provided in section 2112 of Title 28.

**(B)** If the petitioner applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there was no opportunity to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Commission in a hearing or in such other manner, and upon such terms and conditions, as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, and its recommendation, if any, for the modification or setting aside of its original determination, with the return of such additional evidence.

**(C)** Upon the filing of the petition under this paragraph, the court shall have jurisdiction to review the determination of the Commission in accordance with subparagraphs (A), (B), (C), and (D) of paragraph (2) of the second sentence of section 706 of Title 5. If the court ordered additional evidence to be taken under subparagraph (B) of this paragraph, the court shall also review the Secretary's [2] determination to determine if, on the basis of the entire record before the court pursuant to subparagraphs (A) and (B) of this paragraph, it is supported by substantial evidence. If the court finds the determination is not so supported, the

court may set it aside. With respect to any determination reviewed under this paragraph, the court may grant appropriate relief pending conclusion of the review proceedings, as provided in section 705 of Title 5.

**(D)** The judgment of the court affirming or setting aside, in whole or in part, any such determination of the Commission shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of Title 28.

**(f) Commencement of proceeding for promulgation of regulation; notice**

A proceeding for the promulgation of a regulation under section 1261(q)(1) of this title classifying an article or substance as a banned hazardous substance or a regulation under subsection (e) of this section may be commenced by the publication in the Federal Register of an advance notice of proposed rulemaking which shall--

**(1)** identify the article or substance and the nature of the risk of injury associated with the article or substance;

**(2)** include a summary of each of the regulatory alternatives under consideration by the Commission (including voluntary standards);

**(3)** include information with respect to any existing standard known to the Commission which may be relevant to the proceedings, together with a summary of the reasons why the Commission believes preliminarily that such standard does not eliminate or adequately reduce the risk of injury identified in paragraph (1);

**(4)** invite interested persons to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days or more than 60 days after the date of publication of the notice), comments with respect to the risk of injury identified by the Commission, the regulatory alternatives being considered, and other possible alternatives for addressing the risk;

**(5)** invite any person (other than the Commission) to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days after the date of publication of the notice), an existing standard or a portion of a standard as a proposed regulation under section 1261(q)(1) of this title or subsection (e) of this section; and

**(6)** invite any person (other than the Commission) to submit to the Commission, within such period as the Commission shall specify in the notice (which period shall not be less than 30 days after the date of publication of the notice), a statement of intention to modify or develop a voluntary standard to address the risk of injury identified in paragraph (1) together with a description of a plan to modify or develop the standard.

The Commission shall transmit such notice within 10 calendar days to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives.

**(g) Publication of standard; termination of proceeding for promulgation of regulation; monitoring of compliance**

**(1)** If the Commission determines that any standard submitted to it in response to an invitation in a notice published under subsection (f)(5) if promulgated (in whole, in part, or in combination with any other standard submitted to the Commission or any part of such a standard) as a regulation under section 1261(q)(1) of this title or subsection (e) of this section, as the case may be, would eliminate or adequately reduce the risk of injury identified in a notice provided under subsection (f)(1), the Commission may publish such standard, in whole, in part, or in such combination and with nonmaterial modifications, as a proposed regulation under such section or subsection.

**(2)** If the Commission determines that--

    **(A)** compliance with any standard submitted to it in response to an invitation in a notice published under subsection (f)(6) is likely to result in the elimination or adequate reduction of the risk of injury identified in the notice, and

    **(B)** it is likely that there will be substantial compliance with such standard,

the Commission shall terminate any proceeding to promulgate a regulation under section 1261(q)(1) of this title or subsection (e) of this section, respecting such risk of injury and shall publish in the Federal Register a notice which includes the determination of the Commission and which notifies the public that the Commission will rely on the voluntary standard to eliminate or reduce the risk of injury, except that the Commission shall terminate any such proceeding and rely on a voluntary standard only if such voluntary standard is in existence. For purposes of this section, a voluntary standard shall be considered to be in existence when it is finally approved by the organization or other person which developed such standard, irrespective of the effective date of the standard. Before relying upon any voluntary standard, the Commission shall afford interested persons (including manufacturers, consumers, and consumer organizations) a reasonable opportunity to submit written comments regarding such standard. The Commission shall consider such comments in making any determination regarding reliance on the involved voluntary standard under this subsection.

**(3)** The Commission shall devise procedures to monitor compliance with any voluntary standards--

    **(A)** upon which the Commission has relied under paragraph (2) of this subsection;

    **(B)** which were developed with the participation of the Commission; or

    **(C)** whose development the Commission has monitored.

**(h) Publication of proposed rule together with preliminary regulatory analysis**

No regulation under section 1261(q)(1) of this title classifying an article or substance as a banned hazardous substance and no regulation under subsection (e) of this section may be proposed by the Commission unless the Commission publishes in the Federal Register the text of the proposed rule, including any alternatives, which the Commission proposes to promulgate, together with a preliminary regulatory analysis containing--

**(1)** a preliminary description of the potential benefits and potential costs of the proposed regulation, including any benefits or costs that cannot be quantified in monetary terms, and an identification of those likely to receive the benefits and bear the costs;

**(2)** a discussion of the reasons any standard or portion of a standard submitted to the Commission under subsection (f)(5) was not published by the Commission as the proposed regulation or part of the proposed regulation;

**(3)** a discussion of the reasons for the Commission's preliminary determination that efforts proposed under subsection (f)(6) and assisted by the Commission as required by section 2054(a)(3) of this title would not, within a reasonable period of time, be likely to result in the development of a voluntary standard that would eliminate or adequately reduce the risk of injury identified in the notice provided under subsection (f)(1); and

**(4)** a description of any reasonable alternatives to the proposed regulation, together with a summary description of their potential costs and benefits, and a brief explanation of why such alternatives should not be published as a proposed regulation.

The Commission shall transmit such notice within 10 calendar days to the appropriate Congressional committees. Nothing in this subsection shall preclude any person from submitting an existing standard or portion of a standard as a proposed regulation.

**(i) Publication of final regulatory analysis with regulation; required findings; judicial review**

**(1)** The Commission shall not promulgate a regulation under section 1261(q)(1) of this title classifying an article or substance as a banned hazardous substance or a regulation under subsection (e) of this section unless it has prepared a final regulatory analysis of the regulation containing the following information:

**(A)** A description of the potential benefits and potential costs of the regulation, including costs and benefits that cannot be quantified in monetary terms, and the identification of those likely to receive the benefits and bear the costs.

**(B)** A description of any alternatives to the final regulation which were considered by the Commission, together with a summary description of their potential benefits and costs and a brief explanation of the reasons why these alternatives were not chosen.

**(C)** A summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

The Commission shall publish its final regulatory analysis with the regulation.

**(2)** The Commission shall not promulgate a regulation under section 1261(q)(1) of this title classifying an article or substance as a banned hazardous substance or a regulation under subsection (e) of this section unless it finds (and includes such finding in the regulation)--

**(A)** in the case of a regulation which relates to a risk of injury with respect to which persons who would be subject to such regulation have adopted and implemented a voluntary standard, that--

**(i)** compliance with such voluntary standard is not likely to result in the elimination or adequate reduction of such risk of injury; or

**(ii)** it is unlikely that there will be substantial compliance with such voluntary standard;

**(B)** that the benefits expected from the regulation bear a reasonable relationship to its costs; and

**(C)** that the regulation imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which the regulation is being promulgated.

**(3)(A)** Any regulatory analysis prepared under subsection (h) or paragraph (1) shall not be subject to independent judicial review, except that when an action for judicial review of a regulation is instituted, the contents of any such regulatory analysis shall constitute part of the whole rulemaking record of agency action in connection with such review.

**(B)** The provisions of subparagraph (A) shall not be construed to alter the substantive or procedural standards otherwise applicable to judicial review of any action by the Commission.

**(j) Petition to initiate rulemaking**

The Commission shall grant, in whole or in part, or deny any petition under section 553(e) of Title 5 requesting the Commission to initiate a rulemaking, within a reasonable time after the date on which such petition is filed. The Commission shall state the reasons for granting or denying such petition. The Commission may not deny any such petition on the basis of a voluntary standard unless the voluntary standard is in existence at the time of the denial of the petition, the Commission has determined that the voluntary standard is likely to result in the elimination or adequate reduction of the risk of injury identified in the petition, and it is likely that there will be substantial compliance with the standard.

### CREDIT(S)

(Pub.L. 86-613, § 3, July 12, 1960, 74 Stat. 374; Pub.L. 89-756, § 2(d), (e), Nov. 3, 1966, 80 Stat. 1303, 1304; Pub.L. 91-113, § 2(b), Nov. 6, 1969, 83 Stat. 187; Pub.L. 97-35, Title XII, § 1203(b)(1), Aug. 13, 1981, 95 Stat. 708; Pub.L. 101-608, Title I, §§ 107(b), 108(b), 110(b), Nov. 16, 1990, 104 Stat. 3112, 3113; Pub.L. 110-314, Title II, § 204(b)(1), (3), (4)(B), (D), Aug. 14, 2008, 122 Stat. 3041, 3042.)

Notes of Decisions (20)

## Footnotes

1    So in original. Probably should be "it".

2    So in original. Probably should be "Commission's".

15 U.S.C.A. § 1262, 15 USCA § 1262
Current through P.L. 119-5. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

Exhibit A

---

Code of Federal Regulations
  Title 16. Commercial Practices
    Chapter II. Consumer Product Safety Commission (Refs & Annos)
      Subchapter C. Federal Hazardous Substances Act Regulations
        Part 1507. Fireworks Devices (Refs & Annos)

16 C.F.R. § 1507.1

§ 1507.1 Scope.

Currentness

This part 1507 prescribes requirements for those fireworks devices (other than firecrackers) not otherwise banned under the act. Any fireworks device (other than firecrackers) which fails to conform to applicable requirements is a banned hazardous substance and is prohibited from the channels of interstate commerce. Any fireworks device not otherwise banned under the act shall not be a banned hazardous substance by virtue of the fact that there are no applicable requirements prescribed herein.

SOURCE: 41 FR 22935, June 8, 1976; 61 FR 67200, Dec. 20, 1996, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1261–1262, 2079(d); 21 U.S.C. 371(e).

Notes of Decisions (4)

Current through May 15, 2025, 90 FR 20565. Some sections may be more current. See credits for details.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Code of Federal Regulations
Title 16. Commercial Practices
Chapter II. Consumer Product Safety Commission (Refs & Annos)
Subchapter C. Federal Hazardous Substances Act Regulations
Part 1507. Fireworks Devices (Refs & Annos)

16 C.F.R. § 1507.6

§ 1507.6 Burnout and **blowout**.

Currentness

The pyrotechnic chamber in fireworks devices shall be constructed in a manner to allow functioning in a normal manner without burnout or **blowout**.

SOURCE: 41 FR 22935, June 8, 1976; 61 FR 67200, Dec. 20, 1996, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1261–1262, 2079(d); 21 U.S.C. 371(e).

Current through May 15, 2025, 90 FR 20565. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit A

# EXHIBIT E

 KeyCite Yellow Flag

Proposed Regulation

Code of Federal Regulations
    Title 16. Commercial Practices
        Chapter II. Consumer Product Safety Commission (Refs & Annos)
            Subchapter C. Federal Hazardous Substances Act Regulations
                Part 1500. Hazardous Substances and Articles: Administration and Enforcement Regulations (Refs & Annos)

16 C.F.R. § 1500.17

§ 1500.17 Banned hazardous substances.

Currentness

(a) Under the authority of section 2(q)(1)(B) of the act, the Commission declares as banned hazardous substances the following articles because they possess such a degree or nature of hazard that adequate cautionary labeling cannot be written and the public health and safety can be served only by keeping such articles out of interstate commerce:

(1) Mixtures that are intended primarily for application to interior masonry walls, floors, etc., as a water repellant treatment and that are "extremely flammable" within the meaning of section 2(l) of the act (repeated in § 1500.3(b)(10)).

(2) Carbon tetrachloride and mixtures containing it (including carbon tetrachloride and mixtures containing it used in fire extinguishers), excluding unavoidable manufacturing residues of carbon tetrachloride in other chemicals that under reasonably foreseeable conditions of use do not result in an atmospheric concentration of carbon tetrachloride greater than 10 parts per million.

(3) Fireworks devices intended to produce audible effects (including but not limited to cherry bombs, M–80 salutes, silver salutes, and other large firecrackers, aerial bombs, and other fireworks designed to produce audible effects, and including kits and components intended to produce such fireworks) if the audible effect is produced by a charge of more than 2 grains of pyrotechnic composition; except that this provision shall not apply to such fireworks devices if all of the following conditions are met:

(i) Such fireworks devices are distributed to farmers, ranchers, or growers through a wildlife management program administered by the U.S. Department of the Interior (or by equivalent State or local government agencies); and

(ii) Such distribution is in response to a written application describing the wildlife management problem that requires use of such devices, is of a quantity no greater than required to control the problem described, and is where other means of control are unavailable or inadequate. (See also § 1500.14(b)(7); § 1500.17(a)(8) and (9); § 1500.83(a)(27); § 1500.85(a)(2); and part 1507).

(4) Liquid drain cleaners containing 10 percent or more by weight of sodium and/or potassium hydroxide; except that this subparagraph shall not apply to such liquid drain cleaners if packaged in accordance with a standard for special packaging

of such articles promulgated under the Poison Prevention Packaging Act of 1970 (Pub.L. 91–601, 84 Stat. 1670–74 (15 U.S.C. 1471–76)).

(5) Products containing soluble cyanide salts, excluding unavoidable manufacturing residues of cyanide salts in other chemicals that under reasonable and foreseeable conditions of use will not result in a concentration of cyanide greater than 25 parts per million.

(6)(i) Any paint or other similar surface-coating material intended, or packaged in a form suitable, for use in or around the household that:

(A) Is shipped in interstate commerce after December 31, 1973, and contains lead compounds of which the lead content (calculated as the metal) is in excess of 0.06 percent of the total weight of the contained solids or dried paint film; or

(B) Is shipped in interstate commerce after December 31, 1972, and contains lead compounds of which the lead content (calculated as the metal) is in excess of 0.5 percent of the total weight of the contained solids or dried paint film.

(C) [Reserved]

(D) The provisions of paragraph (a)(6)(i) of this section do not apply to artists' paints and related materials.

(ii) Any toy or other article intended for use by children that:

(A) Is shipped in interstate commerce after December 31, 1973, and bears any paint or other similar surface-coating material containing lead compounds of which the lead content (calculated as the metal) is in excess of 0.06 percent of the total weight of the contained solids or dried paint film; or

(B) Is shipped in interstate commerce after December 31, 1972, and bears any paint or other similar surface-coating material containing lead compounds of which the lead content (calculated as the metal) is in excess of 0.5 percent of the total weight of the contained solids or dried paint film.

(iii) Since the Commission has issued comprehensive regulations for lead-containing paint and certain consumer products bearing such paint at the 0.06 percent level under the Consumer Product Safety Act (see 16 CFR part 1303), paragraphs (i) and (ii) of § 1500.17(a)(6) are revoked as to the subject products manufactured after February 27, 1978.

Note: The effective date of paragraphs (a)(6)(i)(A) and (a)(6)(ii)(A) was stayed by an order published in the Federal Register of August 10, 1972 (37 FR 16078).

(7) General-use garments containing asbestos (other than garments having a bona fide application for personal protection against thermal injury and so constructed that the asbestos fibers will not become airborne under reasonably foreseeable conditions of use).

(8) Firecrackers designed to produce audible effects, if the audible effect is produced by a charge of more than 50 milligrams (.772 grains) of pyrotechnic composition (not including firecrackers included as components of a rocket), aerial bombs, and devices that may be confused with candy or other foods, such as "dragon eggs," and "cracker balls" (also known as "ball-type caps"), and including kits and components intended to produce such fireworks except such devices which meet all of the following conditions:

(i) The fireworks devices are distributed to farmers, ranchers, or growers through a wildlife management program administered by the U.S. Department of Interior (or by equivalent State or local governmental agencies); and

(ii) Such distribution is in response to a written application describing the wildlife management problem that requires use of such devices, is of a quantity no greater than required to control the problem described, and is where other means of control is unavailable or inadequate. (See also § 1500.17(a)(3) and (9)).

(9) All fireworks devices, other than firecrackers, including kits and components intended to produce such fireworks, not otherwise banned under the act, that do not comply with the applicable requirements of part 1507 of this chapter, except fireworks devices which meet all the following conditions:

(i) The fireworks devices are distributed to farmers, ranchers, or growers through a wildlife management program administered by the U.S. Department of the Interior (or by equivalent State or local government agencies); and

(ii) Such distribution is in response to a written application describing the wildlife management problem that requires use of such devices, is of a quantity no greater than required to control the problem described, and is where other means of control is unavailable or inadequate. (See also § 1500.17(a)(3) and (8)).

(10) Self-pressurized products intended or suitable for household use that contain vinyl chloride monomer as an ingredient or in the propellant manufactured or imported on or after October 7, 1974. (See also § 1500.17(a)(3) and (8)).

(11)(i) Reloadable tube aerial shell fireworks devices that use shells larger than 1.75 inches in outer diameter and that are imported on or after October 8, 1991.

(ii) Findings.

(A) General. In order to issue a rule under section 2(q)(1) of the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. 1261(q)(1), classifying a substance or article as a banned hazardous substance, the FHSA requires the Commission to make certain findings and to include these findings in the regulation. These findings are discussed below.

(B) Voluntary standard. Although a voluntary standard relating to the risk of injury associated with reloadable tube aerial shells has been adopted, it has not been implemented. Thus, the Commission is not required to make findings

covering the likelihood that the voluntary standard would result in elimination or adequate reduction of the risk of injury or that there would be substantial compliance with the voluntary standard.

(C) Relationship of benefits to costs. The Commission estimates that the removal of large reloadable shells from the market is likely to virtually eliminate the number of associated injuries, with only a slight offsetting increase in the number of injuries due to the use of substitute Class C fireworks products available to consumers. The estimated net benefits range from essentially zero to close to $1 million annually. The annual costs of a ban are estimated to be very low. Included are potential costs to foreign manufacturers and U.S. importers from sales losses, production changes, and inventory retrofitting, and slightly reduced market choices for consumers who purchase aerial display fireworks. Costs to each of these sectors are estimated to be slight, and are reduced to the extent that alternative products are perceived as adequate substitutes for large reloadable shells. Thus, the Commission finds that the benefits expected from the regulation bear a reasonable relationship to its costs.

(D) Least burdensome requirement. The Commission considered several alternatives to the ban. These included: Design or performance criteria; additional or alternative labeling; inclusion of some reloadable shells 1.75 inches or smaller in the ban; and no action in reliance on the voluntary standard. The Commission determined that a ban of reloadable shells larger than 1.75 inches in outer diameter is the least burdensome alternative that would prevent or adequately reduce the risk of injury.

(1) Regarding design or performance criteria, the Commission considered requirements similar to those stated in the voluntary standard of the American Fireworks Standards Laboratory ("AFSL"). However, such criteria may increase the cost of the product and would not address all factors involved in the incidents. Further, concerns exist about the feasibility of criteria and quality control.

(2) Regarding additional or alternative labeling, the users' perception and experience concerning the amount of time available to get away may lead them to disregard an inconsistent warning. There are no data to suggest that a significant number, if any, incidents would be avoided if large reloadable shells carried more detailed labels or instructions than they currently do. It cannot be concluded that potential benefits would be greater than zero.

(3) The Commission considered including reloadable shells that are 1.75 inches or less in outer diameter and have the "equivalent explosive power" of larger shells. A kinetic energy level of 70 joules was considered to evaluate explosive power. However, any potential benefits are uncertain since the Commission concluded that a clear relation between kinetic energy and injury potential could not be established. Also, costs could be slightly higher.

(4) The Commission also considered imposing no mandatory requirements on large reloadable shells and relying instead on the AFSL voluntary standard. However, it is uncertain whether any net benefits to consumers would result from this alternative, since the level of injury reduction could be near zero if, as is probable, some firms chose not to conform with some or all of the AFSL standard.

(12)(i) Large multiple-tube devices. Multiple-tube mine and shell fireworks devices that first enter commerce or are imported on or after March 26, 1997, that have any tube measuring 1.5 inches (3.8 cm) or more in inner diameter, and that have a minimum tip angle less than 60 degrees when tested in accordance with the procedure of § 1507.12 of this part.

(ii) Findings—

(A) General. In order to issue a rule under the section 2(q)(1) of the FHSA, 15 U.S.C. 1261(q)(1), classifying a substance or article as a banned hazardous substance, the FHSA requires the Commission to make certain findings and to include these in the regulation. These findings are discussed in paragraphs (a)(12)(ii)(B) through (D) of this section.

(B) Voluntary standard.

(1) One alternative to the tip-angle requirement that the Commission considered is to take no mandatory action, and to depend on a voluntary standard. The American Fireworks Safety Laboratory (AFSL) has a standard for mines and shells intended to address the potential tip-over hazard associated with multiple-tube fireworks devices. AFSL's Voluntary Standard for Mines and Shells—Single or Multiple Shot requires that large multiple-tube devices not tip over (except as the result of the last shot) when shot on a 2–inch thick medium-density foam pad. The Commission cannot conclude that AFSL's existing voluntary standard adequately reduces the risk of injury from large devices that tip over while functioning. The Commission's tests using polyurethane foam did not find sufficient agreement between performance on foam and on grass. No other data are available to show that this dynamic test is reliable.

(2) In addition, even if the AFSL standard is effective, the Commission does not believe that compliance with the standard will be adequate. AFSL reports that it has been testing in accordance with its standard since January 1994. However, the results of CPSC's compliance testing indicate that multiple-tube devices still tip over while functioning. In fiscal year 1994, all 24 imported devices the Commission tested, and 1 of 8 domestic devices, tipped over while functioning. In fiscal year 1995, 22 of 27 imported devices and 1 of 5 domestic devices tipped over during Commission testing. The Commission finds that there is unlikely to be substantial compliance with the voluntary standard applicable to multiple-tube devices.

(C) Relationship of benefits to costs. The Commission estimates that the 60–degree tip-angle standard will eliminate the unreasonable tip-over risk posed by these devices. This will provide benefits of saving one life about every 3 years, and preventing an unknown number of nonfatal injuries. The annual cost of modifying affected devices is estimated to be between $1.5 million and $2.7 million. The Commission finds that the benefits from the regulation bear a reasonable relationship to its costs.

(D) Least burdensome requirement. The Commission considered the following alternatives: a ban of all multiple-tube devices with inner tube diameters 1.5 inches or greater; a dynamic performance standard; additional labeling requirements; and relying on the voluntary standard. Although a ban of all large multiple-tube devices would address the risk of injury, it would be more burdensome than the tip-angle standard. The Commission was unable to develop a satisfactory dynamic standard that would reduce the risk of injury. Neither additional labeling requirements nor reliance on the voluntary standard would adequately reduce the risk of injury. Thus, the Commission finds that a standard requiring large multiple-tube devices to have a minimum tip angle greater than 60 degrees is the least burdensome requirement that would prevent or adequately reduce the risk of injury.

(13)(i) Candles made with metal-cored wicks. Candles manufactured or imported on or after October 15, 2003, made with metal-cored candlewicks, unless:

(A) The metal core of each candlewick has a lead content (calculated as the metal) of not more than 0.06 percent of the total weight of the metal core; and

(B) Each outer container or wrapper in which candles subject to paragraph (a)(13)(i)(A) of this section are shipped, including each outer container or wrapper in which such candles are distributed to a retail outlet, is labeled "Conforms to 16 CFR 1500.17(a)(13)." For purposes of this paragraph (B), the term "outer container or wrapper" does not include the immediate container in which candle(s) is/are intended to be displayed at retail or during use in the home, unless that container or wrapper is also the only container or wrapper in which the candle(s) is/are shipped to a retailer.

(ii) Metal-cored candlewicks. Metal-cored candlewicks manufactured or imported on or after October 15, 2003, unless:

(A) The metal core of each candlewick has a lead content (calculated as the metal) of not more than 0.06 percent of the total weight of the metal core; and

(B) Each outer container or wrapper in which candlewicks subject to paragraph (a)(13)(ii)(A) of this section is shipped, including each outer container or wrapper of a shipment distributed to a retail outlet, is labeled "Conforms to 16 CFR 1500.17(a)(13)." For purposes of this paragraph (B), the term "outer container or wrapper" does not include the immediate container in which candlewick(s) is/are intended to be displayed or sold at retail, unless that container or wrapper is also the only container or wrapper in which the candlewick(s) is/are shipped to a retailer.

(iii) Findings—

(A) General. To issue a rule under section 2(q)(1) of the FHSA, 15 U.S.C. 1261(q)(1), classifying a substance or article as a banned hazardous substance, the Commission must make certain findings and include them in the regulation. These findings are discussed in paragraphs (a)(13)(iii)(B) through (D) of this section.

(B) Voluntary Standard. One alternative to the ban that the Commission considered is to take no mandatory action, and to depend on a voluntary standard. One organization has a standard for candlewicks intended to address the potential for substantial illness posed by such wicks and candles with such wicks. The Commission has found that the standard is technically unsound and that substantial compliance with it is unlikely. Furthermore, there is no evidence that the standard has been adopted and implemented by candlewick or candle manufacturers.

(C) Relationship of Benefits to Costs. The Commission estimates that the ban will reduce the potential for exposure to lead and resulting lead poisoning because there is no "safe" level of lead in the blood. The annual cost to the candle/ wick industry of the ban is estimated by the Commission to be in the range of $100,000 to $300,000. On a percentage basis these costs represent only 0.005 to 0.015 percent of the overall value of candle shipments in 2000, which was approximately $2 billion. Accordingly, the Commission finds that the benefits from the regulation bear a reasonable relationship to its costs.

(D) Least burdensome requirement. The Commission considered the following alternatives: no action; labeling all metal-cored candles with wicks containing more than 0.06 percent lead by weight of the metal; recordkeeping for

Case 1:25-cv-05030-VMC    Document 1-1    Filed 09/04/25    Page 123 of 228

Exhibit A

shipments of wicks containing 0.06 percent or less lead by weight of the metal and of candles with such wicks; and relying on the voluntary standard. Neither no action, nor labeling, nor reliance on the voluntary standard would adequately reduce the risk of illness. Recordkeeping for shipments of wicks and of candles was not the least burdensome requirement that would prevent or adequately reduce the risk of illness. Therefore the Commission finds that a ban on candlewicks containing more than 0.06 percent lead by weight of the metal and candles with such wicks is the least burdensome requirement that would prevent or adequately reduce the risk of illness.

(b) [Reserved]

(Authority: Secs. 2(f)(1), (A), (B), (g), (q)(1)(B), 3(a), 74 Stat. 372, 374, as amended 80 Stat. 1304–05, 83 Stat. 187–189, 90 Stat. 503 (15 U.S.C. 1261, 1262); sec. 701 (e), (f), (g), 52 Stat. 1055–56, as amended 70 Stat. 919, 72 Stat. 948 (21 U.S.C. 371 (e), (f), (g)), sec. 30(a), 86 Stat. 1231 (15 U.S.C. 2079(a)))

**Credits**

[38 FR 27012, Sept. 27, 1973, as amended at 38 FR 27514, Oct. 4, 1973; 38 FR 31520, Nov. 15, 1973; 39 FR 30114, Aug. 21, 1974; 39 FR 42903, Dec. 9, 1974; 41 FR 22935, June 8, 1976; 42 FR 44202, Sept. 1, 1977; 43 FR 12310, March 24, 1978; 48 FR 16, Jan. 3, 1983; 56 FR 37837, Aug. 9, 1991; 56 FR 49139, Sept. 27, 1991; 61 FR 13095, March 26, 1996; 61 FR 18245, April 25, 1996; 61 FR 26096, May 24, 1996; 68 FR 19147, April 18, 2003; 68 FR 38176, June 27, 2003]

SOURCE: 38 FR 27012, Sept. 27, 1973; 51 FR 29096, Aug. 14, 1986; 57 FR 46665, Oct. 9, 1992; 58 FR 40334, July 28, 1993; 59 FR 9076, Feb. 25, 1994; 60 FR 10752, Feb. 27, 1995; 61 FR 19829, May 3, 1996; 74 FR 6993, Feb. 12, 2009; 74 FR 10480, March 11, 2009; 75 FR 81788, Dec. 28, 2010; 80 FR 61732, Oct. 14, 2015; 80 FR 72342, Nov. 19, 2015; 81 FR 2, Jan. 4, 2016; 83 FR 8341, Feb. 27, 2018, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1261–1278.

Notes of Decisions (9)

Current through June 12, 2025, 90 FR 24764. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit A

# EXHIBIT F

Code of Federal Regulations
  Title 16. Commercial Practices
    Chapter II. Consumer Product Safety Commission (Refs & Annos)
      Subchapter C. Federal Hazardous Substances Act Regulations
        Part 1500. Hazardous Substances and Articles: Administration and Enforcement Regulations (Refs & Annos)

16 C.F.R. § 1500.14

§ 1500.14 Products requiring special labeling under section 3(b) of the act.

Currentness

(a) Human experience, as reported in the scientific literature and to the Poison Control Centers and the National Clearing House for Poison Control Centers, and opinions of informed medical experts establish that the following substances are hazardous:

(1) Diethylene glycol and mixtures containing 10 percent or more by weight of diethylene glycol.

(2) Ethylene glycol and mixtures containing 10 percent or more by weight of ethylene glycol.

(3) Products containing 5 percent or more by weight of benzene (also known as benzol) and products containing 10 percent or more by weight of toluene (also known as toluol), xylene (also known as xylol), or petroleum distillates such as kerosine, mineral seal oil, naphtha, gasoline, mineral spirits, stoddard solvent, and related petroleum distillates.

(4) Methyl alcohol (methanol) and mixtures containing 4 percent or more by weight of methyl alcohol (methanol).

(5) Turpentine (including gum turpentine, gum spirits of turpentine, steam-distilled wood turpentine, sulfate wood turpentine, and destructively distilled wood turpentine) and mixtures containing 10 percent or more by weight of such turpentine.

(b) The Commission finds that the following substances present special hazards and that, for these substances, the labeling required by section 2(p)(1) of the act is not adequate for the protection of the public health. Under section 3(b) of the act, the following specific label statements are deemed necessary to supplement the labeling required by section 2(p)(1) of the act:

(1) Diethylene glycol. Because diethylene glycol and mixtures containing 10 percent or more by weight of diethylene glycol are commonly marketed, stored, and used in a manner increasing the possibility of accidental ingestion, such products shall be labeled with the signal word "warning" and the statement "Harmful if swallowed."

(2) Ethylene glycol. Because ethylene glycol and mixtures containing 10 percent or more by weight of ethylene glycol are commonly marketed, stored, and used in a manner increasing the possibility of accidental ingestion, such products shall be labeled with the signal word "warning" and the statement "Harmful or fatal if swallowed."

(3) Benzene, toluene, xylene, petroleum distillates.

(i) Because inhalation of the vapors of products containing 5 percent or more by weight of benzene may cause blood dyscrasias, such products shall be labeled with the signal word "danger," the statement of hazard "Vapor harmful," the word "poison," and the skull and crossbones symbol. If the product contains 10 percent or more by weight of benzene, it shall bear the additional statement of hazard "Harmful or fatal if swallowed" and the additional statement "Call physician immediately."

(ii) Because products containing 10 percent or more by weight of toluene, xylene, or any of the other substances listed in paragraph (a)(3) of this section may be aspirated into the lungs, with resulting chemical pneumonitis, pneumonia, and pulmonary edema, such products shall be labeled with the signal word "danger," the statement or hazard "Harmful or fatal if swallowed," and the statement "Call physician immediately."

(iii) Because inhalation of the vapor of products containing 10 percent or more by weight of toluene or xylene may cause systemic injury, such products shall bear the statement of hazard "Vapor harmful" in addition to the statements prescribed in paragraph (b)(3)(ii) of this section.

(4) Methyl alcohol (methanol). Because death and blindness can result from the ingestion of methyl alcohol, the label for this substance and for mixtures containing 4 percent or more by weight of this substance shall include the signal word "danger," the additional word "poison," and the skull and crossbones symbol. The statement of hazard shall include "Vapor harmful" and "May be fatal or cause blindness if swallowed." The label shall also bear the statement "Cannot be made nonpoisonous."

(5) Turpentine. Because turpentine (including gum turpentine, gum spirits of turpentine, steam-distilled wood turpentine, sulfate wood turpentine, and destructively distilled wood turpentine) and products containing 10 percent or more by weight of such turpentine, in addition to oral toxicity resulting in systemic poisoning, may be aspirated into the lungs with resulting chemical pneumonitis, pneumonia, and pulmonary edema, such products shall be labeled with the signal word "danger" and the statement of hazard "Harmful or fatal if swallowed."

(6) Charcoal. Charcoal briquettes and other forms of charcoal in containers for retail sale and intended for cooking or heating.

(i)(A) Because inhalation of the carbon monoxide produced by burning charcoal indoors or in confined areas may cause serious injury or death, containers of such products packaged before November 3, 1997, shall bear the following borderlined statement:



WARNING: Do Not Use for Indoor Heating or Cooking Unless Ventilation Is Provided for Exhausting Fumes to Outside. Toxic Fumes May Accumulate and Cause Death.

(B) For bags of charcoal packaged before November 3, 1997, the statement specified in paragraph (b)(6)(i) of this section shall appear within a heavy borderline in a color sharply contrasting to that of the background, on both front and back panels in the upper 25 percent of the panels of the bag at least 2 inches below the seam, and at least 1 inch above any reading material or design elements in type size as follows: The signal word "WARNING" shall appear in capital letters at least three-eighths inch in height; the remaining text of the warning statement shall be printed in letters at least three-sixteenths inch in height.

(ii)(A) Because inhalation of the carbon monoxide produced by burning charcoal indoors or in confined areas can cause serious injury or death, containers of such products packaged on or after November 3, 1997, shall bear the following borderlined label.



(B) Except as provided in paragraph (b)(6)(ii)(C) of this section, the following requirements apply to bags of charcoal subject to paragraph (b)(6)(ii)(A) of this section. The label specified in paragraph (b)(6)(ii)(A) of this section shall appear within a heavy borderline, in a color sharply contrasting to that of the background, on both the front and back panels in the upper 25 percent of the panels of the bag, and with the outer edge of the borderline at least 2.54 cm (1 inch) below the seam and at least 2.54 cm (1 inch) above any other reading material or design elements. The signal word "WARNING" shall be in bold capital letters in at least 7.14 mm ($^9/_{32}$ inch) type. The remaining text of the warning statement shall be in at least 4.763 mm ($^3/_{16}$ inch) type. The phrase "CARBON MONOXIDE HAZARD" shall be in bold. This phrase and the word "NEVER" shall be in all capital letters. The lettering shall have a strokewidth-to-height ratio of 1:6 to 1:8. The label shall be at least 50.8 mm (2 inches) high and 147.5 mm (5 $^{13}/_{16}$ inches) wide. The label's lettering, spacing between the bottom of the letters of one line and the top of the letter of the next line, and pictogram shall have the size relation to each other and to the remainder of the label shown in paragraph (b)(6)(ii)(A) of this section.

(C) For bags of charcoal subject to paragraph (b)(6)(ii)(A) of this section that are 6 inches or less wide, the minimum label height may be reduced to 38 mm (1.5 inches) and the minimum width may be reduced to 139.7 mm (5.5 inches). The signal word "WARNING" shall be in capital letters in at least 6.32 mm (0.249 inch) type. The remaining text of the warning shall be in at least 4.23 mm (0.166 inch) type. All other requirements of paragraphs 6(b)(ii) (A) and (B) of this section shall apply to these bags.

(7) Fireworks devices. Because of the special hazards presented by fireworks devices if not used in a certain manner, the following listed fireworks devices shall be labeled as indicated:

(i) Fountains.

WARNING (OR CAUTION)

FLAMMABLE (or EMITS SHOWERS OF SPARKS, if more descriptive).

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Place on level surface.

Light fuse and **get away**.

(ii) California candles.

WARNING (OR CAUTION) EMITS SHOWERS OF SPARKS

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Hold in hand at bottom of tube.

Point away from body so that neither end points toward body.

(iii) Spike and handle cylindrical fountains.

(A) Spike fountains.

WARNING (OR CAUTION) EMITS SHOWERS OF SPARKS

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Stick firmly in ground in an upright position.

Do not hold in hand.

Light fuse and **get away**.

(B) Handle fountains.

WARNING (OR CAUTION) EMITS SHOWERS OF SPARKS

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Hold in hand—point away from body.

Light fuse.

(iv) Roman Candles.

WARNING (OR CAUTION) SHOOTS FLAMING BALLS

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Stick butt end in ground.

Do not hold in hand.

Light fuse and **get away**.

(v) Rockets with sticks.

WARNING (OR CAUTION) FLAMMABLE

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Place in wooden trough or iron pipe at 75° angle, pointing away from people or flammable material.

Do not hold in hand.

Light fuse and **get away**.

(vi) Wheels.

WARNING (OR CAUTION) FLAMMABLE (OR EMITS SHOWERS OF SPARKS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Attach securely by means of a nail through the hole (or place on hard flat surface, for ground spinners).

Case 1:25-cv-05030-VMC    Document 1-1    Filed 09/04/25    Page 130 of 228
§ 1500.14 Products requiring special labeling under section 3 . . . . 16 C.F.R. § 1500.14
Exhibit A

Light fuse and **get away**.

(vii) Illuminating torches.

WARNING (OR CAUTION) FLAMMABLE (OR EMITS SHOWERS OF SPARKS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Hold in hand—point away from body, clothing, or other flammable material (or place upright on level ground. Do not hold in hand, if more descriptive).

Light fuse (or light fuse and **get away**, if more descriptive).

(viii) Sparklers.

On the front and back panels:

WARNING (OR CAUTION) FLAMMABLE

On the side, front, back, top, or bottom panel.

CAUTION

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Do not touch glowing wire (or do not touch hot plastic, wood, etc., if more descriptive).

Hold in hand with arm extended away from body.

Keep burning end or sparks away from wearing apparel or other flammable material.

(ix) Mines and shells.

WARNING (OR CAUTION) EMITS SHOWERS OF SPARKS
(OR SHOOTS FLAMING BALLS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Place on hard smooth surface (or place upright on level ground, if more descriptive).

Do not hold in hand.

Light fuse and **get away**.

(x) Whistles without report.

WARNING (OR CAUTION) FLAMMABLE

SHOOTS WHISTLE IN AIR (if applicable)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Do not hold in hand.

Light fuse and **get away**.

(xi) Toy smoke devices and flitter devices.

WARNING (OR CAUTION) FLAMMABLE (OR EMITS SHOWERS OF SPARKS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Do not hold in hand.

Light fuse and **get away**.

(xii) Helicopter-type rockets.

WARNING (OR CAUTION) FLAMMABLE (OR EMITS SHOWERS OF SPARKS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Place on hard, open surface.

Light fuse and **get away**.

(xiii) Party poppers.

WARNING (OR CAUTION) FLAMMABLE

Use only under [close] adult supervision. (Use of the word close is optional.)

Do not point either end toward face or other person.

Hold in hand—jerk string.


   (xiv) Missile-type rockets.

    WARNING (OR CAUTION) FLAMMABLE (OR EMITS SHOWERS OF SPARKS, IF MORE DESCRIPTIVE)

Use only under [close] adult supervision. (Use of the word close is optional.)

For outdoor use only.

Place on hard, open surface.

Light fuse and **get away**.


   (xv) Labeling—General. Any fireworks device not required to have a specific label as indicated above shall carry a warning label indicating to the user where and how the item is to be used and necessary safety precautions to be observed. All labels required under this section shall comply with the requirements of § 1500.121 of these regulations. (See also § 1500.17(a) (3), (8) and (9); § 1500.83(a) (27); § 1500.85(a) (2); and part 1507).


   (8) Art materials.

Note: The Labeling of Hazardous Art Materials Act ("LHAMA"), 15 U.S.C. 1277 (Pub.L. 100–695, enacted November 18, 1988) provides that, as of November 18, 1990, "the requirements for the labeling of art materials set forth in the version of the standard of the American Society for Testing and Materials ["ASTM"] designated D–4236 that is in effect on [November 18, 1988] * * * shall be deemed to be a regulation issued by the Commission under section 3(b)" of the Federal Hazardous Substances Act, 15 U.S.C. 1262(b). For the convenience of interested persons, the Commission is including the requirements of ASTM D–4236 in paragraph (b)(8)(i) of this section, along with other requirements (stated in paragraph (b)(8)(ii) of this section) made applicable to art materials by the LHAMA. The substance of the requirements specified in LHAMA became effective on November 18, 1990, as mandated by Congress.


   (i) ASTM D–4236—

    (A) Scope.—

      (1) This section describes a procedure for developing precautionary labels for art materials and provides hazard and precautionary statements based upon knowledge that exists in the scientific and medical communities. This section concerns those chronic health hazards known to be associated with a product or product component(s), when the component(s) is present in a physical form, volume, or concentration that in the opinion of a toxicologist (see paragraph (b)(8)(i)(B)(11) of this section) has the potential to produce a chronic adverse health effect(s).

(2) This section applies exclusively to art materials packaged in sizes intended for individual users of any age or those participating in a small group.

(3) Labeling determinations shall consider reasonably foreseeable use or misuse.

(4) Manufacturers or repackagers may wish to have compliance certified by a certifying organization. Guidelines for a certifying organization are given in paragraph (b)(8)(i)(H) of this section.

(B) Descriptions of Terms Specific to This Standard.

(1) Art material or art material product—any raw or processed material, or manufactured product, marketed or represented by the producer or repackager as intended for and suitable for users as defined herein.

(2) Users—artists or crafts people of any age who create, or recreate in a limited number, largely by hand, works which may or may not have a practical use, but in which aesthetic considerations are paramount.

(3) Chronic adverse health effect(s)—a persistent toxic effect(s) that develops over time from a single, prolonged, or repeated exposure to a substance. This effect may result from exposure(s) to a substance that can, in humans, cause sterility, birth defects, harm to a developing fetus or to a nursing infant, cancer, allergenic sensitization, damage to the nervous system, or a persistent adverse effect to any other organ system.

(4) chronic health hazard(s) (hereafter referred to as "chronic hazard")—a health risk to humans, resultant from exposure to a substance that may cause a chronic adverse health effect.

(5) Analytical laboratory—a laboratory having personnel and apparatus capable of performing quantitative or qualitative analyses of art materials, which may yield information that is used by a toxicologist for evaluation of potentially hazardous materials.

(6) Label—a display of written, printed, or graphic matter upon the immediate container of any art material product. When the product is unpackaged, or is not packaged in an immediate container intended or suitable for delivery to users, the label can be a display of such matter directly upon the article involved or upon a tag or other suitable labeling device attached to the art material.

(7) Producer—the person or entity who manufactures, processes, or imports an art material.

(8) Repackager—the person or entity who obtains materials from producers and without making changes in such materials puts them in containers intended for sale as art materials to users.

(9) Sensitizer—a substance known to cause, through an allergic process, a chronic adverse health effect which becomes evident in a significant number of people on re-exposure to the same substance.

(10) Toxic—applies to any substance that is likely to produce personal injury or illness to humans through ingestion, inhalation, or skin contact.

(11) Toxicologist—an individual who through education, training, and experience has expertise in the field of toxicology, as it relates to human exposure, and is either a toxicologist or physician certified by a nationally recognized certification board.

(12) Bioavailability—the extent that a substance can be absorbed in a biologically active form.

(C) Requirements.

(1) The producer or repackager of art materials shall submit art material product formulation(s) or reformulation(s) to a toxicologist for review, such review to be in accordance with paragraph (b)(8)(l)(D) of this section. The toxicologist shall be required to keep product formulation(s) confidential.

(2) Unless otherwise agreed in writing by the producer or repackager, no one other than the toxicologists shall have access to the formulation(s); except that the toxicologists shall furnish a patient's physician, on a confidential basis, the information necessary to diagnose or treat cases of exposure or accidental ingestion.

(3) The producer or repackager, upon advice given by a toxicologist in accordance with paragraph (b)(8)(i)(D) of this section and based upon generally accepted, well-established evidence that a component substance(s) is known to cause chronic adverse health effects adopt precautionary labeling in accordance with paragraph (b) (8)(i)(E) of this section.

(4) Labeling shall conform to any labeling practices prescribed by federal and state statutes or regulations and shall not diminish the effect of required acute toxicity warnings.

(5) The producer or repackager shall supply a poison exposure management information source the generic formulation information required for dissemination to poison control centers or shall provide a 24–hour cost-free telephone number to poison control centers.

(6) The producer or repackager shall have a toxicologist review as necessary, but at least every 5 years, art material product formulation(s) and associated label(s) based upon the then-current, generally accepted, well-established scientific knowledge.

(7) Statement of Conformance—"Conforms to ASTM Practice D–4236," or "Conforms to ASTM D–4236," or "Conforms to the health requirements of ASTM D–4236." This statement may be combined with other conformance statements. The conformance statement should appear whenever practical on the product; however, it shall also be acceptable to place the statement on one or more of the following:

Case 1:25-cv-05030-VMC    Document 1-1    Filed 09/04/25    Page 135 of 228
§ 1500.14 Products requiring special labeling under section... , 16 C.F.R. § 1500.14
Exhibit A

(i) The individual product package,

(ii) a display or sign at the point of purchase,

(iii) separate explanatory literature available on requirements at the point of purchase,

(iv) a response to a formal request for bid or proposal.

(D) Determination of Labeling.

(1) An art material is considered to have the potential for producing chronic adverse health effects if any customary or reasonably foreseeable use can result in a chronic hazard.

(2) In making the determination, a toxicologist(s) shall take into account the following:

(i) Current chemical composition of the art material, supplied by an analytical laboratory or by an industrial chemist on behalf of a manufacturer or repackager.

(ii) Current generally accepted, well-established scientific knowledge of the chronic toxic potential of each component and the total formulation.

(iii) Specific physical and chemical form of the art material product, bioavailability, concentration, and the amount of each potentially chronic toxic component found in the formulation.

(iv) Reasonably foreseeable uses of the art material product as determined by consultation with users and other individuals who are experienced in use of the material(s), such as teachers, or by market studies, unless such use information has previously been determined with respect to the specific art material(s) under review.

(v) Potential for known synergism and antagonism of the various components of the formulation.

(vi) Potentially chronic adverse health effects of decomposition or combustion products, if known, from any reasonably foreseeable use of the hazardous art material product.

(vii) Opinions of various regulatory agencies and scientific bodies, including the International Agency for Research on Cancer and the National Cancer Institute, on the potential for chronic adverse health effects of the various components of the formulation.

(3) Based upon the conclusion reached in conformance with review determinations set forth herein, the toxicologist(s) shall recommend precautionary labeling consistent with paragraph (b)(8)(i)(E) of this section.

(E) Labeling Practices—

(1) Signal Word.

(i) When a signal word for an acute hazard(s) is mandated and a chronic hazard(s) exists, the signal word shall be that for the acute hazard.

(ii) When only a chronic hazard(s) exists, the signal word WARNING shall be used.

(iii) The signal word shall be prominently visible and set in bold capitals in a size equal to or greater than the statement of potential chronic hazards.

(2) List of Potentially Chronic Hazards—Potentially chronic hazards, as determined under the procedures of paragraph (b)(8)(i)(D) of this section, shall be stated substantially in accordance with the statements listed in paragraph (b)(8)(i)(F) of this section. Potentially chronic hazards noted shall be those that are clinically significant and that might be expected with any reasonably foreseeable use of the art material. The hazards should be grouped in the order of relative descending severity.

(3) Name of Chronically Hazardous Component(s)—All components and known decomposition products of the formulation with a potential for chronic hazards, as determined under the procedures of paragraph (b)(8)(i)(D) of this section, shall be listed prominently. Generically equivalent names may be used.

(4) Safe Handling Instructions—Appropriate precautionary statements as to work practices, personal protection, and ventilation requirements shall be used substantially conforming with those listed in paragraph (b)(8)(i)(G) of this section.

(5) List of Sensitizing Components—To protect users from known sensitizers found within art materials, each label shall contain a list of those sensitizers present in sufficient amounts to contribute significantly to a known skin or respiratory sensitization.

(6) Combined Statement—If an art material contains more than one component capable of causing a chronic adverse health effect, or if a single chemical can cause several different chronic adverse health effects, the potential effects may be combined into one statement.

(7) Information Sources—The precautionary label shall contain a statement identifying a source for additional health information substantially in conformance with one of the phrases listed below:

(i) For more health information—(24 hour cost-free U.S. telephone number),

(ii) Contact a physician for more health information, or

(iii) Call your local poison control center for more health information.

(8) Labeling Content, Product Size—Any art material product in a container larger in size than one fluid ounce (30 ml) (if the product is sold by volume) or one ounce net weight (28 g) (if the product is sold by weight) shall have full precautionary labeling, as described in paragraph (b)(8)(i) (E) of this section. Any art material product in a container equal to or smaller than one fluid ounce or one ounce net weight shall have a label that includes a signal word in conformance with paragraph (b)(8)(i)(E)(1) of this section and a list of potentially harmful or sensitizing components in conformance with paragraphs (b)(8)(i)(E) (3) and (5) of this section.

(9) The information described in paragraph (b)(8)(i)(E) of this section must appear on:

(i) The outside container or wrapper, if any, unless it is easily legible through the outside container or wrapper and

(ii) All accompanying literature where there are directions for use, written or otherwise. Where a product that requires warning labels under paragraphs (b)(8)(i) (D) and (E) of this section is packed within a point-of-sale package that obscures the warning statement(s), the point-of-sale package shall carry the signal word conforming to paragraph (b)(8)(i)(E)(1) and the following wording: "Contains: (list hazardous product(s)) that may be harmful if misused. Read cautions on individual containers carefully. Keep out of the reach of children."

(10) Statements required under paragraphs (b)(8)(i) (D) and (E) of this section must be in the English language and located prominently in conspicuous and legible type in contrast by topography, layout, or color with other printed matter on the label.

(11) Supplemental Information—Where appropriate, more detailed information that relates to chronic hazard(s), such as physical properties, decomposition products, detailed safety instructions, or disposal recommendations, shall be included in supplemental documents, such as Material Safety Data Sheets, technical brochures, technical data sheets etc.

(F) chronic Hazard Statements

MAY CAUSE STERILITY.

CONTACT MAY CAUSE PERMANENT EYE DAMAGE.

MAY BE HARMFUL BY BREATHING VAPORS/DUSTS.

MAY BE HARMFUL IF SWALLOWED.

MAY BE HARMFUL BY SKIN CONTACT.

MAY PRODUCE BIRTH DEFECTS IN THE DEVELOPING FETUS.

MAY BE EXCRETED IN HUMAN MILK.

MAY CAUSE HARM TO THE NURSING INFANT.

CANCER AGENT! EXPOSURE MAY PRODUCE CANCER.

CANCER AGENT BASED ON TESTS WITH LABORATORY ANIMALS.

POSSIBLE CANCER AGENT BASED ON TESTS WITH LABORATORY ANIMALS.

MAY PRODUCE ALLERGIC REACTION BY INGESTION/INHALATION/SKIN CONTACT.

MAY PRODUCE NUMBNESS OR WEAKNESS IN THE EXTREMITIES.

EXPOSURE MAY CAUSE (SPECIFY THE ORGAN(S)) DAMAGE.

HEATING/COMBUSTION MAY CAUSE HAZARDOUS DECOMPOSITION PRODUCTS.

(G) Precautionary Statements

Keep out of reach of children.

When using do not eat, drink, or smoke.

Wash hands immediately after use.

Avoid inhalation/ingestion/skin contact.

Avoid fumes from combustion.

Keep container tightly closed when not in use.

Store in well-ventilated area.

Wear protective clothing (specify type).

Wear protective goggles/face shield.

Wear NIOSH-certified mask for dusts/mists/fumes.

Wear NIOSH-certified respirator with an appropriate cartridge for (specify).

Wear NIOSH-certified supplied-air respirator.

Use window exhaust fan to remove vapors and ensure adequate cross ventilation. (Specify explosion-proof if necessary.)

Do not heat above (specify temperature) without adequate ventilation.

Use (specify type) local exhausting hood.

Do not use/mix with (specify material).

(ii) The following shall apply with respect to the standard for art materials set forth in § 1500.14(b)(8)(i).

(A) The term art material or art material product shall mean any substance marketed or represented by the producer or repackager as suitable for use in any phase of the creation of any work of visual or graphic art of any medium. The term does not include economic poisons subject to the Federal Insecticide, Fungicide, and Rodenticide Act or drugs, devices, or cosmetics subject to the Federal Food, Drug, and Cosmetics Act.

(B) The standard referred to in paragraph (b)(8)(i) of this section applies to art materials intended for users of any age.

(C) Each producer or repackager of art materials shall describe in writing the criteria used to determine whether an art material has the potential for producing chronic adverse health effects. Each producer or repackager shall submit, to the Commission's Division of Regulatory Management, Consumer Product Safety Commission, Washington, DC 20207, the written description of the criteria described above and a list of art materials that require hazard warning labels under this section. Upon request of the Commission, a producer or repackager shall submit to the Commission product formulations.

(D) All art materials that require chronic hazard labeling pursuant to this section must include on the label the name and United States address of the producer or repackager of the art materials, an appropriate United States telephone number that can be contacted for more information on the hazards requiring warning labels under this section, and a statement that such art materials are inappropriate for use by children.

(E) If an art material producer or repackager becomes newly aware of any significant information regarding the hazards of an art material or ways to protect against the hazard, this new information must be incorporated into the labels of such art materials that are manufactured after 12 months from the date of discovery. If a producer or repackager reformulates an art material, the new formulation must be evaluated and labeled in accordance with the standard set forth § 1500.14(b)(8)(i).

(F) In determining whether an art material has the potential for producing chronic adverse health effects, including carcinogenicity and potential carcinogenicity, the toxicologist to whom the substance is referred under the standard described above shall take into account opinions of various regulatory agencies and scientific bodies, including the U.S. Consumer Product Safety Commission (CPSC), the U.S. Environmental Protection Agency (EPA), and the International Agency for Research on Cancer (IARC).

(iii) Pursuant to the LHAMA, the Commission has issued guidelines which, where possible, specify criteria for determining when any customary or reasonably foreseeable use of an art material can result in a chronic hazard. These guidelines include criteria for determining when art materials may produce chronic adverse effects in children and adults, criteria for

Case 1:25-cv-05030-VMC    Document 1-1    Filed 09/04/25    Page 140 of 228
§ 1500.14 Products requiring special labeling under section 3(b)    16 C.F.R. § 1500.14
Exhibit A

determining which substances contained in art materials have the potential for producing chronic adverse effects and what those effects are, criteria for determining the bioavailability of chronically hazardous substances contained in art materials when the products are used in a customary or reasonably foreseeable manner, and criteria for determining acceptable daily intake levels for chronically hazardous substances contained in art materials. Because these guidelines apply to hazardous substances in general as well as to hazardous substances in art materials, the guidelines are set forth in § 1500.135 and a definition of "chronic toxicity" is provided in § 1500.3(c)(2)(ii) as part of supplementation of the term "toxic" in section 2(q) of the FHSA.

(iv) Policies and interpretations.

(A) For purposes of enforcement policy, the Commission will not consider as sufficient grounds for bringing an enforcement action under the Labeling of Hazardous Art Materials Act ("LHAMA") the failure of the following types of products to meet the requirements of § 1500.14(b)(8)(i) through (iii).

(1) Products whose intended general use is not to create art (e.g., common wood pencils, and single colored pens, markers, and chalk), unless the particular product is specifically packaged, promoted, or marketed in a manner that would lead a reasonable person to conclude that it is intended for use as an art material. Factors the Commission would consider in making this determination are how an item is packaged (e.g., packages of multiple colored pencils, chalks, or markers unless promoted for non-art materials uses are likely to be art materials), how it is marketed and promoted (e.g., pencils and pens intended specifically for sketching and drawing are likely to be art materials), and where it is sold (e.g., products sold in an art supply store are likely to be art materials). The products described in this paragraph do not meet the statutory definition of "art material."

(2) Tools, implements, and furniture used in the creation of a work of art such as brushes, chisels, easels, picture frames, drafting tables and chairs, canvas stretchers, potter's wheels, hammers, air pumps for air brushes, kilns, and molds.

(3) Surface materials upon which an art material is applied, such as coloring books and canvas, unless, as a result of processing or handling, the consumer is likely to be exposed to a chemical in or on the surface material in a manner which makes that chemical susceptible to being ingested, absorbed, or inhaled.

(4) The following materials whether used as a surface or applied to one, unless, as a result of processing or handling, the consumer is likely to be exposed to a chemical in or on the surface material in a manner which makes that chemical susceptible to being ingested, absorbed, or inhaled: paper, cloth, plastics, films, yarn, threads, rubber, sand, wood, stone, tile, masonry, and metal.

(B) For purposes of LHAMA enforcement policy, the Commission will enforce against materials including, but not limited to, paints, crayons, colored pencils, glues, adhesives, and putties, if such materials are sold as part of an art, craft, model, or hobby kit. The Commission will enforce the LHAMA requirements against paints or other materials sold separately which are intended to decorate art, craft, model, and hobby items. Adhesives, glues, and putties intended for general repair or construction uses are not subject to LHAMA. However, the Commission will enforce the LHAMA requirements against adhesives, glues, and putties sold separately (not part of a kit) if they are intended for art and craft and model construction uses. This paragraph (b)(8)(iv)(B) applies to products introduced into interstate commerce on or after August 14, 1995.

(C) Commission regulations at § 1500.14(b)(8)(i)(C)(7) require that a statement of conformance appear with art materials that have been reviewed in accordance with the Commission standard. The Commission interprets this provision to require a conformance statement regardless of the presence of any chronic hazard warnings.

(D) Nothing in this enforcement statement should be deemed to alter any of the requirements of the Federal Hazardous Substances Act ("FHSA"), such as, but not limited to, the requirement that any hazardous substance intended or packaged in a form suitable for household use must be labeled in accordance with section 2(p) of the FHSA.

Appendix A to § 1500.14(b)(8)—Guidelines for a Certifying Organization (Not Mandatory)

(a) The term certifying organization, as used in this paragraph, refers to an organization or an institute that, after assuring that all provisions are met, certifies that an art material does conform to the labeling requirements of this practice.

(b) The certifying body may be funded by member manufacturers, but should include users or their representatives, as well as manufacturers' chemists, on its technical and certifying committees.

(c) Representative samples of art materials, labeled as conforming to this section and bought at retail, should be analyzed at random and from time to time by an analytical laboratory to ensure they are the same as the formulation used by the toxicologist(s) for determining labeling requirements.

(d) The methods used by the toxicologist(s) in review and determination of the need and content of precautionary labeling for potentially chronic adverse health effects should be periodically reviewed by an advisory board composed of not less than three or more than five toxicologists, at least one of whom is certified in toxicology by a nationally recognized certification board.

(e) In cases where there is disagreement by participating producers or participating users, with the determination of the toxicologist(s), there should be a method whereby the toxicologist's decision can be presented to the advisory board of toxicologists for arbitration.

**Credits**

[38 FR 27012, Sept. 27, 1973, as amended at 41 FR 22934, June 8, 1976; 48 FR 16, Jan. 3, 1983; 53 FR 3018, Feb. 3, 1988; 57 FR 46669, Oct. 9, 1992; 60 FR 8193, Feb. 13, 1995; 61 FR 19829, May 3, 1996; 61 FR 33175, June 26, 1996]

SOURCE: 38 FR 27012, Sept. 27, 1973; 51 FR 29096, Aug. 14, 1986; 57 FR 46665, Oct. 9, 1992; 58 FR 40334, July 28, 1993; 59 FR 9076, Feb. 25, 1994; 60 FR 10752, Feb. 27, 1995; 61 FR 19829, May 3, 1996; 74 FR 6993, Feb. 12, 2009; 74 FR 10480, March 11, 2009; 75 FR 81788, Dec. 28, 2010; 80 FR 61732, Oct. 14, 2015; 80 FR 72342, Nov. 19, 2015; 81 FR 2, Jan. 4, 2016; 83 FR 8341, Feb. 27, 2018, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1261–1278.

Notes of Decisions containing your search terms (0)

View all 27

Current through May 15, 2025, 90 FR 20565. Some sections may be more current. See credits for details.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

<span style="color:red">Exhibit A</span>

**UNITED STATES OF AMERICA**
**CONSUMER PRODUCT SAFETY COMMISSION**



# CONSUMER FIREWORKS TESTING MANUAL

**Directorate for Laboratory Sciences**
**Division of Chemistry**

This manual is to provide guidance to the Commission staff that test fireworks devices for compliance with fireworks regulations. This manual is not intended to supersede or limit fireworks regulations. In the case of discrepancies between this manual and the regulations, the regulations will supersede this manual.

This manual has not been reviewed or approved by, and may not necessarily represent the views of, the Commission.

Fourth Edition (17 August 2006)

# TABLE OF CONTENTS

I. BACKGROUND ................................................................................................... 4

II. SAFETY AND EQUIPMENT ............................................................................ 4
    A. Safety Precautions ..................................................................................... 4
    B. Equipment and Supplies ............................................................................ 5
        1. Field Analysis ..................................................................................... 5
        2. Laboratory Analysis ........................................................................... 5
    C. Equipment Calibration and Accuracy ....................................................... 6
    D. General Fireworks Data and Testing Forms ............................................. 6

III. SAMPLE ACCOUNTABILITY, HANDLING AND SPLITTING ...................... 6
    A. Sample Identification ................................................................................. 6
    B. Pre-analytical Split Procedure ................................................................... 7
    C. Reserve Sample Procedure ......................................................................... 8

IV. FIREWORKS ANALYTICAL PROCEDURES ................................................. 9
    A. Field Analysis (8 Devices) ........................................................................ 9
        1. Fuse Burn Time ................................................................................ 10
        2. Functionality of the Fuse ................................................................. 10
        3. Function of the Fireworks Device .................................................... 11
        4. Malfunction(s) of the Fireworks Device .......................................... 12
        5. Burnout and Blowout ....................................................................... 13
    B. Additional Field Testing Requirements for Smoke Devices 16 CFR 1507.9(a)  14
    C. Laboratory Analysis (8-10 Devices) ........................................................ 15
        1. Pyrotechnic Leakage ........................................................................ 16
        2. Fuse Support .................................................................................... 16
        3. Fuse Side Ignition ............................................................................ 17
        4. Bases ................................................................................................ 19
            a.    Height and Base Measurements ............................................. 19
            b.    12-Degree Block Tilt Test ...................................................... 20
        5. Reloadable Tube Aerial Shell Diameter Test ................................... 21
        6. Handles on Hand-Held Devices ....................................................... 22
        7. Devices with Ground Spikes ............................................................ 23
        8. Wheel Devices .................................................................................. 23
        9. Smoke Devices or Flitter Devices .................................................... 24
        10. Rockets with Sticks ......................................................................... 24
            a.    Stick Rigidity Test (10 Devices) ............................................ 25
            b.    Stick Straightness Test (10 Devices) ...................................... 26
            c.    Stick Attachment Test (10 Devices) ....................................... 27
        11. Fire Crackers and Aerial Reports .................................................... 27

|  | a. | Firecrackers.................................................................. | 28 |
|  | b. | Aerial Reports (Paper Firecracker Type)............................... | 28 |
|  | c. | Aerial Reports (Paper Firecracker Type with Different Sizes)............... | 29 |
|  | d. | Aerial Reports (Plastic Projectile or Bottle Rockets) ........................... | 29 |
|  | e. | Aerial Reports (Aerial Shell is the Report Casing) ................................ | 29 |
| 12. | Party Poppers ................................................................. | | 30 |
| 13. | Large Multiple-Tube Mine and Shell Fireworks Devices ........................... | | 30 |
|  | a. | General Device Measurements and Observations ................................. | 31 |
|  | b. | 60-Degree Tilt Angle Testing Procedure ................................................ | 31 |
| 14. | Label Exhibits ................................................................. | | 31 |

V. COMPLETION OF REPORTS  ....................................................... 32

VI. APPENDICES INDEX ................................................................ 34

Appendix 1 (General Fireworks Testing Data Forms)  .............................. 35
    1.) Fireworks Split Sheet................................................................ 36
    2.) Fireworks Tracking Sheet ......................................................... 37
    3.) Fireworks Field Sheet ............................................................... 38
    4.) Fireworks Laboratory Sheet...................................................... 39
    5.) Fireworks Smoke Device Sheet ............................................... 40
    6.) Fireworks Handles/Spikes Lab Sheet ....................................... 41
    7.) Fireworks Wheels/Axles Lab Sheet .......................................... 42
    8.) Fireworks Display Rack Lab Sheet ........................................... 43
    9.) Fireworks Pyro-Comp Lab Sheet ............................................. 44
Appendix 2 (General Split Information)................................................... 45
Appendix 3 (Fireworks Field Tests) ....................................................... 48
Appendix 4 (Generic Fireworks Function Statements)............................... 49
Appendix 5 (Fireworks Laboratory Tests)............................................... 51
Appendix 6 (Fireworks Base Measurement Pictorial Directions) ............... 53

## I. BACKGROUND

Regulations under the Federal Hazardous Substances Act include a variety of requirements for fireworks. Certain exploding devices which exceed specified powder content are banned (16 CFR 1500.17(a)(3) and (8), and 16 CFR 1500.85(a)(2)). Other regulations that establish cautionary labeling requirements are 16 CFR 1500.14(b)(7), 16 CFR 1500.83(a)(27), and 16 CFR 1500.121. A third category of regulations (16 CFR 1500.17(a)(9), (11), and (12), and 16 CFR 1507) ban fireworks which fail to conform to performance standards addressing aspects such as fuse function, stability, and leakage, among others.

This manual addresses testing of consumer fireworks (1.4G or UN 0336). Laboratory staff should consult with the Office of Compliance before testing 1.3G or UN 0335 fireworks to determine whether the devices should be tested to other requirements.

## II. SAFETY AND EQUIPMENT

### A. Safety Precautions

Fireworks devices are potentially explosive and can cause severe personal injury and damage property in the vicinity. Every logical precaution should be taken during handling, testing, and storage of the fireworks samples.

### *SMOKING AND OPEN FLAMES ARE STRICTLY PROHIBITED AROUND FIREWORKS.*

Most of the time, the pyrotechnic powder contained in firecrackers, aerial reports, and party poppers will not ignite from discharges of static electricity or minor friction; however, if static dissipating flooring material is not present, touch a water pipe or other ground to eliminate static charges. During the laboratory analysis, if the analyst is not working in a dust/fume hood, dust masks and surgical gloves should be worn to avoid inhalation or skin contact with chemicals when dissecting fireworks for structural evaluation and powder weighing.

Prior to the scheduled field-testing the analyst must ensure that the test site is adequate. In addition to and beyond the "Testing Site", an additional 200 foot wide perimeter should exist around the entire "Testing Site" (approximately 250000 square feet) that is free of tall weeds, dry brush or other combustible material. The test site should be isolated from both residential and commercial dwellings, and provide sufficient clearance for the fireworks device to fire and land without interfering with pedestrian or vehicle traffic. During field testing analysts *MUST* wear hearing protection and either safety glasses or face shield and flame resistant clothing (denim or equivalent). Also, during field testing, some kind of water source must be present, such as a charged garden hose, a fire hose connected to a live fire hydrant, or charged water fire extinguishers. Always understand how the

4

Exhibit A

device should function by reading and following the instructions on the label before igniting the device.

***DURING BOTH FIELD TESTING AND LABORATORY ANALYSIS, TWO (2) ANALYSTS SHALL BE PRESENT AT ALL TIMES.***

In general it is desirable to test the devices in an open configuration. However, personal and property safety takes precedence over open testing. If experience shows a device to be unpredictable or to have a propensity to cause field fires, perform testing in the containment cage or use other restriction configurations. Specific safety precautions will be discussed with appropriate tests.

## B. Equipment and Supplies

The following items will be needed to conduct fireworks analysis:

1. **Field Analysis**
   a. Face shield or safety glasses, sound absorbing earmuffs or earplugs, and clothing made of denim or equivalent. Avoid synthetic and lightweight fabrics.
   b. Water source such as a fire truck, charged fire hydrant with attached fire hoses, a charged garden hose, or charged water fire extinguishers. **NOTE: When only water fire extinguishers are available, all devices must be fired in a cage to contain the pyrotechnic effects.**
   c. General supplies:
      - Stopwatch
      - Cigarette lighter or matches
      - Cell Phone *(When field testing, the cell phone must be on at all times)*
      - Clipboards with Field Sheets and Site Log Sheets, and ink pens
      - Water cooler
      - Punk sticks
      - Fireworks samples

2. **Laboratory Analysis**
   a. Surgical masks (dust) and surgical latex gloves
   b. Analytical balance capable of reading to 1 mg and calibration weight(s)
   c. 8 ounce weight, scissors, forceps, hemostats, box knives, razor blades or scalpels, tape measure or ruler, blunt dissecting needle or probe
   d. 12 degree tilt block covered with 400 grit sand paper
   e. Weighing paper
   f. Ring stand and clamps
   g. Rocket test board (Droop/Straightness Test)
   h. 60-Degree Tilt Tester for Large Multiple Tube Mine and Shell Fireworks Devices

    **i.**  8 1/2" x 11" lined paper, scotch tape, paper clips, rubber bands, ink pens, plastic storage bags (small and large), 12-B storage boxes (15" x 15" x 15"), 1.4 G Explosive stickers, Box Location labels, box tape

    **j.**  Official CPSC seals (Form 164)

    **k.**  Water fire extinguisher

    **l.**  Pall Mall unfiltered cigarettes, lighter or matches

## C. Equipment Calibration and Accuracy

The calibration of the weighing balance (readable to 1 mg) shall be checked before use in the following manner:

    **1.**  Place the balance on a flat surface where it will be used. Level and calibrate the balance according to the manufacturer's directions. Use the certified weights to check the balance calibration. If the balance is not within the manufacturer's specifications follow the calibration directions or obtain expert service. The balance(s) readings of the certified weights must be recorded and entered into the balance certification spreadsheet.

## D. General Fireworks Testing Data Forms (Appendix 1)

## III. SAMPLE ACCOUNTABILITY, HANDLING AND SPLITTING

Fireworks samples will be collected, packaged, handled, stored, transported and analyzed in such a manner that the identity of the sample is maintained and that the integrity of the sample is preserved. Records must be kept that show continuity of sample handling and how sample integrity was maintained. If the analyst discovers any discrepancies between the sample that was received and the Collection Report or investigator's seals, the analyst must immediately call such discrepancies to the attention of the investigator, the investigator's supervisor or to the Office of Compliance. If a sample is received without a Collection Report (CPSC Form 166), the analyst can obtain the collection report online from the CIS/IFS Database or through the LSC Fireworks Database when the sample is logged in.

Samples will be collected by investigative personnel from various Regional Centers in accordance with CPSC Directive 9010.36 and delivered to the designated laboratory or test location for testing.

## A. Sample Identification

A **"Sample"** includes all items received under one sample number. A **"Sample"** is the physical item that is delivered to the laboratory that is sealed with CPSC Form 164. The sample can be the shipping container itself with single or multiple seals (CPSC Form 164) affixed to the exterior on the container. A shipping container may contain the sample as an interior enclosure or container such as another box, a paper or plastic bag, an envelope, etc., that is sealed with CPSC Form 164. In rare

cases, the **"Sample"** may not be sealed with CPSC Form 164; this should be noted on the "Fireworks Split Sheet" in the Seal Condition block.

A **"Sample"** may contain one sub-sample, or multiple sub-samples. A **"Sub-sample"** is an individual retail item or a retail package of multiple items. A sample will generally consist of nine to nineteen sub-samples. Each sub-sample should be identified with a bar-code label that displays the sample number and sub-sample number. The collecting investigator should also have placed either on the bar-code label or somewhere on the sub-sample, the date the sample was collected, and their initials. All of the seal and sub-sample identification information will be needed when the sample is split for analysis, and the data entered into the LSC Fireworks Database.

## B.  Pre-analytical Split Procedure

The **Pre-analytical Split Procedure** includes examining and recording the condition of the sealed sample, and the number and type of container(s) the sample was shipped in. The condition and effectiveness of the seal are recorded along with the sample number, and the product name. The analyst then breaks the CPSC seal (Form 164). The seal should be torn or cut across the section showing sample number, date and signature. The analyst then mounts the seal(s) and any label(s) on mounting paper (an 8.5" X 11" piece of lined paper) and identifies the mounting paper in the upper right corner with the sample number, the date and the initials of the analyst preparing the display. The analyst must then initial and date the seal (in ink) in the spaces provided. The broken seal must be submitted with the completed Laboratory Report (CPSC Forms 224, 221, and 222).

At this point the appropriate numbers of sub-samples or devices are divided up for laboratory and field analysis. As a general rule, eight sub-samples or individual devices are for field analysis, and eight sub-samples or individual devices (ten sub-samples or individual devices if reports are present) are for laboratory analysis (See **Appendix 2** for a summary of **General Split Information**). Any remaining sub-samples or devices that are not used for laboratory or field analysis are repackaged, sealed, and stored as the "Reserve Sample". Storage of sub-samples or devices is discussed in the following section.

While dividing the sample for lab and field analysis, check the fireworks devices to determine if they have an additional attached base or whether assembly of the base is necessary. If attached bases are present, record the condition of the bases (detached, cracked, or broken into pieces) and the number of bases in that particular condition on the "Fireworks Split Sheet".

Additionally, during the split process, the sub-samples and the sub-sample container(s) are checked for pyrotechnic leakage**.** If leakage is present, attempt to identify how many of the units leaked, and collect and quantify the amount of leakage present. If only a slight amount of leakage is present, and the leakage is clay material, record the leakage as "Light Dusting". If more than a "Light Dusting" is present, collect all of the material that leaked from the devices. Next, gently shake each device to determine if additional pyrotechnic leakage occurs. If additional leakage occurs, continue to gently

shake each device until leakage can no longer be removed from the sub-sample or device. Collect any additional leakage material and add it to the previously collected material, and weigh. If pyrotechnic leakage is present, and the sample was loosely packaged, make a note that handling and jarring of the sample during shipment due to loose packaging, could have been the cause of the leakage.

Test the pyrotechnic leakage material for ignitability by placing the material in a small pile and attempting to ignite it with a fuse or the flame from a small butane torch. If ignition occurs, describe whether it is a rapid burning material (flash powder or black powder), a slower burning material (stars), a very slow burning material (filler, sawdust, hulls, etc.), or non-ignitable material such as clay from the end plugs. The ignitability test results and weight results of the pyrotechnic leakage material collected during the sample splitting process are recorded on the "Fireworks Split Sheet".

**NOTE: For samples that have pyrotechnic leakage, place the LAB and FIELD sample split in plastic bags. This will allow the analyst the ability to collect any additional pyrotechnic leakage that occurs during normal sample handling. This material is tested during the Laboratory Analysis (See Section IV.B.1).**

**_NOTE: DO NOT TEST FOR IGNITABILITY IN THE FIREWORKS TESTING LAB. OPEN FLAMES ARE FORBIDDEN. TEST FOR IGNITABILITY USING A HOOD IN THE CHEMISTRY LABORATORY BUILDING OR TEST IT OUTSIDE ON THE GROUND._**

**NOTE: It is not necessary to take firecrackers to the field for analysis, unless the Recalls and Compliance Division (CRC) in the Office of compliance has specifically asked for field analysis. Firecrackers only require the determination of pyrotechnic leakage, and the explosive pyrotechnic powder weight.**

When the sample splitting process is complete, record in the "Sample Comment" section of the "Fireworks Split Sheet" any other discrepancies, problems, or oddities that were noted during the sample splitting process. Record such things as: detached or missing fuses; crushed or deformed devices; etc.

## C. Reserve Sample Procedure

Any remaining sub-samples or individual devices that are to be sealed are to be handled as follows:

1.  Individual devices and/or sub-sample(s) are placed in a plastic bag, taped shut, and sealed with a completed CPSC Form 164. Affix the seal in such a way that it actually seals the sample container. More than one seal may be required. If possible, use a single strand of tape to close the sample container. Place the seal across the tape and closure. Affix to the newly sealed sample container, the original Collection Report Envelope (CPSC Form 165)

Exhibit A

with the Sample I.D. Bar-code that was attached to the original sample container. The sealed sample is then placed in a DOT 12-B box for storage.

DOT 12-B boxes for storage of reserve samples are prepared by closing the bottom portion of the box and taping it shut. If possible, use a single strand of tape to close the sample container. All sample reserve DOT 12-B boxes are labeled with a diamond shaped 1.4 G Explosive sticker in the lower right quadrant on one of the box faces. Place a CPSC Form 328 (storage location label) in the upper left quadrant of the face with the 1.4 G Explosive sticker. Record the sample number(s) that are inside the box on the CPSC Form 328, and place the box in a secure location for storage.

2.  If the "Reserve Sample" is too large for other sealed samples to be placed inside of the box (e.g. – Reloadable Tube Aerial Shells, etc.), place the device(s) and/or sub-sample(s) in a DOT 12-B box that has been prepared as in step 2 above, and with these additional instructions. Affix to the **inside bottom** of the box a completed seal (CPSC Form 164). The completed seal (CPSC Form 164) should be placed such that the seal crosses over the bottom inside closure. Place the "Reserve" devices and/or sub-sample(s) into the box. Close the upper portion of the box and tape it shut. If possible, use a single strand of tape to close the sample container. Affix a second completed seal (CPSC Form 164) so that the seal crosses over the tape of the upper outer closure. More than one seal may be required. Affix to the newly sealed sample container (box), the original Collection Report Envelope (CPSC Form 165) with the Sample I.D. Bar-code that was attached to the original sample container. Place the box in a secure location for storage.

Record the number of remaining sub-sample or individual devices that were repackaged, sealed, and placed in reserve storage, on the "Fireworks Split Sheet".

Upon completing the "Fireworks Split Sheet", enter the data into the "LSC Fireworks Database" to provide sample tracking continuity or give the split sheet to the secretary for entry into the "LSC Fireworks Database".


## IV. FIREWORKS ANALYTICAL PROCEDURES

### A. Field Analysis for all Fireworks (8 Devices)

**Field Analysis** requires the analyst to closely measure and observe the ignition and functioning of individual sub-samples/devices. A summary of the required tests for the various categories of fireworks is shown in **Appendix 3**. Field analysis of fireworks samples requires the following tests (Numbers 1-5) to be performed simultaneously:

Exhibit A

1. **Fuse Burn Time**
2. **Functionality of the Fuse**
3. **Function of the Fireworks Device**
4. **Malfunction(s) of the Fireworks Device**
5. **Burnout and Blowout**

A copy of the standard **"Fireworks Field Sheet"** can be found in **Appendix 1,** which contains the various Fireworks Testing Data Forms.

**NOTE: Prior to departing for the test site the analyst should check that all of the needed equipment and supplies are present in the van. All of the samples for testing should be loaded into the back of the van in such a manner so as to prevent the samples from tipping over or freely moving around. The van door should also be locked to prevent unwanted entry and tampering with the samples.**

1. <u>**Fuse Burn Time (16 CFR 1507.3(A)(2))**</u>

   The fuses on consumer fireworks are required to burn at least 3 seconds and not more than 9 seconds. Measure the Fuse Burn Time (FBT) with a digital stopwatch readable to 0.1 second.

   Place each fireworks device on a hard, level, flat surface. The fuse on most fireworks devices is covered by tape, a plastic tube or wrapped in paper that is taped to the device. Expose the tip of the fuse for ignition by either removing the tape or paper.

   **NOTE:**  While testing, the person lighting the fuse (igniter) should stand in a manner that does **NOT** place their head over the device. The igniter should stand with the fireworks device on either the right or left side of their body, and extend an arm out sideways to ignite the fireworks device. Once the fuse ignites, the igniter should move away from the fireworks device.

   To ignite the fuse, the first analyst (igniter) should place the burning tip of a punk stick on the tip of the fuse. The second analyst (time/function recorder) will time the burning of the fuse from the initial ignition (when the fuse sputters and supports combustion) to the time the device starts to function. The second analyst should move away from the fireworks device as it functions. The time at which a device begins to function does not necessarily coincide with the increased production of smoke from a device, or the first spark from a device. The fireworks device "begins to function" when it becomes obvious that combustion of pyrotechnic materials (excluding internal fuses) has begun, that is, the device starts to produce readily visible effects such as the firing of flaming balls or shells, the discharge of a shower of sparks, or audible effects such as whistles, crackle, etc. Conduct the test on samples/devices and record the results on the form entitled "Fireworks Field Sheet".

Exhibit A

2. **Functionality of the Fuse**

There are common fuse functionalities that need to be noted on the "Fireworks Field Sheet", while determining fuse burn times:

**a.** If the fuse ignites, but fails to cause the device to function after 20 seconds, stop timing the FBT, and enter "20.0" as the FBT for the device. Also, on the "Fireworks Field Sheet" record the number of fuses that ignited, but failed to ignite the devices on the line:

    **"___ of ___ fuses burned but device failed to function."**

**b.** All other abnormalities regarding the functionality of a fuse should be placed under the "Fuse Burn Comment" section. If the fuse fails to ignite after the analyst has made repeated attempts to ignite the fuse, record the fuse burn time as "0.0" seconds. Record on the "Fireworks Field Sheet" under the "Fuse Burn Comment" the following statement:

    **"___ of ___ fuses failed to ignite after repeated attempts."**

**c.** On most "**Reloadable Tube Aerial Shell**" devices, the safety fuse has a black or gray colored ignition aid on the fuse tip. If the ignition aid burns, but fails to ignite the fuse, stop timing. Allow sufficient time for the second analyst to reset the stopwatch. When the second analyst is ready, attempt to re-light the fuse with the punk in the usual manner. Measure and record the fuse burn time. Also, record on the "Fireworks Field Sheet" under the "Fuse Burn Comment" the following statement:

    **"___ of ___ fuse ignition aids burned, but failed to ignite the fuse."**

**d.** Some fireworks devices have two fuses. When this is observed, make a note on the "Fuse Burn Comment" line. Additionally, note if the two fuses protrude from the same orifice or if they are located at different positions (specify locations) on the fireworks device.

**e.** On some fireworks devices there are fuses that consist of two components. The end fuse component is safety fuse that is attached to a very fast burning fuse called "Quick Match". Note in the "Fuse Burn Comment" if the fuse is a two-component fuse, and if the safety fuse is detached.

    *CAUTION*: "Quick Match" burns at a very fast rate. It is less than 0.5 seconds per foot.

Exhibit A

### 3.  Function of the Fireworks Device

During the field-testing portion of the analysis, it is important for the analyst to be concise and accurate in describing how the device functioned during the test. After the fuse has burned, the analyst must observe what the device does and record these observations in the "**FUNCTION**" section of the "Fireworks Field Sheet". An example of a function statement for a Reloadable Tube Aerial Shell follows:

**"Shoots shell that emits a whistle, 50 to greater than 100 feet into the air, which bursts releasing stars that emit crackle, and releases multiple aerial reports."**

When a shell is propelled into the air by the lift charge and reaches its apogee, the shell normally bursts with a muffled popping noise. The bursting shell releases a shower of multi-colored flaming stars and sparks. Sometimes, single or multiple aerial reports may be heard.

**Appendix 4** lists basic generic function statements for the various types of fireworks devices. Actual "Function Statements" will vary during field-testing depending upon what effects are present, and the construction of the device.

**NOTE:  Rockets are _ALWAYS_ tested inverted in a drum, and Missiles are _ALWAYS_ tested in the Fireworks Testing Cage, unless otherwise instructed. As a general rule, rockets and missiles fly erratically. Both can cause field fires at the test site or strike the staff conducting the testing. Rockets and Missiles are ONLY fired upward when a special request from Compliance (CRC) is made.**

**NOTE: When field-testing conditions (wind) do not allow for open testing, all testing is performed in the Fireworks Testing Cage. In the "Function Statement" the phrase "feet" is omitted. At the end of the "Function Statement" the phrase "TESTED IN THE FIREWORKS TESTING CAGE." is added.**

### 4.  Malfunction(s) of the Fireworks Device

It is very important to observe and record any malfunction(s) of a fireworks device. Below is a list of the most common malfunctions that are observed while testing fireworks:

**a.**  Ground spinner flying in the air
**b.**  Aerial reports discharging on the ground
**c.**  Tip-over while functioning
**d.**  Burning debris falling to the ground
**e.**  Ignition of grass fires from burning debris
**f.**  Device casing continuing to burn after functioning

Exhibit A

    **g.**   Incomplete functioning of the fireworks device

    **h.**   Effects behaving in an unusual manner

    **i.**   The nozzle (restricted orifice) or clay end-plug in a tube ruptures or is expelled. This is called "Blowout". **(See Section on Burnout and Blowout 16 CFR 1507.6)**

    **j.**   The sidewall of a tube ruptures. This is called "Blowout". **(See Section on Burnout and Blowout 16 CFR 1507.6)**

    **k.**   When burning pyrotechnic material burns a hole through the sidewall of a tube in a fountain device. This is called "Burnout". **(See Section on Burnout and Blowout 16 CFR 1507.6)**

    **l.**   Blowout Special Cases (Rockets, Mines and Shells, and Reloadable Aerial Shells). **(See Section on Burnout and Blowout 16 CFR 1507.6)**

Record these observations in the "Details Section" of the "Fireworks Field Sheet." Indicate how many of the eight devices tested, experienced a malfunction. If additional comments are necessary, place them in the "Function Statement Section."

**NOTE:** When testing fireworks samples in the open and one or two of the devices function erratically **(specifically tip-over, blowout, and burning debris starting grass fires)**, perform **ALL** further testing of that sample in the "Fireworks Testing Cage".

### 5. Burnout and Blowout 16 CFR 1507.6

The pyrotechnic chambers of fireworks devices must be constructed in such a manner that functioning of the device occurs in a normal manner. Any burning through the bottom or sides or any unintended rupture of the casing through the bottom or side of an item constitutes a burnout or blowout. The entire pyrotechnic effect must occur from the intended orifice(s).

Burnout generally occurs in fountains. It may appear as sparks, flame and/or smoke coming out of the side or bottom of the device. If sparks, flame, and/or smoke are observed, examine the device after it has functioned to determine if the sparks, flame or smoke are a result of burnout, from the burning of the fuse, from flames, sparks, or smoke escaping through the fuse orifices. Unless the side of the tube(s) shows evidence of having burned through, burnout has not occurred.

Blowout (when the walls of the device rupture or the nozzles and/or end plugs in the tubes are ejected while the device is functioning) is more common in rockets, mines and shells, reloadable tube aerial shells, roman candles, smokes, novelty devices, and missiles than in other devices. Occasionally, it occurs in fountains.

Blowout is determined by either observing the device as it functions, or by examining the spent device. Record the Burnout/Blowout observations on the "Fireworks Field Sheet."

Include the number of devices of the eight tested that exhibited the defect and whether the burnout or blowout occurred on the bottom or the side of the device. In the case of multiple tube devices, record the total number of tubes per device, and how many tubes for each failing device that experienced burnout or blowout. This may require disassembly of the spent device.

In addition to the above definition for burnout/blowout, Rockets, Mines and Shells, and Reloadable Tube Aerial Shells are also classified as suffering blowout if they produce their main effect (report, star burst, etc.) at a height less than is normal for such an item (i.e. – below a height of 20 feet).

The category called "Rockets" includes the following items:

**a.** Bottle Rockets,
**b.** Stick Rockets,
**c.** Spin Stabilized Rockets (i.e. - Spinning Type Missiles without Fins), and
**d.** Fin Stabilized Rockets (i.e. - Fin Type Missiles)

## B. Additional Field Testing Requirements for Smoke Devices 16 CFR 1507.9(a)

In addition to the five standard field tests, fireworks smoke devices involve additional time measurements concerning the functioning of the device.

Smoke devices generally contain three pyrotechnic components: 1.) The Safety Fuse; 2.) The First Fire Starter Composition (a pyrotechnic primer for the ignition of the internal pyrotechnic smoke composition); and 3.) The Internal Pyrotechnic Smoke Composition.

Smoke devices require four (4) time measurements during the "Field" testing process. When a smoke device functions correctly, the fourth time measurement (d) will always be zero (0.0) seconds, that is, there is no flame production during the smoke production time. These time measurements are:

1. **Fuse Burn Time (FBT),**
2. **First Fire Flame Time (FFFT),**
3. **Smoke Production Time (SPT),**
4. **External Fire Flame Time (XFFT).**

In a general sense, a smoke device functions in the following manner:

1. **Primary fuse is ignited and burns (FBT).**
2. **"First Fire Starter Composition" is ignited, and the composition emits a short burst of flame or "First Fire Flame", and self-extinguishes (FFFT).**
3. **Smoke production begins and ends (SPT).**

<span style="color:red">Exhibit A</span>

The following "Time Line" represents the various function times of a smoke device:

|    FBT    |    FFFT    |    SPT    |
     (a)         (b)          (c)

However, there are two malfunctions that are sometimes observed while testing smoke devices: A.) Excessive First Fire Flaming (EFFF), and B.) External Fire Flame (XFF).

The first malfunction called "Excessive First Fire Flaming" occurs when the smoke device continues to produce flame after the "First Fire Starter Composition" has burned, but prior to the beginning of smoke production. The following "Time Line" provides a representation of where the "Excessive First Fire Flaming Time" (EFFFT) time period occurs during the function time of a smoke device:

|    FBT    |    FFFT    +    **EFFFT**    |    SPT    |
     (a)         (b)              (b2)           (c)

> **NOTE: When measuring the "First Fire Flame Time" and the "Excessive First Fire Flaming Time", if the analyst cannot distinguish when the "First Fire Flame" ends, and the "Excessive First Fire Flame" begins, the two time measurements should be recorded as one time.**

The second malfunction called "External Fire Flame" (XFF) occurs while the smoke device is producing smoke. This malfunction is caused by a temperature increase of the smoke being expelled. This temperature increase causes the organic component of the smoke to ignite and burst into flame. As the temperature of the expelled gases decreases, the flame self-extinguishes, and smoke production resumes.

> **NOTE: CPSC staff practice regarding "External Fire Flame" is: Small "brief" or "mild" bursts of flame accompanying the combustion of the smoke composition are regarded as part of the normal operation of a smoke device.**

The following "Time Line" provides a representation of where the "External Fire Flame" time period occurs during the function time of a smoke device. "External Fire Flame" can occur more than once during the functioning of a smoke device. Individual "External Fire Flame Times" for a smoke device are measured, but they are recorded as a **CUMULATIVE** time.

|    FBT    |    FFFT    |    SPT    +    **XFFT**    +    SPT    |
     (a)         (b)          (c)             (d)             (c)

> **NOTE: When the measurement of "Smoke Production Time" begins, continue until smoke production has stopped. "Smoke Production Time" is a continuous**

15

**measurement. _DO NOT_ stop timing "Smoke Production Time" if "External Fire Flaming" occurs. "Smoke Production Time" is recorded as the total smoke production time _NOT_ "Smoke Production Time" minus "External Fire Flaming Time". Use separate stop watches to measure the four times: "Fuse Burn Time", "First Fire Flame Time", "Smoke Production Time", and "External Fire Flaming Time".**

## C. Laboratory Analysis (8-10 Devices)

Each of the following tests shall be conducted on eight sub-samples (8) with the exception of Report Charge Powder Weights. These are obtained from either five (5) or ten (10) sub-samples, as discussed below. The following measurements and observations are conducted in the laboratory:

1. Pyrotechnic Leakage and Ignition of Leakage
2. Fuse Support
3. Fuse Side Ignition
4. Height and Base Dimensions and Device Stability (12-degree Tilt Test)
5. Diameter of Reloadable Tube Aerial Shells
6. Handles [Handle Attachment, Handle Length, Tip Measurement (Diameter or Side Length)]
7. Spikes [Spike Attachment, Spike Length, Tip Measurement (Diameter or Side Length)]
8. Wheels & Axles (Driver & Axle Support)
9. Smoke and Flitter Devices
10. Rockets with Sticks (Stick Straightness, Stick Rigidity, Total Rocket Length, and Driver/Rocket Motor Attachment)
11. Firecracker or Aerial Report Powder Weights
12. Powder Weight in Party Poppers
13. Large Multiple Tube Mine and Shell Fireworks Devices (Display Racks) & 60-degree Tilt Test
14. Label Exhibits

**NOTE: Handles and Spikes; Wheels and Axles; Smoke and Flitter Devices; and Large Multiple Tube Mine and Shell Fireworks Devices (Display Racks) have their own laboratory work sheet (See Appendix 1) with observations that are specific to that type of fireworks device.**

### 1. Pyrotechnic Leakage 16 CFR 1507.5

Any additional pyrotechnic leakage that collects in the plastic storage bags (Lab and Field samples) while handling the sample, should be collected, consolidated, weighed, and tested for ignitability as previously described in Section III.B. Again, attempt to identify how many of the units leaked. Regardless of composition (clay, pyrotechnic material, or a combination of the two), if the amount of pyrotechnic leakage is too small to gather and weigh, the leakage is recorded as "Light Dusting". If more than a "Light Dusting" is present, gently

repeat the shaking process. Any additional material should be collected, weighed and checked for ignitability (See Section III.B.). Record the test results on the "Fireworks Laboratory Sheet". **(All pyrotechnic leakage weights are added together.)**

 *NOTE: DO NOT TEST FOR IGNITABILITY IN THE FIREWORKS TESTING LAB. OPEN FLAMES ARE FORBIDDEN. TEST FOR IGNITABILITY USING A HOOD IN THE CHEMISTRY LABORATORY BUILDING OR TEST IT OUTSIDE ON THE GROUND.*

2. **Fuse Support (8 Subs) 16 CFR 1507.3(b)**

If the sub-sample/device weighs **less than 8-ounces (227 grams)**, fasten two of the sub-samples/devices together with either a piece of tape, string, or a rubber band, and grasp the fuse by the tip, and lift. The fuse should not separate from the device.

If the sub-sample/device weighs **8-ounces (227 grams) or more**, attach an 8-ounce weight to the sub-sample/device, and grasp the fuse by the tip, and lift. The fuse should not separate from the device.

Test a total of eight (8) sub-samples/devices for fuse support. Record the number of fuses that **supported** the weight of two sub-samples/devices or one sub-sample/device plus 8-ounces on the "Fireworks Laboratory Sheet".

In addition to the above single fuse tests, when a device has two or more fuses that are NOT taped or tied together, but are protruding from the same hole, or located at different points on the device, each fuse should be tested for fuse support using the appropriate test as described above. Record the results in the "Sample Comment" section.

**NOTE: FUSES COVERED BY PAPER/PLASTIC WRAP AND/OR TAPE**

a. **If two fuses are taped together, tied together, or wrapped inside a flame retardant covering, consider the two fuses as being one fuse. DO NOT SEPARATE THEM.**

b. **When the fuse(s) are wrapped with a paper or foil covering and/or taped to the device, do not unwrap the paper or foil from around the fuse(s), or remove the tape unless the paper and/or the tape prevents you from grasping the fuse. In this case, cut the tape or paper down to a point where the fuse can be grasped (expose the fuse to a length of about 1/8-inch to 1/4-inch). Hemostats, forceps, or pliers can be used for grasping the fuse and performing the "Fuse Support Test."**

<span style="color:red">Exhibit A</span>

3. **Fuse Side Ignition (8 Subs) 16 CFR 1507.3(a)(1)**

Prior to removing the fuse from the fireworks device for side ignition testing, confirm that the "Fuse Support" test has been performed. The "Side Ignition" test requires cutting the fuse at the point where the fuse enters the fireworks device. (See **"NOTE: FUSE SIDE IGNITION TEST"**) If the fuse is wrapped in paper, plastic, or taped to the device, ***remove the fuse with the paper, plastic, and/or tape, <u>intact</u>.*** Collect eight (8) fuses where possible, and place them in one of the plastic pouches for later testing. Either attach the pouch to the completed lab form or attach to the pouch a sticky label with the sample number written on it. Testing fuses for side ignition is performed in a location where pyrotechnic and other flammable materials are not present, or outdoors if weather permits.

In a fume hood, lay a large sheet of aluminum foil on the flat interior counter top of the fume hood. Lay the fuse on the aluminum foil, with any tape, plastic, or paper wrapping facing upward. Place the glowing tip of a lit cigarette (use only unfiltered Pall Mall cigarettes) directly on the fuse, or the paper, plastic wrapping and/or tape that is either around or covering the fuse (**not the fuse tip or end**). Using a stopwatch begin timing when the glowing tip of the cigarette first touches the fuse, paper or plastic wrapping, or tape. Continue timing until ignition of the fuse occurs or a **maximum** of five (5) seconds. If the fuse ignites in less than 5 seconds, record the measured time on the "Fireworks Laboratory Sheet." If the fuse does not ignite in 5 seconds, stop the test, and record the measured time as 5 seconds on the "Fireworks Laboratory Sheet."  Make any additional comments either in the "Side Ignition Comment" section or in the "Fuse Comment" section.

Certain smaller fireworks devices are exempt from the side ignition requirement. Firecrackers are exempt from this requirement, along with devices which contain less than 6 grams of pyrotechnic composition and require a restricted orifice to properly function. Such products include small bottle rockets, small smoke devices, small ground spinners (Jumping Jacks), small helicopters, small missiles, etc. For these products mark the **"Exempt"** box on the "Fireworks Laboratory Sheet" in the "Side Ignition" section.

**NOTE: FUSE SIDE IGNITION TEST**

a. **Some fireworks devices only have a small piece of fuse protruding from the device. When the protruding fuse length is ½-inch or greater, proceed with the standard side ignition test. However, the side ignition test cannot be conducted on short fuses, that is, fuses less than ½-inch, because of the possibility of igniting the end of the fuse with the cigarette. When the fuse length is less than ½-inch, record on the "Fireworks Laboratory Sheet" the following statements in their respective comment block:**

18

Exhibit A

> 1.) **Side Ignition Comment:** *"Insufficient fuse to test for Side Ignition; because of the possibility of igniting the end of the fuse with the cigarette."*
>
> 2.) **General Fuse Comment:** *"Less than ½-inch of fuse protrudes from the device."*

b. **In situations where:  1.) Only part of the fuse is wrapped leaving at least ½-inch of the fuse exposed; or 2.) Where some of the fuses in the sample are wrapped and others are not, test both the wrapped and unwrapped fuses. Record the results of either situation on a "Laboratory Continuation Sheet." The laboratory report should note these results for each test (wrapped and unwrapped) separately.**

> 1.) **At least 1/2-inch of the fuse is exposed while the remainder of the fuse is covered with flame retardant wrapping. Test all of the fuses for side ignition on the flame retardant wrapping material first, and record the results on a "Laboratory Continuation Sheet." Second, test the exposed portion (the portion not covered by the flame retardant wrapping material) of the fuses for side ignition, and record the results on the same "Laboratory Continuation Sheet" above.**
>
> 2.) **Some of the fuses in the sample are wrapped with a flame retardant covering and others are not. Test both the wrapped and unwrapped fuses, and record the results for each test (wrapped and unwrapped) separately on a "Laboratory Continuation Sheet."**

4. **Bases (8 Subs) 16 CFR 1507.4**

Fireworks devices that operate standing in an upright position are required to have a stable base. This reduces the likelihood that the device will tip over during normal operation and emit a horizontal shower of sparks or shoot burning pyrotechnic material horizontally in the direction of the user or onlookers.

a. **Height and Base Measurements**

The base or bottom of fireworks devices that are operated in a standing position must have a horizontal base dimension or the base diameter equal to at least one-third the overall height of the device (excluding any fuse or twisted paper at the top of the device), but including any base or cap affixed to the device.

**NOTE: HEIGHT TO BASE MEASUREMENT TEST**
**Firecrackers, Bottle Rockets, Stick Rockets, Roman Candles, Handles &**
**Spikes, Smoke Devices, and Wheels & Axles are exempt from the Height to**
**Base Measurement test.**

Perform the Height to Base Measurement test on the device by measuring the height and the horizontal base dimension as indicated by the arrows in the drawings of the various bases as shown in Appendix 6 or the diameter of the base when the device is cylindrical. Record the findings on the "Fireworks Laboratory Sheet". It is necessary for the analyst to calculate the height to base ratio in the lab to determine if the ratio is less than, equal to, or greater than 3. If the height to base ratio is equal to or greater than 3, perform the 12-Degree Block Tilt Test (Section b. below).  There is one exception to this test. This exception applies to Large Multiple-Tube Mine and Shell Fireworks Devices (Display Racks). These devices consist of two or more tubes, where at least one of the functioning tubes has an inside diameter measuring 1.5 inches (3.8 cm) or greater. There is a specialized test for these devices in Section IV.c.13.a & b

If the fireworks devices in the sample have one or more bases that are detached or if the sample has bases that are packaged separately, make a notation of this in the Sample Comment Section of the Split Sheet. Perform the Height to Base Measurement test on the devices **with and without** the bases attached. Record the findings of both tests on a **"Laboratory Continuation Sheet."** If the Height:Base Ratio is less than 3 with the base attached, but equal to or greater than 3 when the base is detached, perform the 12-Degree Block Tilt Test on the sample with the bases detached and record the results.

When measuring the base dimension, always remember to measure the horizontal dimension as indicated by the arrows in the drawings of the various bases as shown in Appendix 6 or the diameter of the base when the device is cylindrical. When a device is constructed of small multiple tubes, and the device does not have a "distinct" side, measure the diameter of the device. This is used to calculate the height to base ratio. The ratio (quotient) is calculated by dividing the height measurement (dividend) by the base measurement (divisor). Three examples follow:

**1.)** The height of a device is 4-inches, and the base is rectangular, measuring 2-inches by 4-inches. A height of 4-inches is recorded, and the base dimension of 2-inches is recorded. The height to base ratio of 2 is calculated as follows:

$$4" \div 2" = 2$$

**2.)** The height of a device is 10-inches, and the base is hexagonal, measuring 6-inches across from side to side and 3 1/2-inches on a side. A height of

10-inches is recorded, and the base dimension of 6-inches is recorded. The height to base ratio of 1.67 is calculated as follows:

$$10" \div 6" = 1.67$$

**3.)** The height of a device is 13-inches, and is constructed of multiple 3/8-inch tubes bunched together to form a "circular" device. Since the base is "circular" in appearance, measurement of the base diameter is 4-inches. A height of 13-inches is recorded, and the base dimension (in this case the diameter of 4-inches) is recorded. The height to base ratio is calculated as follows:

$$13" \div 4" = 3.25$$

In this situation, it would be necessary to perform the 12-Degree Block Tilt Test on the sample.

**b. 12-Degree Block Tilt Test**

Prior to testing, check the work surface to ensure that it has a tilt angle of 0-degrees, since the test block is a pre-cut 12-degree angle. The 12-Degree Block Tilt Test is performed by gently placing the device, with neither a downward force nor by making an effort to either stabilize or tip the device, on a wooden block that is cut at a 12-degree angle to the horizontal. Always place the device on the block in the position it is most likely to tip, that is, the largest base dimension is parallel to the bottom edge of the testing block. Rotate the device such that each distinct base dimension is parallel to the bottom edge of the testing block. For devices with a round base or "nearly round base", rotate the device in small increments through a full 360 degrees and gently place the device, with neither downward force nor making an effort to either stabilize or tip the device, on the block with each rotation. Test 8 sub-samples and record the results on the "Fireworks Laboratory Sheet".

**___ of _8_ tipped over on a 12-degree block.**

**5. Reloadable Tube Aerial Shell Diameter Test (8 Subs) 16 CFR 1500.17(a)(11)(i)**

The maximum outside diameter of Reloadable Tube Aerial Shell fireworks devices is 1.75 inches. This test involves measuring the diameter of a reloadable tube aerial shell. Using the 6-inch metal caliper, place the exterior measurement jaws around the largest portion of the shell's exterior. Adjust the caliper and determine the outside diameter of the shell (Figure 1). When the shell appears to be spherical, make several measurements to ensure that the maximum diameter of the sphere (ball), not the lift charge chamber, is reported. When the shell is cylindrical, make several measurements of the shell diameter, not the shell height or

# Figure 1.  Reloadable Tube Aerial Shell Diameter Measurement



**Spherical**

**Cylindrical**

**Double Spherical**

lift charge chamber. When the shell is a multiple break shell, make several measurements of

the largest diameter sphere (ball) only. Record the maximum diameter measurement on the "Fireworks Laboratory Sheet".

6.  **Handles on Hand-held Devices (8 Subs) 16 CFR 1507.7**

Hand-held fireworks devices, except sparklers, are required to have a handle at least four inches in length, which must be securely attached or be an integral part of the device. To determine the handle length, use the following procedure.

Measure the length of the exposed handle. If the length of the exposed handle is less than four inches, and the handle extends into the tube of the fireworks device, the handle is then considered an integral part of the device. Empty the pyrotechnic chamber, or use a spent device, and slide a ruler, rod, or a straight rigid object into the empty pyrotechnic chamber to measure the length of pyrotechnic chamber. ***The handle length is equal to the total length of the device (tube end where the fuse is, to the exposed tip of the handle) minus the chamber length***. The handle length includes the length of any clay plug that may be present below the pyrotechnic chamber. Record the two length results on the "Fireworks Handle/Spikes Lab Sheet", and calculate the handle length.

To check for secure attachment of the handle to the device, test 8 devices by applying a reasonable twisting force at the attachment joint. Report the number of separations (if any) on the "Fireworks Handle/Spikes Lab Sheet".

**___ of _8_ handles detached when twisted.**

## 7. Devices with Ground Spikes (8 Subs) 16 CFR 1507.7

This test is for devices that are to be held upright in the ground by means of a spike. The spike on the fireworks device is required to protrude at least two inches from the base, have a blunt tip not less than one eighth of an inch in diameter or one eighth of an inch on the side of a rod with a rectangular cross section, and be securely attached.
Measure the length of the exposed ground spike and the spike's blunt tip diameter or side length and record the measurements on the "Fireworks Handle/Spikes Lab Sheet".

To check for secure attachment of the Spike to the device, test 8 devices by applying a reasonable twisting force at the attachment joint. If there is a separation of the Spike section, report the number of separations on the "Fireworks Handle/Spikes Lab Sheet".

**External Spike Length: _____ inches.**
**Blunt Tip Measurement: _____ inches.**
**___ of _8_ spikes detached when twisted.**

## 8. Wheel Devices (8 Subs) 16 CFR 1507.8

Wheel type fireworks devices are required to have drivers (pyrotechnic filled component) and axles, which are securely attached so that they will not come apart during shipping, handling and normal operation. Wheel devices are intended to operate in fixed locations.

Indicate on the report, the number of drivers that are attached to each wheel device.

**_____ drivers attached to each sub-sample/device.**

To test for driver attachment, attach an eight-ounce weight to the driver (using string or a small clip tied to the weight), and let the weight hang down. Test eight (8) sub-samples/devices. Record the number of the drivers that separate from the device on the "Fireworks Wheel/Axles Lab Sheet".

**_____ drivers of _____ supported 8 ounces without separation.**

In a like manner, attach an eight-ounce weight to the axle. Test eight (8) sub-samples/devices. Record the number of the axles that separate from the device on the

"Fireworks Wheel/Axles Lab Sheet".

**_____ axles of __8__ supported 8 ounces without separation.**

In cases where the axle is a separate nail or spike that passes through a bearing such as an eyelet, tube, or ball bearing, these axle substitutes should also be securely attached to the wheel device. In these cases, check for secure attachment of the eyelet, tube, or ball bearing by attaching the eight-ounce weight to the nail (or axle), which has been put through the bearing. Test eight (8) sub-samples/devices. Record the number of the bearings that separate from the device on the "Fireworks Wheels/Axles Lab Sheet." Indicate on the report whether or not the nail or spike was provided.

**Nail or spike provided with retail sample? ___ Yes   ___ No**

9. **Smoke Devices or Flitter Devices (8 Subs) 16 CFR 1507.9(b)(c)**

Smoke and flitter devices shall not be of a color and configuration so as to be confused with banned fireworks such as M-80's, silver salutes or cherry bombs. Examine the laboratory analysis portion of the sample, and determine if the device appears to be similar in color and in configuration to a banned item. Record the results on the "Fireworks Smoke Sheet." In the extremely rare occasion when the sample appears to be similar in color to, and in the configuration of a banned item, photograph a few of the devices in the sample, and send a copy of the picture with an explanation to the Compliance Officer that is responsible for the sample. Also included a photo of what the banned item looks like for comparison.

Smoke devices must not incorporate plastic materials, which make direct contact with pyrotechnic composition. Dissect a device to determine if plastic materials are in contact with the pyrotechnic composition. If the device has plastic material in contact with pyrotechnic material, examine the remaining seven devices, and record the results on the "Fireworks Smoke Sheet."

10. **Rockets with Sticks (10 Subs) 16 CFR 1507.10**

Rockets with sticks (including sky rockets and bottle rockets) are required to have a straight and rigid stick to provide a direct and stable flight. Rocket sticks should be protected from damage (breakage, and/or detachment) during transportation, normal handling, and normal operation.

Check 10 rockets for stick rigidity, 10 rockets for stick straightness, and 10 rockets for stick attachment and 10 rockets for any other tests. The tests for rigidity and straightness are performed using a Fireworks Rocket Test Stand (Figure 2). Chart recorder paper is

# Figure 2.   Fireworks Rocket Test Stand

**Backboard with Grid Rulings    Stick Clamping Block**



attached to the Fireworks Rocket Test Stand to provide the necessary grid ruling for measuring rigidity and stick straightness. The chart paper grid ruling are: 1 block per millimeter (minor blocks) or 10 minor blocks per centimeter (**major blocks are designated by bold lines**). Minor block grid rulings are not displayed on Figures 2, 3, and 4.

**a. Stick Rigidity Test (10 devices):**

Rigidity is evaluated by clamping a 1" section of the rocket stick's end, furthest from the driver, to the flat surface of the stick-clamping block.

Measure the downward distance that the end of the rocket driver droops (Figure 3), by counting the number of blocks (major and minor blocks) that the driver has drooped. Next, measure the total length of the rocket (Figure 3).

The results from the downward droop measurements and the length measurements are recorded in **<u>centimeters</u>** on the "Fireworks Laboratory Sheet". The fireworks database program uses the metric system in calculating the droop ratio (rigidity measurement)

# Figure 3.    Fireworks Rocket Stick Rigidity Measurement



Rigidity Measurement = Rocket Droop / Rocket Length

when the data is entered. The droop ratio is calculated by dividing the droop measurement by the rocket length.

**b.  Stick Straightness Test (10 devices):**

The Fireworks Rocket Test Stand (Figure 2) is laid flat on the table and the rocket is laid on the flat grid surface of the test stand. Roll the rocket stick to determine the greatest arch or bow (Figure 4). Count the number of blocks (Major and minor blocks) and record the results in **<u>millimeters</u>** on the "Fireworks Laboratory Sheet". The fireworks database program uses the metric system to perform calculations.

**c.  Stick Attachment Test (10 devices):**

Lift the rocket device by grasping the end of the stick. Holding it vertically with the driver pointed downward; attach an eight-ounce weight to the rocket driver/motor. Test

# Figure 4.   Fireworks Rocket Stick Straightness Measurements

**Backboard with Grid Rulings**    **Stick Clamping Block**



**Measure Stick Curvature
in Millimeters**

ten rockets in this manner. Record the number of devices that supported an eight-ounce weight without driver/stick separation on the "Fireworks Laboratory Sheet."

11. <u>Firecrackers and Aerial Reports 16 CFR 1500.17(A)(3)&(8)</u>

**NOTE:  Work in a Fume Hood. Use surgical gloves, dust masks and <u>care</u> when handling flash powder.**

Firecrackers are allowed no more than a 50 milligrams (0.772 grains) charge of pyrotechnic composition. Reports in aerial devices that rise into the air more than 10 feet are allowed no more than a 129.6 mg (2 grains) charge of pyrotechnic composition.

a.  **Firecrackers**

The charge of pyrotechnic composition in firecrackers is often "flash powder", which is

Exhibit A

gray in color. However, some firecrackers contain a pyrotechnic composition powder that is not gray. Carefully dissect one firecracker from each of five sub-samples. More than one firecracker from each sub-sample may be used if insufficient sub-samples were collected.

After the powder from 5 firecrackers has been weighed, calculate the average weight. If the average weight is less than 30 mg the analysis is complete. However, if the average powder weight is 30 mg or more, weigh the powder from an additional five firecrackers for a total of 10 firecrackers.

The dissection of firecrackers can best be performed by gently cutting the report longitudinally with a scalpel, hobby knife, or razor blade. The cuts should be shallow until only several layers of paper cover the powder. Unroll the remaining paper and with gentle tapping transfer the report powder to a piece of weighing paper that was previously folded into quarters. Keep as much of the clay material (if present) from transferring to the weighing paper. Use a small spatula to remove any large piles or pieces of clay, or fuse material from the weighing paper.

In order to separate any remaining clay material from the pyrotechnic composition, place and hold the centerfold of one of the sides between the first three fingers. The thumb and middle finger are located below the paper, while the index finger is located above the paper in the fold. Slightly tilt the end of the paper furthest from your fingers in a downward angle. With the other hand, gently tap or swing the index or middle finger in a back and forth motion so that side of the fingertip gently brushes against or taps the bottom of the paper in the area of the centerfold. This gentle tapping motion will cause the clay and report powder to separate. The clay will migrate away from the fingers holding the paper. Remove the clay and any foreign matter from the weighing paper and discard. Repeat this procedure until the report powder is free of clay or foreign material.

Transfer the clean report powder to a tared weighing dish on the balance. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet".

**b. Aerial Reports (Paper Firecracker Type)**

As a general rule, aerial reports are a collection of one or more firecrackers inside an aerial shell or rocket. The report powder in aerial reports is generally gray as with firecrackers. At times, however, black, pink, or white powder has been observed as the report charge. Carefully dissect the device and remove the report(s). If the aerial reports are similar to firecrackers, dissect the aerial report in a manner similar to that used with firecrackers.

After the powder from 5 aerial reports has been weighed, calculate the average weight. If the average weight is less than 100 mg the analysis is complete. However, if the average powder weight is 100 mg or more, weigh the powder from an additional five aerial reports for a total of 10 aerial reports. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet". This applies to **ALL** types and sizes of aerial reports.

**c.  Aerial Reports (Paper Firecracker Type with Different Sizes)**

Some firework devices contain aerial reports of two or more physical sizes. All sizes of reports need to be weighed as if they were from different devices. For example, a device may contain large and small aerial reports. Weigh the powder from five of the larger reports and five of the small reports. If the average of 5 aerial reports is less than 100 mg for either size, the analysis is complete for that particular size. If the powder weights average 100 mg or more for either size, an additional five reports are needed for a total of 10. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet".

**d.  Aerial Reports (Plastic Projectile or Bottle Rocket)**

If the aerial report is not a paper firecracker type, but a pyrotechnic composition in the device that is separated by layers of clay or some other material, carefully dissect the aerial effects casing and remove the report charge. The best way to open a plastic cylindrical projectile is to cut off the sealed end and remove the component layers until the report charge is removed. Clean and separate the report charge and record the weight. If the average of 5 aerial reports is less than 100 mg the analysis is complete. If the average of 5 aerial reports is 100 mg or more then an additional 5 aerial report weights are needed for a total of 10 report weights. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet".

**e.  Aerial Reports (Aerial Shell is the Report Casing)**

When the field function indicates that a loud report was observed during testing, examine the aerial shell(s) of the device. Open the paper shells by cutting through the paper (cylindrical shells should be cut longitudinally and spherical shells should be cut along the center seam of the shell). When plastic spherical shells are encountered, the best way to open them up is by cracking them open with a "C" clamp or vise, and separating the shell into two halves. (Care must be taken to prevent loss of contents when the sphere cracks open.) The best way to open a plastic cylindrical shell is to cut off the sealed end and remove the component layers until the report charge is removed. The report charge is then screened through a 100-mesh sieve. The screening process is performed by shaking the sieve contents back and forth, and tapping the sieve's side.

No instruments should be used to stir or mix the ingredients. If stars are present in the shell, such actions may fragment the stars.

A "loud report" indicates that the aerial report is overloaded. Ten aerial shells from different devices will be needed to determine the 10 report weights. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet".

## 12. Party Poppers 16 CFR 1507.11

### *NOTE: DO NOT DISSECT PARTY POPPERS IN THE FIREWORKS LAB. DUE TO THE SENSITIVITY OF THE PYROTECHNIC COMPOSITION, FLAME AND/OR AN EXPLOSION CAN OCCUR.*

Party poppers are not allowed more than 0.25 grains (16.2 mg) of powder. Further the cloth or soft paper insert must not ignite during operation. The powder in party poppers is very sensitive to friction, which is the mode of its operation.

Carefully dissect one. The powder may be somewhat loosely bound to the string; remove by gentle scraping with a spatula or a scalpel and weigh. Use at least one party popper per sub-sample. After 5 devices are analyzed, calculate the average weight. If the average weight of 5 devices is 10 mg or less, the analysis is complete, record the weights. If the average weight of 5 devices is more than 10 mg, a total of 10 devices need to be analyzed and the weights recorded. After the powder from 5 party poppers has been weighed, calculate the average weight. If the average weight is 10 mg or less, the analysis is complete. However, if the average powder weight is more than 10 mg, weigh the powder from an additional five party poppers for a total of 10 party poppers. Record the powder weight in milligrams (mg) on the "Fireworks Laboratory Sheet".

**NOTE: EXERCISE GREAT CARE, USE SAFETY GOGGLES OR A FACE SHIELD; IT IS ALMOST CERTAIN THAT SOME PARTY POPPERS WILL IGNITE DURING THE REMOVAL OF THE PYROTECHNIC COMPOSITION. REPORT IF IT IS NOT POSSIBLE TO WEIGH THE COMPOSITION BECAUSE OF ITS SENSITIVITY TO FRICTION OR SHOCK.**

## 13. Large Multiple-Tube Mine and Shell Fireworks Devices

A **"Display Rack"** is officially called a **"Large Multiple-Tube Mine and Shell Fireworks Device"**. This test **ONLY** applies to Large Multiple-Tube Mine and Shell Fireworks Devices with any functioning tube measuring 1.5 inches (3.8 cm) or more in inside diameter. These devices are subject to 16 CFR 1500.17(a) (12) and 16 CFR

1507.12 and shall not tip over when subjected to the 60-Degree Tilt Angle Test as described in this section.

**a.  General Device Measurements and Observations**

When testing "Display Racks" the following tests are performed: 1.) Height Measurement; 2.) Base Measurement; 3.) Inside Tube Diameter Measurement; 4.) Base Detachment; 5.) Number of Tubes per Device; and 6.) Number of Sides to the Base. Numbers 4, 5, and 6 are observations only, but they must be recorded.

To determine the Inside Tube Diameter, place a spring-loaded ID caliper inside of the launch tube, and expand the caliper until the two caliper tips are touching the inside walls of the tube. Remove the caliper and determine the distance between the two caliper tips, and record the results.

**b.  60-Degree Tilt Angle Testing Procedure**

The fireworks device shall be placed on a smooth surface that can be inclined to 60-degrees from the horizontal, as shown in the Figure 5. The height and width of the inclined plane (not including the portion of the plane below the mechanical stop) shall be at least 1 inch (2.54 cm) greater than the largest dimension of the base of the fireworks device to be tested. The test shall be conducted on a smooth, hard surface that is horizontal as measured by a spirit level or equivalent instrument. The mechanical stop on the inclined plane shall be 1/16 inch (1.6 mm) in height and perpendicular to the inclined plane. The stop shall be positioned parallel to the bottom edge of the inclined plane and so that no portion of the device to be tested or its base touches the horizontal surface. The device shall not tip over when the plane is inclined to 60-degrees from the horizontal. The procedure shall be repeated for each edge of the device. If the base of the device is circular, rotate the device in 90-degree increments as if the device were rectangular, to obtain 4 measurements.

**14. <u>Label Exhibits</u>**

Remove the label from one of the sub-samples and prepare a Label Exhibit. Place the label on an 8.5" X 11" piece of lined paper. A second label exhibit (if not done during the split procedure) should be made of the retail package, and/or box (if the product is packaged in multiple units). When the exhibits have been mounted, the analyst must identify the labels and mounting papers, by recording the Sample Number, Date, and analyst's initials on them in the top right corner. These are attached to the laboratory report.

# Figure 5.  60-Degree Tilt Angle Tester



After the completion of field analysis and laboratory analysis, the analyst should access the LSC Fireworks Database and confirm that all of the data are entered in correctly from the three forms (Split Sheet, Field Sheet, and corresponding Laboratory Sheet depending upon the fireworks sample type). When the data are confirmed correct, the analyst reviewing the reports gives the first approval in the database by entering their initials into the database, which signifies the analyst has "Signed Off" on the analysis.

Forward the sample folder to the Laboratory Division Director (DD) who will review the data again and make corrections if necessary. The DD will then give their second approval and enter their initials into the database, which signifies that the DD has "Signed Off" on the report; and the report is saved in the database, preventing additional changes from being made to the approved version of the report.

# APPENDICES INDEX

Appendix 1 – General Fireworks Testing Data Forms

Appendix 2 – General Split Information

Appendix 3 – Fireworks Field Tests

Appendix 4 – Generic Fireworks Function Statements

Appendix 5 – Fireworks Laboratory Tests

Appendix 6 – Fireworks Base Measurement Pictorial
        Directions

Exhibit A

# <u>Appendix 1</u>

## General Fireworks Testing Data Forms

1.) Fireworks Split Sheet

2.) Fireworks Tracking Sheet

3.) Fireworks Field Sheet

4.) Fireworks Laboratory Sheet

5.) Fireworks Smoke Device Sheet

6.) Fireworks Handles/Spikes Lab Sheet

7.) Fireworks Wheels/Axles Lab Sheet

8.) Fireworks Display Rack Lab Sheet

9.) Fireworks Pyro-Comp Lab Sheet

Exhibit A

# FIREWORKS SPLIT SHEET

Sample Number: _____.

Product Name: _____.

Date Sample Received: _____.

Date Sample Split: _____.

Received By: _____.

Sample Condition: ☐Good ☐Torn ☐Leaking ☐Protruding ☐Crushed

Class: ☐Not Classified ☐Fireworks Import ☐Domestic Fireworks
        ☐Routine Compliance

Number of Containers: _____.

Container Type: ☐Cardboard Box ☐Plastic Bag ☐Paper Bag ☐Other:

Seal Break Date: _____.

Seal Broken By (Analyst's Initials): _____.

Seal Condition:  ☐Intact  ☐Broken  ☐None

Number of Subs: _____  Units/Sub: _____.

Sub IDs: _____.

# of Devices Analyzed: _____ # of Devices Reserved: _____.

Seal Date: _____.

Location of reserve: ☐LS Seatainer ☐Bldg. F ☐Other

Sample Sealed By (Full Name): _____.

| | | | |
|---|---|---|---|
| ☐FIRECRACKER | ☐ROMAN CANDLE | ☐WHEELS & AXLES | ☐SPARKLERS |
| ☐STICK ROCKET | ☐HANDLES & SPIKES | ☐MISSILES | ☐KIT CHEMICALS |
| ☐MINES/SHELL | ☐SMOKE DEVICES | ☐FOUNTAINS | ☐OTHER PYROTECHNICS |
| ☐TUBE MORTAR | ☐NOVELTY DEVICES | ☐DISPLAY RACK | ☐NONE OF THE ABOVE |

Sample Comment: _____.

_____.

_____.

PYROTECHNIC LEAKAGE:  ☐Yes ☐No ☐Light dusting

If yes: _____ mg leaked from ____ of ____ devices.

Leakage Ignites: ☐Yes ☐No

Type of Leakage: ☐Pyro ☐Clay ☐Mix of Pyro/Clay

BASE ATTACHMENT: N/A ☐  (*Enter information into Sample Comment*.)

_____ of _____ device bases were detached from the device.

_____ of _____ device bases were cracked.

_____ of _____ device bases were broken into pieces.

Base Assembly Required:  ☐Yes ☐No

Analyst: _____  Date: _____.

36

Exhibit A

| SAMPLE NUMBER FY-_____. | PRODUCT NAME | TYPE | QUAN | RECD BY | SPLIT DATE | L/T DATE | F/T DATE | REV1 DATE | REV2 DATE |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

Exhibit A

# FIREWORKS FIELD SHEET

Sample Number: _____ .

Product Name: _____ .

| | | | |
|---|---|---|---|
| ❑FIRECRACKER | ❑ROMAN CANDLE | ❑WHEELS & AXLES | ❑SPARKLERS |
| ❑ROCKET | ❑HANDLES & SPIKES | ❑MISSILES | ❑KIT CHEMICALS |
| ❑MINES/SHELL | ❑SMOKE DEVICES | ❑FOUNTAINS | ❑OTHER PYROTECHNICS |
| ❑TUBE MORTAR | ❑NOVELTY DEVICES | ❑DISPLAY RACK | ❑NONE OF THE ABOVE |

## FUSE BURN TIME (to nearest 0.1 sec)

_____  _____  _____  _____  _____  _____  _____  _____.

Number of Devices Tested: _____ .

Number of Devices that Functioned: _____ .

_____ of _____ fuses burned but device failed to function.

Fuse Burn Comment:

## BURNOUT AND BLOWOUT

_____ of _____ devices exhibited ❑ burnout   ❑ blowout

*Comment:* ❑ Burnout/Blowout Not Applicable, or

_____ of _____ tubes,  _____ of _____ tubes,  _____ of _____ tubes,

_____ of _____ tubes,  _____ of _____ tubes,  _____ of _____ tubes,

_____ of _____ tubes,  _____ of _____ tubes, exhibited burnout or blowout.

## FUNCTION:




_____ of _____ ground spinners had air travel

_____ of _____ devices had reports discharge on the ground

_____ of _____ devices tipped over while functioning

_____ of _____ devices had burning debris fall to the ground

_____ of _____ devices ignited grass fires

_____ of _____ devices continued to burn after functioning

_____ of _____ devices did not fully function

Analyst: _____   Date: _____ .

38

Exhibit A

# FIREWORKS LABORATORY SHEET

Sample Number: _____.

Product Name: _____.

| | | | |
|---|---|---|---|
| ☐FIRECRACKER | ☐ROMAN CANDLE | ☐WHEELS & AXLES | ☐SPARKLERS |
| ☐ROCKET | ☐HANDLES & SPIKES | ☐MISSILES | ☐KIT CHEMICALS |
| ☐MINES/SHELL | ☐SMOKE DEVICES | ☐FOUNTAINS | ☐OTHER PYROTECHNICS |
| ☐TUBE MORTAR | ☐NOVELTY DEVICES | ☐DISPLAY RACK | ☐NONE OF THE ABOVE |

## PYROTECHNIC LEAKAGE    Amount: _____ mg.

Comment:  ☐Light dusting

☐ _____ of _____ devices leaked.  ☐Leakage ignites.

Analyst: _____    Date: _____.

## FUSE SUPPORT

_____ of _____ supported ☐2 devices ☐device+8oz.

Analyst: _____    Date: _____.

## SIDE IGNITION(seconds)  ☐*EXEMPT*

_____ _____ _____ _____ _____ _____ _____ _____.

Side Ignition Comment: _____.

Fuse Comment: _____.

Analyst: _____    Date: _____.

## HEIGHT/BASE (inches)

Tube Diameter: _____    Shell Diameter: _____.

Height: _____ Base: _____.

_____ of _____ tipped over on a 12 degree block.

Comment: _____.

Analyst: _____    Date: _____.

## ROCKETS

Stick Straightness in Millimeters:

_____ _____ _____ _____ _____ _____ _____ _____ _____.

Stick Rigidity in Centimeters:    Rocket length: _____ cm

_____ _____ _____ _____ _____ _____ _____ _____ _____.

Stick attachment: _____ of _____ devices support 8 oz.

Analyst: _____    Date: _____.

## REPORT WEIGHTS (mg)

1.) ____ ____ ____ ____ ____ ____ ____ ____ ____ ____.

Report Comment: _____.

2.) ____ ____ ____ ____ ____ ____ ____ ____ ____ ____.

Report Comment: _____.

3.) ____ ____ ____ ____ ____ ____ ____ ____ ____ ____.

Report Comment: _____.

Analyst: _____    Date: _____.

# FIREWORKS SMOKE DEVICE SHEET

Sample Number: _____ .

Product Name: _____ .

## FUSE BURN TIME (to nearest 0.1 sec)

_____  _____  _____  _____  _____  _____  _____  _____ .

Number of Devices Tested: _____ .

Number of Devices that Functioned: _____ .

_____ of _____ fuses burned but device failed to function.

Fuse Burn Comment:

---

First Fire Flame Times:

_____  _____  _____  _____  _____  _____  _____  _____ .

Smoke Times:

_____  _____  _____  _____  _____  _____  _____  _____ .

External Fire Flame Times:

_____  _____  _____  _____  _____  _____  _____  _____ .

Analyst: _____  Date: _____ .

---

## BURNOUT AND BLOWOUT

_____ of _____ devices exhibited ❑ burnout   ❑ blowout

***Comment:***

Analyst: _____  Date: _____ .

---

## FUNCTION:

Emits first fire flame _____ inches long, produces smoke.

Analyst: _____  Date: _____ .

---

## PYROTECHNIC LEAKAGE   Amount: _____ mg.

Comment: ❑Light dusting

❑ _____ of _____ devices leaked.  ❑Leakage ignites.

Analyst: _____  Date: _____ .

---

## FUSE SUPPORT

_____ of _____ supported  ❑2 devices  ❑device+8oz.

Analyst: _____  Date: _____ .

---

## SIDE IGNITION(seconds) ❑*EXEMPT*

_____  _____  _____  _____  _____  _____  _____  _____ .

Side Ignition Comment: _____ .

Fuse Comment: _____ .

Plastic-Pyro Contact: ____ of _____ had plastic in contact with pyrotechnic.

May be confused with a banned item.    ❑Yes   ❑No

Analyst: _____  Date: _____ .

Exhibit A

# FIREWORKS HANDLES/SPIKES LAB SHEET

Sample Number: _____.
Product Name: _____.

---

### PYROTECHNIC LEAKAGE    Amount: _____ mg.

Comment:  ☐Light dusting
          ☐ _____ of _____ devices leaked.  ☐Leakage ignites.
      Analyst: _____ Date: _____.

---

## FUSE SUPPORT

_____ of _____ supported  ☐2 devices  ☐device+8oz.
      Analyst: _____ Date: _____.

---

## SIDE IGNITION(seconds)

_____ _____ _____ _____ _____ _____ _____ _____.
Side Ignition Comment: _____.
Fuse Comment: _____.
      Analyst: _____ Date: _____.

---

### HANDLES

___ of ___ Handles detached when twisted.
 Handle Length:
     1.)  Total device length = _____ inch
     2.)  Empty pyrotechnic chamber length = _____ inch
     3.)  Handle length = Total length - Chamber Length = _____ inch
 Handle tip diameter or side measurement:  _____ inch
      Analyst: _____ Date: _____.

---

### GROUND SPIKES

___ of ___ Ground Spikes detached when twisted.
 Exposed Ground Spike Length:  _____ inch
 Ground Spike tip diameter or side measurement:  _____ inch
      Analyst: _____ Date: _____.

---

## REPORT WEIGHTS (mg)

1.) ____  ____  ____  ____  ____  ____  ____  ____  ____  ____.
Report Comment: _____.
2.) ____  ____  ____  ____  ____  ____  ____  ____  ____  ____.
Report Comment: _____.
      Analyst: _____ Date: _____.

41

Exhibit A

# FIREWORKS WHEELS/AXLES LAB SHEET

Sample Number: _____ .

Product Name: _____ .

---

**PYROTECHNIC LEAKAGE**    Amount: _____ mg.

Comment: ❏ Light dusting

          ❏ _____ of _____ devices leaked.  ❏ Leakage ignites.

     Analyst: _____ Date: _____ .

---

## FUSE SUPPORT:
_____ of _____ supported ❏ 2 devices ❏ device+8oz.

## DRIVER SUPPORT:
_____ drivers of _____ supported 8 ounces without separation.

## AXLE INTEGRITY:
_____ axles of _____ supported 8 ounces without separation.

## DRIVER PER DEVICE:  _____ devices

Nail or spike provided with retail sample? ❏ Yes    ❏ No

    Analyst: _____ Date: _____ .

---

### SIDE IGNITION(seconds)

_____ _____ _____ _____ _____ _____ _____ _____ .

Side Ignition Comment:

Fuse Comment:

    Analyst: _____ Date: _____ .

---

Exhibit A

# FIREWORKS DISPLAY RACK LAB SHEET

Sample Number: _____.

Product Name: _____.

## PYROTECHNIC LEAKAGE    Amount: _____ mg.

Comment:  ☐Light dusting

☐ _____ of _____ devices leaked.  ☐Leakage ignites.

Analyst: _____    Date: _____.

## FUSE SUPPORT

_____ of _____ supported  ☐2 devices  ☐device+8oz.

Analyst: _____    Date: _____.

## SIDE IGNITION(seconds)  ☐*EXEMPT*

_____  _____  _____  _____  _____  _____  _____  _____.

Side Ignition Comment: _____.

Fuse Comment: _____.

Analyst: _____    Date: _____.

## STABILITY

Height: _____    Base: _____    Inside Tube Dia.: _____.

# of Tubes per Device: _____    # of Sides to the Base: _____.

_____ of _____ bases were detached.

Base comment: _____.

60-degree Tilt Test:

Device #                 Side Tip Angles (Degrees)

_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.
_____    _____    _____    _____    _____    _____    _____.

Analyst: _____    Date: _____.

## REPORT WEIGHTS (mg)

1.) ____  ____  ____  ____  ____  ____  ____  ____  ____  ____.

2.) ____  ____  ____  ____  ____  ____  ____  ____  ____  ____.

Report Comment: _____.

Analyst: _____    Date: _____.

43

Exhibit A

# **FIREWORKS PYRO-COMP LAB SHEET**

Sample Number: _____ .

Product Name: _____ .

☐ **FIRECRACKER**      ☐ **ROMAN CANDLE**     ☐ **WHEELS & AXLES**    ☐ **NONE OF THE ABOVE**
☐ **ROCKET**           ☐ **HANDLES & SPIKES** ☐ **MISSILES**
☐ **MINES/SHELL**      ☐ **SMOKE DEVICES**    ☐ **FOUNTAINS**
☐ **TUBE MORTAR**      ☐ **NOVELTY DEVICES**  ☐ **DISPLAY RACK**

1.) Total Device Weight:  _____  (grams)

2.) Weight of Non-report effects from 5 tubes or aerial shells

  Type  -  (Flaming balls, stars, whistle, comets, crackle, seed hulls with pyro. comp., etc.)

_____ a.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ b.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ c.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ d.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ e.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ f.) _____   _____   _____   _____   _____   (mg.) Average = _____ .
_____ g.) _____   _____   _____   _____   _____   (mg.) Average = _____ .

3.) (Circle One)Weight of Burst or Report (excluding paper reports) from aerial shells
_____   _____   _____   _____   _____   (mg.)
_____   _____   _____   _____   _____   (mg.)      Average = _____ .
Report Comment:

4.) Weight of Lift Charge from 5 tubes
_____   _____   _____   _____   _____   (mg.)      Average = _____ .

5.) Paper Reports Weights Only
_____   _____   _____   _____   _____   (mg.)
_____   _____   _____   _____   _____   (mg.)      Average = _____ .
Report Comment:

6.) Number of reports per tube or aerial shell = _____ .

7.) Number of tubes per Sub (device) = _____ .

8.) Number of aerial shells per Sub (retail package) = _____ .

9.) Total pyrotechnic weight per tube or aerial shell = _____ .

10.) Total pyrotechnic weight per Sub (device/retail pkg.) = _____ .

Analyst: _____  Date: _____ .

44

Exhibit A

# <u>Appendix 2</u>
## General Split Information

| Fireworks Type | NUMBER OF DEVICES NEEDED FOR FIELD TESTING | NUMBER OF DEVICES NEEDED FOR LAB TESTING [1] |
|---|---|---|
| Firecrackers (**A**) | N/A | 10 |
| Rockets (**B**) | 10 | 30 |
| Mines & Shells (**C**) | 8 | 8 – 10 |
| Reloadable Tube Aerial Shells (**C**) | 8 | 8 – 10 |
| Roman Candles (**C**) | 8 | 8 – 10 |
| Handles & Spikes (**C**) | 8 | 8 – 10 |
| Toy Smokes (**C**) | 8 | 8 |
| Novelties (**C**) | 8 | 8 – 10 |
| Wheel & Axles (**C**) | 8 | 8 |
| Missiles (**C**) | 8 | 8 – 10 |
| Fountains (**C**) | 8 | 8 |
| Party Poppers (**D**) | N/A | 10 |
| *Large Multiple Tube (≥ 1.5") Mine & Shells (**C**) | 8 | 8 – 10 |
| Sparklers (**E**) | N/A | 10 |
| Snakes (**F**) | N/A | 10 |

**1** – Eight (8) devices are normally used for Lab Analysis, however, when the device contains Aerial Reports, ten (10) devices are used for analysis. One report is removed from each device.

**\*** – "Large Multiple Tube (≥ 1.5") Mine & Shells" are the same as "Display Racks"

**(A.) <u>Firecrackers:</u>**

1.) Eleven (11) sub-samples are required for Firecrackers with two exceptions: a.) large or small rolls of firecrackers, or b.) bricks of firecrackers. A sub-sample may consist of one firecracker per retail package, loose multiple firecrackers in a box, or multiple firecrackers braided together to form a short or long string, which is sold as a retail package. One firecracker is removed from each sub-sample for a total of 10 firecrackers for analysis. If there are less than 11 sub-samples, divide the 10 count equally between the sub-samples.  A minimum of one intact sub-sample is set-aside as the reserve. Any remaining firecrackers are placed in reserve.

2.) **Exception:** If only one or two sub-samples were sent and they are "large rolls" or "Bricks", remove 10 firecrackers from one of the sub-samples for analysis. When "large rolls" of firecrackers have different size firecrackers, remove 10 firecrackers of each size for analysis. A "Brick" of firecrackers is a large retail package consisting of multiple smaller retail packages of short or long strings of braided firecrackers. When collecting firecrackers for analysis from a "Brick", remove one (1) firecracker from ten of the smaller internal retail packages, or if there are less than 10 internal retail packages, divide the 10 count

Exhibit A

# **Appendix 2 cont.**

equally between the number of smaller internal retail packages. Any remaining firecrackers are placed reserve.

**(B.) Rockets:**

**Forty (40) rockets** are required for analysis. Ten (10) rockets for **Stick Rigidity**; ten (10) rockets for **Stick Straightness**; ten (10) rockets for **Stick Attachment to rocket motor/driver, fuse attachment, rocket length, side ignition, and aerial report weights**; and ten (10) rockets for **Field Testing**. The following criteria **MUST** be used in selecting rockets for the various tests.

**NOTE:**
1. **STICK RIGIDITY - When selecting rockets for the stick rigidity test, only select the thinnest, and most flimsy rocket sticks. Select one rocket from each of the ten sub-samples for a total of ten rockets (10).**
2. **STICK STRAIGHTNESS - When selecting rockets for the stick straightness test, only select rocket sticks that are the most crooked, or have the greatest bow. Select one rocket from each of the ten sub-samples for a total of ten rockets (10).**
3. **STICK ATTACHMENT, ETC. - When selecting the ten (10) rockets that will be used for stick attachment to rocket motor/driver, fuse attachment, rocket length, side ignition, and aerial report weights, randomly select the rocket. Select one rocket from each of the ten sub-samples for a total of ten rockets (10).**
4. **FIELD TESTING - When selecting rockets for Field Testing, randomly select the rocket. Select one rocket from each of the ten sub-samples for a total of ten rockets (10).**

Typically, rockets come in retail packages that contain 1, 2, 4, 6, 8, 10, 12, 16, 24, 36, or 144 (a Gross) rockets.  Generally, a "Gross" consists of 12 small retail packages with 12 rockets per package.

**EXAMPLE:**  Eleven sub-samples will normally be sent to the lab when a retail package contains 4 rockets or more. Four rockets from each sub-sample (a retail package) must be removed (three for laboratory analysis, and the fourth for field analysis).  Thus, a total of ten rockets are selected for field analysis, and thirty rockets are selected for laboratory analysis. The eleventh sub-sample is for reserve.

**Exception for Rockets:**  When there are two (2) or more rockets in a retail package, and the labels indicate that some or all of the rockets have **"different and distinct functions"**; the total number of sub-samples should be such that each **"different and distinct function"** in the retail package has 40 rockets for analysis.

**NOTE:**  If the labels are identical except for color, this exception **DOES NOT APPLY.**

**EXAMPLE:**  The retail package has 6 rockets. The labels indicate there are 4 **"different and distinct functions"** (three of the six rockets have the same function). A total of 41 retail packages should have been collected.

Exhibit A

# Appendix 2 cont.

**(C.) Mines/Shells, Reloadable Tube Aerial Shells, Roman Candles, Handles & Spikes, Toy Smokes, Novelty Items, Wheels & Axles, Missiles, Fountains, and Display Racks:**

1.) Eight sub-samples are required for field analysis, and eight sub-samples are required for laboratory analysis. If the sample indicates that explosive reports are present, ten sub-samples are then required for laboratory analysis. Therefore, 17 - 19 sub-samples should have been collected for items packed as single or individual units for retail sales.  Any extra sub-sample(s) are resealed and placed in reserve.

2.) When retail packages are collected containing two (2) or more devices, each retail package is generally considered a sub-sample. In this situation, only 11 sub-samples should have been collected. Two devices from each sub-sample (a retail package) shall be removed for analysis. The first device is for laboratory analysis and the second device is for field analysis.  Thus a total of eight devices are for field analysis, and eight devices are for laboratory analysis. If the sample indicates that explosive reports are present, ten devices are then required for laboratory analysis. These two additional devices that will be used for report analysis are collected from different sub-samples if possible. The intact eleventh sub-sample and any remaining individual devices are sealed and placed in reserve.

3.) **Exception for Roman Candles, Handles or Spikes:**  When there are two (2) or more devices in a retail package, and the labels indicate that some or all of the devices have **"different and distinct functions"**; the total number of sub-samples that should have been collected would be such that each **"different and distinct function"** in the retail package would have either 17 devices for functions that do not have aerial reports, and 19 devices for functions that have aerial reports. Any extra sub-sample(s) or remaining individual devices are resealed and placed in reserve.

**EXAMPLE-1:**  1 retail package has 6 devices. Labels indicate there are four (4) **"different and distinct functions"** with one of the four functions indicating that aerial  reports are present (three of the six devices have the same function, but no aerial reports). A total of 19 retail packages would need to be collected (17 retail packages if aerial reports are not present). The sample would be split into four parts (A, B, C, and D). Any extra sub-sample(s) or remaining individual devices are resealed and placed in reserve.

**EXAMPLE-2:**  1 retail package has 6 devices. Labels indicate there are three (3) **"different and distinct functions"** with one of the three functions indicating that aerial reports are present (three sets of  two devices that have the same function). A total of 11 retail packages would need to be collected (9 retail packages if aerial reports are not present). The sample would be split into three parts (A, B, and C). Any extra sub-sample(s) or remaining individual devices are resealed and placed in reserve.

**(D.) Party Poppers:**

One Party Popper will be removed from each of 10 sub-samples for analysis. The intact eleventh sub-sample and any remaining individual devices are repackaged, sealed and placed in reserve.

**(E.) Sparklers (Dipped Wire & Wooden Handles, Morning Glories) :**

Two sparklers are removed from each of the 10 sub-samples for field and chemical laboratory analysis. The intact eleventh sub-sample and any remaining individual devices are repackaged, sealed and placed in reserve.

Exhibit A

# **Appendix 2 cont.**

**(F.) Snakes:**

One snake pellet is removed from each of the 10 sub-samples for chemical laboratory analysis.  The intact eleventh sub-sample and any remaining individual devices are repackaged, sealed and placed in reserve.

Exhibit A

# Appendix 3
## Fireworks Field Tests

| Fireworks Field Test / Fireworks Type | Fuse Burn Time | Functionality of the Fuse | Device Function | Burnout Blowout | Device Malfunctions |
|---|---|---|---|---|---|
| Firecrackers | N/A | N/A | N/A | N/A | N/A |
| Rockets (**1**) | X | X | X (**2**) | N/A (**4**) | N/A (**5**) |
| Mines & Shells | X | X | X | X | X |
| Reloadable Tube Aerial Shells | X | X | X | X | X |
| Roman Candles | X | X | X | X | X |
| Handles & Spikes | X | X | X | X | X |
| Smoke Devices (**7**) | X | X | X | X | X |
| Novelties | X | X | X | X | X |
| Wheels & Axles | X | X | X | X | X |
| Missiles (**1**) | X | X | X (**3**) | N/A (**4**) | N/A (**5**) |
| Fountains | X | X | X | X | X |
| Party Poppers | N/A | N/A | X | X | X |
| Display Racks (**6**) | X | X | X | X | X |
| Sparklers | N/A | N/A | N/A | N/A | N/A |
| Snakes | N/A | N/A | N/A | N/A | N/A |

**X – Required Test**
**N/A – Not Applicable**


**NOTE:  Numbers 1 –6 represent additional tests, exceptions, or exclusions to that particular test.**
(**1**) – Rockets are always tested inverted in a drum, while Missiles are always tested in the Fireworks Testing Cage. Rockets and Missiles are _**ONLY**_ fired upward into the open air when a special request has been made by the Office of Compliance.
(**2**) – Reference to the device shooting into the air and the height description are excluded from the function statement when the device is tested inverted in a drum.
(**3**) – When testing Missiles, the height description is excluded from the function statement.
(**4**) – The _**ONLY**_ time that blowout is applicable to an _**INVERTED ROCKET OR MISSILE**_; is when the pyrotechnic driver causes an unintended rupture of the casing through the bottom or side of the item (i.e. - the driver blows up or blows the nozzle out). The rule is "The entire pyrotechnic effect (in this cause the "effect" is the propellant burning to create propulsion) must occur from the intended orifice(s)."
(**5**) – Additional "Device Malfunctions" are not applicable (outside of Burnout/Blowout) since these devices are tested inverted in a steel drum or in the Fireworks Testing Cage.
(**6**) – Large Multiple Tube Mines & Shells (One or more functioning tubes are ≥ 1.5-inches in diameter).
   _NOTE: This excludes **Large Tube Single Shot Mines & Shells (Tube size does not matter).**_
(**7**) – Additional time measurements with regards to the functioning of the device are required:
   a.) First Fire Flame Time (**FFFT**), b.) Smoke Production Time (**SPT**), c.) External Fire Flame Time (**XFFT**).

# APPENDIX 4

## GENERIC FIREWORKS FUNCTION STATEMENTS

**Rocket**:        1.) Tested inverted in a drum. Bursts releasing stars.
           **(or)**
           2.) Shoots upward ___ feet into the air, which bursts releasing stars.

**Mine Shells and Display Racks:**
           Shoots flaming balls ___ feet into the air, which burst releasing stars.

**Saturn Missile Battery**: **(Specific Function Statement)**
           Shoots plastic projectiles ___ feet into the air, which emit a whistle, and gives report.

**Victory Celebration: (Specific Function Statement)**
           Shoots flaming balls ___ feet into the air, which burst releasing stars and a parachute with a flaming ball attached, and gives multiple reports.

**Combination Mine Shells:**
           Emits a shower of sparks ___ feet into the air. Shoots flaming balls ___ feet into the air, which burst releasing stars.

**Reloadable Tube Aerial Shells**: **[Specific Function Statement (Effects will vary)]**
           Shoots shell ___ feet into the air, which bursts releasing stars.

**Roman Candles**:    Shoots flaming balls ___ feet into the air.

**Handle/Spike**:    Emits a shower of sparks.

**Smoke Device**:    Emits first fire flame ___ inches long, produces smoke.

           **NOTE:** *Only small smoke ball devices are tested in the lab hood.  Large smoke devices are tested in the field.*

**Novelty Item**: The function description varies depending upon the device.  However, the description will be similar to one of the various types of fireworks devices.

**Strobe Light**:        **(Special Novelty Function Statement)**
           Emits a ___ inch long flame.  Device flashes a brilliant light.

**Helicopters** :  Spins upward ___ feet into the air emitting a shower of sparks.

**Ground Spinners** :    Multiple spinners, spin on the ground, which emit a flame, and a shower of sparks. (Airborne spinners traveled ___ feet upward and ____ feet outward.)

**Wheel/Axle** :  Spins on axle.  Emits a flame ___ inches long, and emits a shower of sparks.

# APPENDIX 4 Cont.

**Missiles**:                **(For Fin and Spin Stabilized Missiles)**

1.   Tested in the fireworks testing cage, or inverted in a drum. Missile spins upward, which bursts releasing stars.
2.   Tested in the fireworks testing cage, or inverted in a drum. Shoots missile upward, which bursts releasing stars.
3.   Missile spins upward __ feet into the air, which bursts releasing stars.
4.   Shoots missile upward __ feet into the air, which bursts releasing stars.

**Fountains**:   Emits a flame __ inches into the air.  Emits a shower of sparks __ feet into the air.

**Sparklers**:   Emits a shower of sparks.

Exhibit A

# Appendix 5
## Fireworks Laboratory Tests

| Device Type / Lab Test | Fire-cracker | Rocket | Mines & Shells | Mortar | Roman Candle | Handle & Spike | Smoke & Flitter | Novelty Devices | Wheels & Axles | Missile | Fountain | Party Popper | Display Racks | Sparkler | Snake |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pyrotechnic Leakage & Ignition | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Fuse Attachment | | X | X | X | X | X | X | X | X | X | X | | X | | |
| Fuse Side Ignition | | X 1 | X | X | X | X | X 1 | X 1 | X 1 | X 1 | X 1 | | X | | |
| Height:Base Measurement | | | X 4 | X 4 | | | 4,8 | X 4 | | X 4 | X 4 | | X 4 | | |
| 12-degree Tilt Test | | | X 5 | X 5 | | | 5 | X 5 | | X 5 | X 5 | | | | |
| Report Powder Weight | X 2 | X 3 | X 3 | X 3 | X 3,6 | X 3,6 | | X 3 | | X 3 | | | X 3 | | |
| Diameter of Reloadable Aerial Shells | | | | X | | | | | | | | | | | |
| Stick Straightness | | X | | | | | | | | | | | | | |
| Stick Rigidity | | X | | | | | | | | | | | | | |
| Stick Attachment | | X | | | | | | | | | | | | | |
| Total Rocket Length | | X | | | | | | | | | | | | | |
| Handle\Spike Attachment | | | | | X | X | | | | | | | | | |
| Handle\Spike Length | | | | | X | X | | | | | | | | | |
| Tip Dia. or Side Length | | | | | X | X | | | | | | | | | |
| Driver Support | | | | | | | | | X | | | | | | |
| Axle Support | | | | | | | | | X | | | | | | |
| Powder Weight | | | | | | | | | | | | X | | | |
| Tube Inside Diameter | | | X 7 | | | | | | | | | | X 7 | | |
| 60-degree Tilt Test | | | | | | | | | | | | | X | | |
| Chemical Analysis on Specified Components | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |

**X – Required Test**

# Appendix 5 Cont.

**NOTE:  Numbers 1 – 9 represent additional tests or exceptions to that particular test.**

1 – If the device requires a restricted orifice for proper thrust and contains less than 6 grams of pyrotechnic composition, the device is <u>EXEMPT</u> from the Side Ignition Test.

2 – If the average powder weight of 5 firecrackers is greater than 30 mg., obtain the powder weights of 5 additional firecrackers for a total of 10 powder weights.

3 – If the average powder weight of 5 aerial reports is greater than 100 mg., obtain the powder weights of 5 additional aerial reports for a total of 10 powder weights.

4 – If any of the eight device bases are detached, determine the height and base measurements of the device with and without the base attached.

5 – If the ratio of the Height:Base is greater than 3, perform the 12-Degree Tilt Test.

6 – If the Field Test indicates that the reports are contained inside of the stars, determine the report weights by dissection of the star.

7 – Mine & Shell devices with "Large" tubes, measure the tube's Inside Diameter (I.D.). If the I.D. is 1.5-inches or greater the device is classified as a Display Rack. Record the tube I.D.

8 – Height/Base measurements are only made if the device can be stood on end.

9 – Chemical Analysis upon Request from CRC

Exhibit A

# **Appendix 6.**
# **Fireworks Base Measurement Pictorial Directions**

**Base Measurement - Equilateral Triangle**



**Base Measurement - Acute Triangle**



**Base Measurement - Obtuse Triangle**



**Base Measurement - Square**



Exhibit A

# **Appendix 6. Cont.**

**Base Measurement - Rectangle**



**Base Measurement - Equilateral Parallelogram**



**Base Measurement - Parallelogram**



**Base Measurement - Trapezoid**



**Base Measurement - Pentagon**



**Base Measurement - Hexagon**



Exhibit A

# **Appendix 6. Cont.**

**Base Measurement - Heptagon**



**Base Measurement - Octagon**



**Base Measurement - Nonagon**



**Base Measurement - Decagon**



**Base Measurement - Circle**



**Base Measurement - Ellipse**



<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

                Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

                Defendants.

Civil Action File No.:  25A01059

## RULE 5.2 CERTIFICATE

COMES NOW, Defendants Phantom Fireworks Eastern Regions, LLC, Phantom Fireworks Showrooms, LLC, and Phantom Importing and Distributing, LLC, and pursuant to Superior/State Court Uniform Rule 5.2, hereby notifies the Court that on the 20th day of June, 2025, Defendants served upon opposing counsel a copy of the following:

1. Defendant Phantom Fireworks Showrooms, LLC's Responses To Plaintiff's First Set Of Combined Requests For Admissions, Interrogatories, And Requests For Production;

2. Defendant Phantom Fireworks Eastern Regions, LLC's Responses To Plaintiff's First Set Of Combined Requests For Admissions, Interrogatories, And Requests For Production; and

3. Defendant Phantom Importing and Distributing, LLC's Responses To Plaintiff's First Set Of Combined Requests For Admissions, Interrogatories, And Requests For Production.

This 20th day of June, 2025.

Exhibit A

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ **R. Scott Connally***
_____

Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

STATE COURT OF
DEKALB COUNTY, GA.
6/20/2025 5:00 PM
E-FILED
BY: Kelly Johnson

2

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

Exhibit A

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

MALACHI CARTER,

              Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC, PHANTOM FIREWORKS
SHOWROOMS, LLC, and PHANTOM
IMPORTING AND DISTRIBUTING, LLC,

              Defendants.

Civil Action File No.:  25A01059

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Rule 5.2 Certificate*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
501 Riverside Drive, Suite 102
Jacksonville, FL 32202
mcompton@forthepeople.com

This 20th day of June, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ **R. Scott Connally***

Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

4

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com
4928-4925-8575, v. 1

<span style="color:red">Exhibit A</span>

TO:            ALL JUDGES, CLERKS OF COURT AND COUNSEL OF RECORD

FROM:      KEVAN G. DORSEY

RE:            NOTICE OF LEAVE OF ABSENCE

DATE:       June 17, 2025

## <u>NOTICE OF LEAVE OF ABSENCE</u>

COMES NOW, Kevan G. Dorsey, and respectfully notifies all Judges before whom he has cases pending, all affected Clerks of Court, and all opposing counsel, that he will be on leave pursuant to Georgia Uniform Court Rule 16.

1.

The time Applicant will be away from the practice of law is:

- Wednesday, June 25, 2025 through and including Friday, June 27, 2025.

- Tuesday, July 1, 2025 through and including Thursday, July 3, 2025.

- Monday, July 28, 2025 through and including Friday, August 1, 2025.

- Wednesday, August 6, 2025 through and including Friday, August 8, 2025.

- Wednesday, October 15, 2025 through and including Friday, October 17, 2025.

- Monday, November 24, 2025 through and including Friday, November 28, 2025.

- Monday, December 8, 2025 through and including Friday, December 12, 2025.

2.

The purpose of the leave is family leave and vacation.

All affected Judges and opposing counsel shall have ten (10) days from the date of this Notice to object.  If no objections are filed, the Leave of Absence shall be granted.

*Signature on following page.*

Exhibit A

This 17th day of June, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ **Kevan G. Dorsey***

_____

Kevan G. Dorsey
Georgia Bar No.: 271402
*Attorney for Defendant(s)*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

STATE COURT OF
DEKALB COUNTY, GA.
6/17/2025 2:01 PM
E-FILED
BY: Kelly Johnson

Exhibit A

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have electronically filed the foregoing ***Notice of Leave of Absence*** with the Clerk of Court using Odyssey/PeachCourt e-file and serve system which will send an email notification of said filing to all counsel of record and the Judge.

This 17th day of June, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ **Kevan G. Dorsey***

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
*Attorney for Defendant(s)*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

### AMENDED NOTICE OF TAKING DEPOSITION OF MALACHI CARTER

TO:    Mr. Malachi Carter
       c/o William Maxwell Compton, Esq.
       MORGAN & MORGAN
       191 Peachtree St Suite 4200,
       Atlanta, GA 30303

YOU ARE HEREBY NOTIFIED, pursuant to O.C.G.A. § 9-11-26, et seq., that on **Monday, August 25, 2025**, commencing at **10:00 a.m.** at MORGAN & MORGAN, 191 Peachtree St Suite 4200, Atlanta, GA 30303, before an officer duly authorized by law to administer oaths, the undersigned will proceed to take the deposition of **Malachi Carter** for discovery and all other purposes allowed by law. The deposition will continue from day-to-day until examination is complete.

This 10th day of July, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402

Exhibit A

R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of *Amended Notice of Taking Deposition of Malachi Carter* via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
191 Peachtree St Suite 4200,
Atlanta, GA 30303
mcompton@forthepeople.com

This 10th day of July, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**MALACHI CARTER,**

      **Plaintiff,**

**v.**

**PHANTOM FIREWORKS
EASTERN REGIONS, LLC;
PHANTOM FIREWORKS
SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,,**

      **Defendants.**

**CIVIL ACTION FILE NO.
25A01059**

**JURY TRIAL DEMAND**

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.2, I hereby certify that on July 28, 2025, I served a true and correct copy of the following on all counsel of record via statutory electronic service:

1. Plaintiff's Second Amended Notice of Deposition to Phantom Importing and Distributing LLC for a Corporate Representative Deposition on Certain Topics.

 

**MORGAN & MORGAN**

*/s/ Max Compton*

_____
William Maxwell Compton
Georgia Bar No. 380092
Attorney for *Plaintiff*

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER,

        Plaintiff,

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC; PHANTOM FIREWORKS
SHOWROOMS, LLC; AND PHANTOM
IMPORTING AND DISTRIBUTING LLC.,

        Defendants.

CIVIL ACTION FILE NO.: 25A01059
_____

JURY TRIAL DEMANDED

_____

## <u>ORDER ON PLAINTIFF'S FIRST MOTION FOR JUDICIAL NOTICE</u>

The above-styled matter is before the Court pursuant to Plaintiff's Motion for

Judicial Notice.  Upon consideration of said motion, the Court **GRANTS** the Motion.

Pursuant to O.C.G.A. § 24-2-220, the Court takes judicial notice of the following federal

statutes and regulations:

1. 15 U.S.C. § 1261
2. 15 U.S.C. § 1262
3. 16 C.F.R. § 1507.1
4. 16 C.F.R. § 1507.6
5. 16 C.F.R. § 1500.17
6. 16 C.F.R. § 1500.14
7. U.S. Consumer Product Safety Commission Fireworks Testing Manual

**IT SO ORDERED**, this 15th day of July, 2025.

_____

Hon. Ana María Martinez
Judge, State Court of DeKalb County

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**MALACHI CARTER,**

        **Plaintiff,**

**v.**

**PHANTOM FIREWORKS
EASTERN REGIONS, LLC;
PHANTOM FIREWORKS
SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,,**

        **Defendants.**

**CIVIL ACTION FILE NO.
25A01059**

**JURY TRIAL DEMAND**

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.2, I hereby certify that on August 5, 2025, I served a true and correct copy of the following on all counsel of record via statutory electronic service:

1. Plaintiff's responses to Defendant Phantom Fireworks Eastern Region, LLC's First Interrogatories.

2. Plaintiff's responses to Defendant Phantom Fireworks Eastern Regions, LLC's First Request for Production of Documents.

        **MORGAN & MORGAN**

        */s/ Max Compton*

        _____
        William Maxwell Compton
        Georgia Bar No. 380092
        Attorney for *Plaintiff*

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **MALACHI CARTER** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION FILE NO.: 25A01059** |
| **PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

### <u>VERIFIED APPLICATION OF KRISTOPHER A. BONHAM TO APPEAR PRO HAC VICE</u>

COMES NOW Attorney Kristopher A. Bonham, who, pursuant to Supreme Court of Georgia Rule 4.4, hereby requests that this Honorable Court grant him admission pro hac vice in the above-captioned matter. In support of this Application, Kristopher A. Bonham ("the Applicant") declares and shows this Court as follows:

1. I. Kristopher A. Bonham, request permission pursuant to Supreme Court of Georgia Rule 4.4, to appear as counsel pro hac vice for Plaintiff, Malachi Carter, in association with William Maxwell Compton, of the law firm of Morgan & Morgan., in the above-styled action now pending before this Court. Malachi Carter's address and phone number is as follows: 3316 Moravia Dr, Stonecrest, GA 30038; (770) 873-7444.

2. This Applicant is with law firm of Morgan & Morgan Mass Tort Litigation Group, PLLC and his business address is 1700 Palm Beach Lakes Blvd, West Palm Beach, FL 33401. His

1

<span style="color:red">Exhibit A</span>

residential address is 307 Pine Circle, Boca Raton, FL 33432. His phone number is (561) 812-1547 and email address is kbonham@forthepeople.com.

3.    The Applicant has been admitted to practice in the below Courts:

    a.  **USDC Southern District of Florida**
       400 N. Miami Avenue
       Miani, FL 33128
       (305) 523-5100
       Admitted: September 7, 2023

    b.  **USDC Middle District of Florida**
       401 W. Central Blvd
       Orlando, Florida 32801
       (407) 835-4200
       Admitted: June 11, 2024

    c.  **USDC Southern District of Texas**
       515 Rusk Ave.
       Houston, Texas 77002
       (713) 250-5500
       Admitted: October 31, 2023

    d.  **Florida Bar** (Bar #1010914)
       500 Duval Street
       Tallahassee, FL 32399
       (850) 488-0125
       Admitted: September 26, 2018

    e.  **State Bar of Texas** (Bar #24118335)
       201 W. 14th Street
       Austin, TX 78711
       (512) 463-1312
       Admitted: April 24, 2020

    f.  **Washington State Bar (**Bar #62520)
       1325 Fourth Ave. Suite 600
       Seattle, WA 98101
       (206) 443-9722
       Admitted: September 13, 2024

STATE COURT OF
DEKALB COUNTY, GA.
8/6/2025 9:14 AM
E-FILED
BY: Kelly Johnson

Exhibit A

4.    This Applicant has previously been admitted *Pro Hac Vice* in Georgia in the matter of *Larry N. Cannon, Jr., v. DePuy Orthopaedics, Inc., et al.* (Northern District of Georgia, Case No.: 1:22-cv-5152-MLB). He was granted admission on October 26, 2023.

5.    This Applicant has also been admitted *Pro Hac Vice* in Georgia in the matter of *Nicole Turner, v. Dollar Tree, Inc.* ( pending in Gwinnett County as Civil Action No.: 24-C-05067-S); He was granted admission on September 25, 2024.

6.    This Applicant was previously admitted *Pro Hac Vice* in Georgia in the matter of *Jerome Polite et al. v. Stellantis N.V.* (previously pending in Doughtry County State Court of Georgia as Case No. 25A01059). He was granted admission on March 12, 2025.

7.    Certificate of Good Standings for the Florida Bar, the State Bar of Texas and the State Bar of Washington are attached as **Exhibit A**, **Exhibit B**, and **Exhibit C**.

8.    The Applicant has not been denied admission pro hac vice in this state or any other state, has not had admission pro hac vice revoked in this state or any other state, and has not otherwise formally been disciplined or sanctioned by any court in this state or any state.

9.    No formal, written disciplinary proceeding or bar complaint has ever been brought against the Applicant by a disciplinary authority in any other jurisdiction.

10.    The Applicant has not been held formally in contempt or otherwise sanctioned by any court in a written order for disobedience to its rules or orders.

11.    The Applicant is familiar with the Georgia Rules of Professional Conduct, as well as the local rules and court procedures.

12.    The Applicant's *pro hac vice* request is sponsored by William Maxwell Compton (Georgia Bar No. 380092) an active member in good standing of this state, whose address and telephone number are as follows: Morgan & Morgan., 501 Riverside Ave., Suite 1200,

Exhibit A

Jacksonville, FL 32202; (912) 443-1017. The Applicant and Mr. Compton shall appear as counsel of record for Plaintiff together in the above captioned matter,

13.    The Applicant has submitted a $275.00 check to the State Bar of Georgia as payment for the application fee and the annual fee, pursuant to the Supreme Court of Georgia Rule 4.4.

WHEREFORE, the Applicant respectfully requests that this Honorable Court admit Kristopher A. Bonham *pro hac vice* in the above captioned matter.

**/s/ Kristopher A. Bonham**
KRISTOPHER A. BONHAM, Esq.
Florida Bar No.: 1010914
MORGAN & MORGAN, P.A.
1700 Palm Beach Blvd, Suite 500
West Palm Beach, FL 33401
Phone: (561) 812-1547
Email: kbonham@forthepeople.com
angelinarodriguez@forthepeople.com

*/s/ William M. Compton*
William Maxwell Compton
Georgia Bar No. 380092
501 Riverside Ave., Suite 1200
Jacksonville, FL 32202
(912) 443-1017 - Direct
(912) 443-1184 – Facsimile
MCompton@forthepeople.com
*Attorney for Plaintiff*

STATE COURT OF
DEKALB COUNTY, GA.
8/6/2025 9:14 AM
E-FILED
BY: Kelly Johnson

4

<span style="color:red">Exhibit A</span>

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| **MALACHI CARTER** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION FILE NO.: 25A01059** |
| **PHANTOM FIREWORKS EASTERN REGIONS, LLC; PHANTOM FIREWORKS SHOWROOMS, LLC; AND PHANTOM IMPORTING AND DISTRIBUTING LLC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## KRISTOPHER A. BONHAM PRO HAC VICE VERIFICATION

COMES NOW, before the undersigned officer duly authorized to administer oaths, Kristopher A. Bonham, who first being fully sworn, on oath deposes and states that the facts alleged in the foregoing *Verified Application to Appear Pro Hac Vice of Attorney Kristopher A. Bonham* are true and correct to the best of his knowledge, information and belief.

SWORN TO AND SUBSCRIBED BEFORE ME, this 30th day of July, 2025.

_____
Kristopher A. Bonham

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: Nov. 17, 2026

DAMIAN SMITH
Notary Public - State of Florida
Commission # HH 333461
My Comm. Expires Nov 17, 2026
Bonded through National Notary Assn.

STATE COURT OF
DEKALB COUNTY, GA.
8/6/2025 9:14 AM
E-FILED
BY: Kelly Johnson

Page **1** of 1

Exhibit A

EXHIBIT A



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida            )

County of Leon            )

In Re:   1010914
Kristopher Allan Bonham
Morgan & Morgan PA
1700 Palm Beach Lakes Blvd Ste 500
West Palm Beach, FL 33401-2013

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **September 26, 2018**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this  22nd  day of **July, 2025**.

*Cynthia B. Jackson*

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar



PG:R10
CTM-358640

STATE COURT OF
DEKALB COUNTY, GA.
8/6/2025 9:14 AM
E-FILED
BY: Kelly Johnson

EXHIBIT B

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

June 03, 2025

Re: Kristopher Allan Bonham, State Bar Number 24118335

To Whom It May Concern:

This is to certify that Kristopher Allan Bonham was licensed to practice law in Texas on April 24, 2020, and is an active member in good standing with the State Bar of Texas. "Good standing" means that the attorney is current on payment of Bar dues; has met Minimum Continuing Legal Education requirements; and is not presently under either administrative or disciplinary suspension from the practice of law.

Our records reflect there are no pending grievances at this time.

No previous disciplinary sanctions have been entered against the attorney's law license.

This certification expires 30 days from the date, unless sooner revoked or rendered invalid by operation of rule or law.

Sincerely,

Seana Willing
Chief Disciplinary Counsel
SW/jw



<span style="color:red">Exhibit A</span>

EXHIBIT C

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE ADMISSION | ) | BAR NO. 62520 |
| OF | ) | **CERTIFICATE** |
| KRISTOPHER ALLAN BONHAM | ) | **OF** |
| TO PRACTICE IN THE COURTS OF THIS STATE | ) | **GOOD STANDING** |

_____

I, Sarah R. Pendleton, Clerk of the Supreme Court of the State of Washington, hereby certify

### KRISTOPHER ALLAN BONHAM

was regularly admitted to practice as an Attorney and Counselor at Law in the Supreme Court and all the

Courts of the State of Washington on September 13, 2024, and is now and has continuously since that

date been an attorney in good standing, and has a current status of active.



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed
the seal of this Court on the 24th day of
June, 2025.

Sarah R. Pendleton
Supreme Court Clerk
Washington State Supreme Court

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

**MALACHI CARTER,**

       **Plaintiff,**

**v.**

**PHANTOM FIREWORKS EASTERN
REGIONS, LLC; PHANTOM
FIREWORKS SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,,**

       **Defendants.**

**CIVIL ACTION FILE NO.
25A01059**

**JURY TRIAL DEMAND**

## CERTIFICATE OF SERVICE

      I hereby certify that on August 6, 2025, I served a true and correct copy of the foregoing

Verfied Application to Appear Pro Hac Vice of Kristopher A. Bonham on all counsel of record

via statutory electronic service.

                        **MORGAN & MORGAN**

                        */s/ Max Compton*

                        _____
                        William Maxwell Compton
                        Georgia Bar No. 380092
                        Attorney for *Plaintiff*

<span style="color:red">Exhibit A</span>

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

## AMENDED NOTICE OF TAKING  VIDEO DEPOSITION OF MALACHI CARTER

TO:    Mr. Malachi Carter
       c/o William Maxwell Compton, Esq.
       MORGAN & MORGAN
       191 Peachtree St Suite 4200,
       Atlanta, GA 30303

YOU ARE HEREBY NOTIFIED, pursuant to O.C.G.A. § 9-11-26, et seq., that on **Monday, August 25, 2025**, commencing at **10:00 a.m.** at MORGAN & MORGAN, 191 Peachtree St Suite 4200, Atlanta, GA 30303, before an officer duly authorized by law to administer oaths, the undersigned will proceed to take the videotaped deposition of **Malachi Carter** for discovery and all other purposes allowed by law. The deposition will continue from day-to-day until examination is complete.

This 15th day of August, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Kevan G. Dorsey*

_____
Kevan G. Dorsey
Georgia Bar No.: 271402

Exhibit A

R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

STATE COURT OF
DEKALB COUNTY, GA.
8/15/2025 4:02 PM
E-FILED
BY: Kelly Johnson

2

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| MALACHI CARTER, | |
| Plaintiff, | |
| v. | Civil Action File No.:  25A01059 |
| PHANTOM FIREWORKS EASTERN REGIONS, LLC, PHANTOM FIREWORKS SHOWROOMS, LLC, and PHANTOM IMPORTING AND DISTRIBUTING, LLC, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served counsel for the opposing party in the foregoing matter with a copy of ***Amended Notice of Taking Video Deposition of Malachi Carter*** via electronic filing, e-mail, and/or by depositing a copy of same in the United States mail with adequate postage affixed thereon, addressed as follows:

William Maxwell Compton, Esq.
MORGAN & MORGAN
191 Peachtree St Suite 4200,
Atlanta, GA 30303
mcompton@forthepeople.com

This 15th day of August, 2025.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

***/s/ Kevan G. Dorsey***

_____
Kevan G. Dorsey
Georgia Bar No.: 271402
R. Scott Connally
Georgia Bar No.: 171421
*Attorneys for Defendants*

3

Exhibit A

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
kevan.dorsey@swiftcurrie.com
scott.connally@swiftcurrie.com
catherine.ferrera@swiftcurrie.com
debbie.hobgood@swiftcurrie.com
callie.connelly@swiftcurrie.com

Exhibit A

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MALACHI CARTER

        **Plaintiff,**

v.

PHANTOM FIREWORKS EASTERN
REGIONS, LLC; PHANTOM
FIREWORKS SHOWROOMS, LLC; AND
PHANTOM IMPORTING AND
DISTRIBUTING LLC.,

        **Defendants.**

**CIVIL ACTION FILE NO.: 25A01059**
_____

**JURY TRIAL DEMANDED**

---

### ORDER GRANTING APPLICATION FOR ADMISSION TO APPEAR
### _PRO HAC VICE_ FOR KRISTOPHER A. BONHAM

The above-styled matter is before this Court pursuant to the Verified Application for

_Pro Hac Vice_ Admission for Kristopher A. Bonham. Having reviewed the pending

Application and having heard no objection, the Application is **GRANTED** and Kristopher A.

Bonham is admitted _Pro Hac Vice_ in this matter.

**SO ORDERED** this 3rd day of September, 2025.

                          _____
                          Hon. Ana M. Martinez
                          State Court of DeKalb County

Prepared by:
_/s/ William Maxwell Compton_
William Maxwell Compton, Esq.
Bar No.: 380092
Morgan & Morgan, P.A.
501 Riverside Ave., 8th Floor
Jacksonville, FL 32202
(912) 443-1017
Email: mcompton@forthepeople.com